IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

HOPE IRVIN, as Personal Representative
of the ESTATE OF VINCENT WOOD, Deceased,

        **Plaintiff**

vs.                                     15cv00550 SCY-KBM

KATHERINE WRIGHT, individually and in her
official capacity as an Albuquerque Police Officer
JEFFREY BLUDWORTH, individually and in his
official capacity as an Albuquerque Police Officer,
and CITY OF ALBUQUERQUE.

        **Defendants.**

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON CLAIM FOR VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

    **COMES NOW,** Plaintiff, by and through her attorney Frances Crockett, hereby states the following for her *Motion for Summary Judgment on Claim for Violation of the Americans With Disabilities Act*.

### I.    INTRODUCTION

    On July 5, 2013, Vincent Wood ("Vincent") was shot and killed in a Circle K parking lot during an investigation and attempted detention by the Albuquerque Police Department ("APD"). In their investigation and attempted detention, APD officers failed to accommodate Vincent's mental illness and failed to recognize Vincent's behavior as demonstrating mental illness.  Instead, APD attempted to get "hands on" with Vincent and detain him before utilizing crisis intervention training, despite the stability of the scene and the fact that Vincent was posing no immediate threat to himself or anyone else before APD arrived. As a result, APD violated the Americans with Disabilities Act ("ADA"). This Court should enter judgment in Plaintiff's favor on the ADA claim.

## II.     UNDISPUTED MATERIAL FACTS

*Vincent Wood and the APD*

1. On July 5, 2013, Vincent was a 66-year-old Vietnam veteran with a history of mental illness.  [Exhibit 1 at 1, 2-3; Exhibit  2.]

2. Prior to July 5, 2013, Vincent had multiple documented and undocumented interactions with the APD, and APD officers frequently observed him in the area of San Mateo and Montgomery, waving his hands, "standing at the bus stop, yelling, and screaming."  [Exhibit 3, 31:21-32:16, 35:6-36:6; Exhibit 4, 26:17-34:7, 60:22-24; Exhibit 5, 23:14-24:9; Exhibit 6, 42:24-44:3; Exhibit 7]

3. Between May 2006 and June 2013, the APD filed 18 reports related to Vincent. [Exhibit 7]

    a. May 21, 2006, APD observed Vincent on the street and noted that he matched the description of an individual who had been brandishing a knife and threatening pedestrians.  "[N]o one was found to have perceived a threat nor witnessed any assault."  Vincent was cooperative and compliant but also verbally aggressive, belligerent, and incoherent.  The officers requested a CIT officer, but none responded, and Vincent was transported to UNM Mental Health for evaluation. [Exhibit 7, at 1-2]

    b. On May 7, 2007, Vincent was the subject of a disorderly conduct call at a 7-11 store. Vincent was loud, disorderly, and angry.  He would not calm down and would not answer questions about his mental health status.  Wood was arrested and referred to psych services at MDC.  [Exhibit 7, at 3-4]

c. On July 25, 2007, APD responded to a call about a verbal dispute between Vincent and another individual.  [Exhibit 7, at 5-6]

d. On August 17, 2007, APD responded to a report that Vincent chased an individual down the street with a knife.  Vincent was cooperative and the officer believed he was under the influence of drugs.  The individual did not press charges, the knife could not be located, and Vincent was taken for a mental health evaluation. [Exhibit 7, at 7-9]

e. On August 23, 2007, a security guard reported that Vincent was on the property arguing with bank tellers about an account he had closed.  APD issued a criminal trespass notice and advised not to return.  [Exhibit 7, at 10-12]

f. On September 3, 2007, APD responded to a report of a black male adult waving a knife at people.  The responding officers noted that they had previously been out with Vincent because he suffers from schizophrenia. Vincent was upset and angry. The officer calmed Vincent and recovered two screwdrivers and a pencil from Vincent. APD transported Vincent to UNM for a mental health evaluation and sent a report to CIT.  [Exhibit 7, at 13-14]

g. On September 7, 2007, APD responded to a disturbance report. Vincent told officers that people were throwing "poo-poo and rocks" onto his RV.  Vincent was angry and spitting.  APD transported him to UNM for a mental health evaluation and caused the RV to be towed because it had no insurance, a non-working engine, broken windows, expired tags, and smelled of sewage.  The report was sent to CIT.  [Exhibit 7, at 15-18]

h. On September 11, 2007, Vincent was reported to be speaking incoherently and taking off his clothes.  APD transported Vincent for a mental health evaluation. [Exhibit 7, at 19-20]

i. On September 19, 2007, a medical facility called APD to pick up Vincent because he was yelling and difficult to understand.  APD transported Vincent to the Veteran's Administration Hospital ("the VA"). [Exhibit 7, at 21-23]

j. On December 28, 2007, APD received a report that Vincent was off his medication and possibly hallucinating.  Vincent was cooperative but loud, belligerent, and profane.  APD transported Vincent for a mental health evaluation and sent the report to CIT. [Exhibit 7 at 24-29]

k. On April 9, 2008, an APD officer observed Vincent having difficulty speaking. The officer learned Vincent was off his medication and he transported Vincent to the VA. [Exhibit 7, at 30-34]

l. On July 28, 2008, APD was dispatched to a mental health call.  Vincent was yelling, acting irrational, and accusing people of calling him names. The officer took Vincent outside and calmed him; medical personnel transported Vincent to the VA.  The officer forwarded the report to CIT.  [Exhibit 7 at 35-36]

m. On August 19, 2010, Vincent's daughter called APD to report a missing person. APD investigated.  The Veteran's Administration Hospital ("the VA") reported that Vincent had walked away from the hospital two-and-a-half months earlier and the VA had not heard from him since.  The VA reported to APD that Vincent was schizophrenic and had been living at the VA.  APD located Vincent, and the matter was resolved.  [Exhibit 7, at 37-44]

n. On January 21, 2011, Vincent took an item from a 7-11 store and did not pay. He showed the clerk a knife and left the store. APD located him three blocks away, and he was charged with robbery. [Exhibit 7, at 45-62] Vincent was determined to be not competent. [Exhibit 1]

o. On January 3, 2012, Vincent called the APD to turn himself in as a homicide suspect. Vincent reported that he was diagnosed with paranoid schizophrenia. He confessed to shooting police officers. APD released him and advised him to return to his residence. [Exhibit 7, at 63-65]

p. On March 11, 2012, APD brought Vincent to the VA for a mental health evaluation after he was reported pacing and talking to himself on the street. The VA informed APD that Vincent was a paranoid schizophrenic who had been recently released after spending two months in the psychiatric ward. Vincent was referred to CIT. [Exhibit 7, at 66-67]

q. On January 16, 2013, APD responded to a report that Vincent banged on and broke a window. APD contacted Vincent, that he was difficult to understand, and that he might have unknown mental health issues. [Exhibit 7, at 68-71]

r. On June 23, 2013, only a few weeks prior to the incident giving rise to this lawsuit, APD was contacted because Vincent was displaying behaviors consistent with mental health issues: pacing in a parking lot, muttering to himself, and waving his hands. APD asked Vincent if he was ok and he "babbled incoherently" in response. A copy of the report was forwarded to CIT. [Exhibit 7, at 72-74]

*The 911 Call*

4. Officer Jeffrey Bludworth graduated from the academy in October 2012 and had only been a field services officer with the North East team, under the command of Sergeant Steve Altman, since April 2013—three months before shooting Vincent. [Exhibit 3, 20:11-14; Exhibit 8, 8:15-9:14, 29:11-13, 70:9-10]

5. On July 5, 2013, Officer Bludworth was a PC2, which meant he could be terminated at any time for any reason.  [Exhibit 8, 11:6-17; Exhibit 3, 21:12-18]  He had been patrolling on his own, without backup or a ride along, for seven months.  [Exhibit 3, 23:8-17]

6. At approximately 7:30 p.m., Officer Bludworth was eating with Sergeant Altman when he received a priority-one dispatch.  [Exhibit 3, 22:13-25, 27:8-17; Exhibit 8, 82:25-83:5]

7. Dispatch reported the following:

   a. An approximately 6'2" thin-build male was at a bus stop at San Mateo wearing a black jacket and black pants and holding a large butcher knife. [Exhibit 9] Vincent was approximately 5'8".  [Exhibit 14, at p.4] Dispatch did not report that the suspect was wearing a hat.  [Exhibit 9]

   b. A security guard said the subject had a violent history and the subject had a 10-40 history "and is known to be—to be violent." [Exhibit 3, 35:13-18; Exhibit 8, 49:11-22; Exhibit 9]

   c. The individual was not suspected of alcohol and/or drug use. [Exhibit 3, 184:23-185:1]

8.  Dispatch did not report whether the subject had an entry in the "Project Guardian" system. [Exhibit 9] Before any officer responded, dispatch reported that the subject was heading northbound on foot.  [Exhibit 9]

9.  Dispatch identified Officer Bludworth ("Ida 434") and Officer Katherine Wright ("Frank 423") as primary officers for the call.  [Exhibit 3, 186:3-8; Exhibit 5, 20:3-7; Exhibit 9]

10. An officer asked dispatch if a CIT officer was en route.  [Exhibit 9 at 10]  Sergeant Altman ordered a CIT officer to respond to the call, and Officer O'Guin ("BK46:") responded.  [Exhibit 8, 12:17-13:17; Exhibit 5, 14:20-15:3, 44:7-12; Exhibit 9]

11. Officer Wright stated over the air that she thought the individual's name might be Vincent and that he was "extremely hard to understand."  [Exhibit 4, 42:15-43:5; Exhibit 9]

12. Weeks prior to this call, Officer Wright responded to a call regarding Vincent, who had reportedly hit someone with a glass bottle. [Exhibit 4,, 26:17-34:7]  Officer Wright engaged Vincent, who was not threatening anybody at the time, checked him for weapons, asked him to sit down, and started a dialogue.  [*Id.*]  Vincent was agitated and angry, but answered questions.  [*Id.*]  The victim elected not to press charges, and Vincent was released.  [*Id.*]

13. Dispatch continued to report the suspect's position, walking northbound on foot.  [Exhibit 9] Dispatch did not report any threatening behavior by the suspect.  [Exhibit 9]

14. Officer Bludworth assumed that Vincent probably had mental health issues and knew that he got "very agitated when other people talk[ed] to him."  [Exhibit 3, 33:14-18, 139:7-24]

15. Officer Bludworth traveled north on San Mateo and turned into a bus-stop alcove on the north side of the street, because he saw some teenagers "joking and having a good time." [Exhibit 3, 41:18-42:17]  Officer Bludworth did not believe these were the juveniles associated with the call because they "appeared not to be in distress." [Exhibit 3, 42:15-23]  Officer Bludworth continued northbound on San Mateo and passed another bus stop on the southbound side of the street, but he did not stop and investigate, because Vincent had left the scene, the juveniles were with the security officer, and Officer Bludworth's "focus was to—to contact Mr. Wood."  [Exhibit 3, 44:8-46:13]

16. Officer Bludworth proceeded to the call without lights and sirens, because he was close to the dispatched address.  [Exhibit 3, 31:3-15]

17. At the intersection of San Mateo and McLeod, Officer Bludworth saw Vincent about fifty feet away, walking through the Circle-K parking lot.  [Exhibit 3, 52:23-54:2; Exhibit 21]   Officer Bludworth initiated lights and sirens to go through the intersection because it was turning red.  [Exhibit 3, 51:14-52:10]  Officer Bludworth set off the "whoop-whoop" and then turned it off, but left the lights flashing for the duration of the investigation and attempted detention.  [Exhibit 3, 51:14-52:10, 201:6-18]

18. Officer Bludworth believed that Vincent was the individual from the dispatch report because he matched the description of an "older" African American male wearing a black jacket and black jeans.  [Exhibit 3, 123:2-21]

19. When Officer Bludworth first saw Vincent he was walking through the Circle K parking lot, "a little bit faster than normal . . . not like he was running . . . just walking" with nothing in his hands.  [Exhibit 3, 105:12-24; Exhibit 21]

20. The scene was calm when Officer Bludworth first arrived, and his gun was not drawn when he exited the police vehicle.  [Exhibit 3,109:20-110:11]

21. Because the call was "priority one" and he was "just going to talk" to Vincent, Officer Bludworth believed he did not need to wait for the CIT officer, Officer O'Guin.  [Exhibit 3, 125:6-126:22]  According to Officer Bludworth, CIT Officers help individuals with "other resources, to help them try to get stable again" and on suicide calls and "straight 10-40 calls" where "you can sit outside and wait for officers to arrive and then go in together."  [Exhibit 3, 125:6-126:14]

22. Officer O'Guin could have taken over the investigation after Bludworth contained Vincent, but Officer Bludworth needed to make contact because he did not know if people were in the store or whether Vincent would hurt somebody.  [Exhibit 3, 127:16-128:4]

23. Vincent was fifty feet away, had no weapons in his hands, was not threatening anyone, including himself, and "was walking into the store."  [Exhibit 3, 153:25-155:3] As shown in the Circle K surveillance video, Vincent did not get near the door of the store and was cutting through the parking lot.  [Exhibit 21, 7:43:05]

24. Vincent is wearing a cap in the Circle K video, which dispatch did not report. [Exhibit 21]

25. Officer Bludworth did not have probable cause to arrest Vincent. [Exhibit 3, 67:21-68:14; Exhibit 15, 112:20-22]

26. Officer Bludworth got out of his police vehicle, with lights still flashing, and called out to Vincent, ordering him in a raised voice to come and talk. [Exhibit 3, 56:17-24, 201:6-15] Officer Bludworth acknowledged that he was "very loud." [Exhibit 17, 49:4-15]

27. Officer Bludworth was in uniform, and his equipment included a camera, badge, nametag, flashlight, can of mace, a nine-millimeter handgun, two sets of handcuffs, a flashlight holder, a baton, a taser, a radio, and two extra magazines. [Exhibit 3, 74:14-75:13]

28. Officer Bludworth testified both that the "whoop whoop" got Vincent's attention and that Vincent did not notice the officer until he called out. [Exhibit 3, 153:25-155:3, 201:19-203:13]

29. Vincent began to walk toward Officer Bludworth and away from the exit of the store and gas station area. [Exhibit 3, 55:1-14; Exhibit 16] Officer Bludworth backed up to use his car door as cover, and Vincent went around the police vehicle toward the passenger side door. [Exhibit 3, 54:18-55:14]

30. Officer Bludworth did not use his taser at this point because he did not believe he had sufficient justification. [Exhibit 3, 81:3-11]

31. Officer Bludworth thought Vincent was going to run away, and as Vincent crossed around the front of the police vehicle, Officer Bludworth shut his vehicle door and

began to mirror Vincent's movements, still ordering Vincent to come talk to him. [Exhibit 3, 55:14-19, 55:20-25] Vincent walked away from the store and towards San Mateo (from position "1" to position "2" on Exhibit 16), and Officer Bludworth had the cover of his police vehicle. [Exhibit 3, 145:16-146:11] Exhibit 16]

32. Officer Bludworth wanted to go "hands-on," detain, and contain Vincent to investigate the alleged assault from the bus stop. [Exhibit 3, 59:11-19, 157:4-18]

33. Vincent was looking at Officer Bludworth, but not responding or making noises. [Exhibit 3, 56:1-10] His physical activity, creating distance between himself and Officer Bludworth and remaining non-responsive to commands, was an indication of mental illness. [Exhibit 12 at 21]

34. When Vincent crossed around the police vehicle (to position "2"), Officer Bludworth could no longer see Vincent's whole body, but at the edge of the car— when Vincent was approximately fifteen feet away—he bent to go through his backpack and retrieved two knives. [Exhibit 3, 58:14-18; 59:11-19, 80:18-81:2, 82:20-83:20; Exhibit 16] Officer Bludworth countered to position "B". [Exhibit 3, 146:8-11; Exhibit 16] Officer Bludworth did not continue to use his car as cover and did not retreat because "it wasn't, to me, a plausible option to keep retreating. I just needed to meet force with force." [Exhibit 3, 146:15-20]

35. Officer Bludworth commanded Vincent to get on the ground and drop his weapons. [Exhibit 3, 65:13-22] Vincent began to make inarticulate grunting noises, "gibberish, almost like baby talk, just un—ununderstandable." [Exhibit 3, 65:18-66:1]

36. Officer Bludworth did not believe he was justified to use force before he saw the knives because Vincent was "just a noncompliant person[.]" [Exhibit 3, 67:1-11] Officer Bludworth drew his service weapon when Vincent pulled out the knives, so he could match "his deadly force with my deadly force." [Exhibit 3, 66:6-12]

37. When Officer Wright arrived, Vincent was digging in his backpack, and as she got out of her vehicle, Vincent was moving forward with the knives, and Officer Bludworth was moving backward, away from Vincent. [Exhibit 4, 104:11-23, 121:6-8] Officer Wright recalled a distance of three or four yards between Officer Bludworth and Vincent. [Exhibit 4, 126:1-10]

### The Shooting

38. At this time, Officer Bludworth turned his camera on—he previously thought it was on but noticed when the knives appeared that it was not operating. [Exhibit 3, 70:15-71:13]

39. Officer Bludworth believed Vincent was an immediate threat before he turned the camera on, but took the time to turn the camera on anyway because:

> [B]ecause I felt that if my lapel camera was not on, that the way everything was going at that time, that I would be—one, I'd be fired; two, I'd lose my—well, lose my job. But by losing my job, I would lose my house that I just bought. I would no longer be able to provide for my family that I have, because I'm the sole and only provider for my family. I thought my name was going to be completely slandered throughout the news, and I thought, again, that the chief was going to essentially either suspend me or give me some type of discipline for not having it on, if I did not, at the end, lose my job.

[Exhibit 3, 90:21-91:16]

40. When he looked up after turning the camera on, Officer Bludworth believed Vincent was five feet away from him. [Exhibit 3, 86:23-87:6]

12

41. The shooting immediately followed the initiation of Officer Bludworth's lapel camera.  [Exhibit 22]

42. Officer Bludworth shot Vincent four times, center mass until Vincent went to the ground.   [Exhibit 3, 113:5-114:13, 115:3-5]   Officer Wright also shot Vincent. [Exhibit 4, 130:8-12]

43. Officer Bludworth estimated that 15 seconds elapsed between Vincent pulling out the knives and the shooting.  [Exhibit 3, 295:22-296:1; *but see* Exhibits 21 & 22]

44. While Officer Bludworth was handcuffing Vincent after shooting him, Vincent said to Officer Bludworth, "You shot me." [Exhibit 3, 238:8-14; Exhibit 17, 37:16-21] Officer Bludworth was surprised that Vincent was able to clearly articulate the words.  [Exhibit 17 67:1-5]  Officer Bludworth explained:  I thought to myself, what the hell, like I—you know, listening to the other officer, he can't talk clearly and he talks through grunting noise, and then all of a sudden, 'You shot me.' Like of all things to be able to say completely clear[.]"  [Exhibit 17, 67:1-5]

45. After the shooting, Officer Bludworth shouted at potential witnesses gathered by the gas pumps to "get out of here."   [Exhibit 3, 171:25-173:7; Exhibit 22]   Officer Bludworth went into the convenience store and instructed the clerks to close the store.  [Exhibit 22]

46. Officer Bludworth did not believe Vincent was a threat until he began to cross toward the police car.  [Exhibit 3, 60:6-11, 12-15]  At that point, it was "just a feeling that [he] was receiving in [his] own personal belief.  [His] heart was telling [him] something bad was going to happen." [Exhibit 3, 60:13-15]

*Policies and Procedures*

47. The United States Department of Justice ("the DOJ") has explained that the ADA applies to "virtually everything that officers and deputies do."  [Exhibit 20, at 1] According to the DOJ, "it is important for officers to be trained to distinguish behaviors that pose a real risk form behaviors that do not." [Exhibit 20, at 3]

48. Effective Jan. 9, 2013, APD implemented Procedural Order 2-13, "Response to the Mentally Ill/Suspected Mentally Ill and People in Crisis."  [Exhibit  10]

49. Standard Operating Procedure 2-13 ("SOP 2-13") defines the following terms:

    a. "Mental Illness" as "[a]ny of various conditions characterized by impairment of an individual's normal cognitive, emotional, or behavioral functioning, and caused by social psychological, biochemical, genetic, or other facts, such as infection or head trauma." [Exhibit 10 at 1]

    b. "Field Crisis Intervention Team" as "[c]omposed of Field Services patrol officers that function within their patrol teams as specialists in handling calls involving the mentally ill, and other calls of crisis not related to mental illness." [Exhibit 10 at 1]

50. SOP 2-13-01 states that officers (1) "should be able to recognize behavior that is indicative of mental illness and that is potentially dangerous to self and/or others"; (2) officers should not "rule out other causes of abnormal behavior"; and (3) "should evaluate the [listed] symptomatic behavior(s) in total context of the situation when determining a subject's mental state and the need for intervention absent of commission of a crime."  [Exhibit 10 at 2]

51. According to SOP 2-13-02, "[n]ot all mentally persons are dangerous",  "some mentally ill persons may be dangerous only under certain circumstances", and indicators may assist the officer to determine if an "apparent mentally ill person

represents an immediate or potential danger to him/herself, officers, or others";

including the following:

a. the availability of weapons;

b. substantiated statements by the apparent mentally ill person;

c. personal history, known or provide, that reflects prior violence under similar circumstances;

d. failure to commit a violent or dangerous act prior to the officer's arrival does not guarantee that such an act will not occur;

e. lack of physical control the apparently mentally ill person demonstrates over his emotions; and

f. the volatility of the environment.

[Exhibit 10 at 3]

52. Officers are directed, if the subject may be mentally ill, to attempt to

a. ensure that backup officers are present before taking any action.

b. try to obtain information on the subject from family or friends.

c. calm the situation by

i. ceasing emergency lights and sirens;

ii. dispersing crowds;

iii. assuming a quiet and non-threatening manner when approaching the subject;

iv. avoiding physical contact while assessing the situation; and

v. moving slowly, being careful not to excite the subject.

d. Communicate with the subject by

i. providing reassurance that the officers are there to help;

ii. attempting to find out what is bothering the subject;

   iii. allowing the subject to ventilate their feelings while relating to his concerns;

   iv. not threatening the subject with arrest or harm;

   v. avoiding topics that may agitate the subject and guiding the conversation toward topics that seem to ease the situation; and

   vi. being truthful.

[Exhibit 10 at 3]

53. Crisis Intervention Team ("CIT") officers "will respond as primary officers," when available, if a call involves an incident such as "when a mental illness or crisis precipitated a response by APD" or an "incident when a subject poses a risk to themselves or others". [Exhibit 10 at 5]

54. According to SOP 2-13-11, risk factors that indicated an immediate or physical danger to himself or others include the availability of weapons, substantiated statements to commit or actual commitment of a violent or dangerous act, personal history reflecting prior violence under similar circumstances, and corroborated information that would lead a CIT detective to believe the person is a danger to himself and should be considered a high threat level. [Exhibit 10 at 10]

55. If a call-for-service indicates a subject in crisis or a High Threat Level subject, "the dispatcher will check the Guardian system to verify if any entry has been made on the individual."  If the subject has an entry, dispatch is to immediately inform the officers who are dispatched and advise the immediate supervisor.  If there is no entry, "the call will be handled per SOP." [Exhibit 10 at 11]

56. All field services officers were responsible to be familiar with SOP 2-13. [Exhibit 11, 46:1-11]

57.   Officer ADA training instructed that APD had to make every effort to accommodate mental disabilities.  [Exhibit 8, 60:16-61:2]

58.   APD accommodates people with mental disabilities by sending a minimum of two officers to a scene, preferably including a trained CIT officer, and by way of SOP 2-13.  [Exhibit 3, 167:9-25; Exhibit 8, 53:17-54:4]

59.   In 2013, if a call involved an individual with a mental illness, generally a CIT officer would be contacted and "you would definitely try to ensure that you had [a] CIT coming," particularly if the call sounded violent in nature. [Exhibit 6, 38:18-39:9; Exhibit 8, 17:4-21] The CIT officer should be the primary officer on a call.  [Exhibit 6, 30:20-25]

60.   Although Officer Bludworth received CIT training at the academy, his responsibility was a call for service, whereas a CIT officer takes "the whole program to another level that an actual patrolman doesn't have time to do."  [Exhibit 8, 33:22-34:4, 47:19-48:4; Exhibit 3, 46:22-47:21]

61.   Patrolmen would not have access to the CIT watch list before going on the call. [Exhibit 8, 45:14-24]

62.   According to the CIT team lieutenant, in order for a patrolman to know if CIT was tracking an individual, he would have to contact the CIT sergeant, and whether CIT followed up on reports as at the discretion of the sergeant who received the report. [Exhibit 11, 7:1-10, 10:17-11:12, 43:19-44:3]

63.   CIT officers are trained to recognize schizophrenia and bipolar disorder.  [Exhibit 6, 40:17-41:13]  Individuals with schizophrenia are generally more afraid of officers

and have a hypersensitivity to lights, sounds, and yelled commands.  [*Id.*; Exhibit 5, 97:13-98:5, 120:6-22]

64. Officer Bludworth would need to know when responding to a call whether the subject had mental health issues so that Officer Bludworth could "best help him." [Exhibit 3, 33:25-34:5] Nevertheless, although Vincent was "mentally unstable," Officer Bludworth's response to the dispatch did not change because he was investigating criminal activity.  [Exhibit 3, 151:11-14]

65. Officer Bludworth did not believe it was necessary to use CIT training to talk to somebody.  [Exhibit 3, 38:2-8]

66. Officer Bludworth believes that a "CIT call" is different, it is a suicide call or a call where someone isn't trying to hurt themselves or others, and the scene is already contained.  [Exhibit 3, 152:5-14]  Officer Bludworth did not believe this call was a CIT call. [Exhibit 3, 151:3-8]

67. Officer Bludworth did not believe that his CIT training was the best option because Officer Bludworth did not want Vincent to go into the store, and he wanted to get "hands on" Vincent to contain him and then talk to him.  [Exhibit 3, 155:4-156:8, 157:4-18, 160:2-161:2, 161:11-21, 163:22-164:9]

68. Officer Bludworth recognized that Vincent's reactions were not those of a normal person, and he knew from previous observations and information from other officers that Vincent was mentally ill.  [Exhibit 3, 31:25-32:24, 264:23-25; Exhibit 9] Officer Bludworth did not believe that Vincent was unable to comply with his commands because "everyone can understand an officer pointing a gun at you and

telling you to stop your actions, whether you're in your own rule or not, can make you stop." [Exhibit 3, 258:17-259:3]

69. Officer Bludworth did not tell Vincent what was happening because he wanted to "get hands on" with Vincent first and explain after he was contained. [Exhibit 3, 150:10-21, 157:4-18]

70. Officer Bludworth believed that he accommodated Vincent by speaking in a "calm, collected manner" and by not rushing at him, grabbing him, throwing him on the ground, or coming at him with a drawn weapon. [Exhibit 3, 166:22-167:8] Officer Bludworth also noted that lights and sirens can "agitate a subject more." [Exhibit 3, 47:22-49:7]

71. Officer Bludworth's supervisor, Sergeant Altman, would have proceeded to the call, ensured that he had backup, and tried to locate the individual. [Exhibit 8, 29:11-13, 36:3-10]

72. Sergeant Altman agreed that Vincent's actions, standing outside the store, with his backpack on, not verbally or physically threatening anyone, were not an immediate threat to the life and safety of others. [Exhibit 8, 55:18-23] Officer Bludworth did not believe Vincent was an immediate threat before he pulled out the knives. [Exhibit 3, 67:1-11] Mr. Joyner, Defendants' expert, testified that Vincent was not an immediate threat to Officer Bludworth or the public when Officer Bludworth first arrived on the scene. [Exhibit 18, 46:17-22]

73. Sergeant Altman agreed that Bludworth could have approached without lights and sirens, could have handled a crowd by telling people to step back, could have waited

for backup and CIT, and could have used a quiet non-threatening manner.  [Exhibit 8, 51:4-52:20]

***Un-rebutted Expert Testimony***

74. Dr. Sharon Kernen is a forensic neuropsychologist who provided an expert report on the nature of Vincent's mental illness and its effect on his behaviors and abilities. [Exhibit 12 at 1]

75. Based on medical records and evaluations from 2006 through 2012, Vincent was hard of hearing, schizophrenic, paranoid, and suffered from major depression with psychotic features.  [Exhibit 12 at 7-10]

76. Vincent received social security disability benefits.  [Exhibit 12 at 7; Exhibit 19, 17:17-24]

77. In 2006, Vincent was severely psychotic, and he was reasonably stable in 2011. [Exhibit 12 at 7-8]  In 2013, he began to self-neglect as a result of his illness, and he was sensitive to provocation.  [Exhibit 13, 141:16-23, 142:24-143:5]  On Feb. 22, 2013, he was found naked and wandering in a park by APD and was admitted to the Veteran's Administration Hospital ("VA"). [Exhibit 14 at 493] He was discharged on March 13, 2013.  [Id.] By April 2013, when he failed to report for scheduled appointments, the VA reviewed his file and evaluated him as being a low risk of harm to himself and others, but still requiring ongoing mental health care.  [Exhibit 13, 147:20-148:9; Exhibit 14 at 567-68]

78. Persons with schizophrenia have a flat affect, speak little, are not able to plan, have a poor working memory, hallucinations, delusions, thought disorders, agitated body movement, and poor judgment.  [Exhibit 12 at 12-14; Exhibit 13, 154:2-15]

79. In dealing with a person with schizophrenia, it is important to observe personal space boundaries because otherwise, the person will feel cornered. [Exhibit 13, 147:3-14]

80. A person with schizophrenia, who is not medicated, will exhibit "weird" behavior that everyone else will recognize as "weird" except the person with schizophrenia. [Exhibit 13, 52:2-12]

81. A person with schizophrenia, even if not generally violent, if provoked, will go into fight-or-flight mode. [Exhibit 13, 150:20-151:3]

82. A person with schizophrenia should be approached in a calm manner, and he should understand that he is not under attack. [Exhibit 13, 35:20-25]

83. Vincent met the criteria for a schizophrenia diagnosis for 34 years. [Exhibit 12 at 15]

84. Anger, hostility, and agitation were not willful acts for Vincent, but a manifestation of his illness. [Exhibit 12 at 16]

85. Officer Bludworth's lights and sirens triggered agitation and escalated the encounter. [Exhibit 13, 156:1-24]

86. Vincent's lack of insight, related to his schizophrenia, caused him to respond to Officer Bludworth's commands with suspicion. [Exhibit 13, 154:16-155:12]

87. Vincent's lack of response to Officer Bludworth's commands resulted from his mental disability; he did not understand the commands and the physical movement involved with the incident would have contributed to memory overload. [Exhibit 13, 75:1-14]

88. Vincent did not understand Officer Bludworth's commands, but he interpreted Officer Bludworth's tone of command, which escalated the agitation.  [Exhibit 12 at 22, Exhibit 13, at 156:25-157:7]

89. Vincent's physicality outside the Circle K indicates that he was possibly neurologically impaired, as well as his heavy clothing in July, and his blank facial expression.  [Exhibit 12 at 22; Exhibit 13, 158:19-159:9; Exhibit 21]

90. During the interaction with Officer Bludworth, Vincent demonstrated the symptoms of his illness:  "his inability to reply, inability to comply with demands, and encompassing cognitive confusion."  [Exhibit 12 at 22]

### III.    ARGUMENT

The undisputed material facts demonstrate that Defendants violated the ADA because they failed to accommodate Vincent's mental health disability during their investigation and attempt at arrest.  As a result, Plaintiff is entitled to judgment as a matter of law under Fed. R. Civ. P. 56 on her claim under the ADA.

### A.    Standard for Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Plaintiff bears the burden to show no evidence supports the Defendants' case, and after this showing, Defendant must designate specific facts to establish there is a genuine issue to be tried.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

**B.      The ADA & Police Conduct**

The ADA states that "[s]ubject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A "qualified individual with a disability" is

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).  The ADA defines "disability" broadly, in favor of coverage under the ADA, and with respect to an individual, as

> (A)      a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B)      a record of such an impairment; or;
>
> (C)      being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1) (A)-(C).  Paragraph (3) excludes transitory impairments and explains that if an individual is regarded as having an impairment and establishes a violation of the ADA, the individual need not establish that their impairment limits a major life activity. 42 U.S.  12102(3)(A), (B).  While the ADA precludes personal capacity suits, the statute contemplates *respondeat superior* liability of the employer for the acts of its agents.  29 U.S.C. § 630 (b) (defining "employer"); *see also Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996); *Butler v. City of Prairie Village*, 172 F.3d 736, 744 (10th Cir. 1999) (citing *Mason*, 82 F.3d at 1009).

A Plaintiff can establish a violation of the ADA by demonstrating

> 1) that he [or she] is a qualified individual with a disability;    (2) that he [or she] was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and    (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999). According to the DOJ, the ADA applies to "virtually everything that officers and deputies do." Exhibit 20.  Two types of ADA claims arise from arrests: when the police wrongfully arrest "someone with a disability because they misperceive the effects of that disability as criminal activity" and when the police fail "to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Id.* at 1220-21.  The public entity must (1) have knowledge of the disability and (2) know that the individual requires accommodation or that the disability limits his "ability to participate in or receive the benefits of its services." *Robertson v. Las Animas County Sheriff's Dep't*, 500 F.3d 1185, 1197 (10th Cir. 2007). "Title II authorizes suits by private citizens for money damages against public entities that violate [Section 12132]." *Guttman v. Khalsa*, 669 F.3d 1101, 1112 (10th Cir. 2012).

### C.   Defendants Violated the ADA in the Investigation and Attempted Arrest of Vincent

Defendants do not dispute that by way of SOP 2-13, APD accommodates individuals with mental disabilities.  Undisputed Material Fact No. 58 ("UMF").  Officer Bludworth does not dispute that he did not follow SOP 2-13 because he believed Vincent should have responded differently to him.  UMF Nos. 66-69.  Defendants further do not dispute that when Officer Bludworth arrived at the Circle K, Vincent presented no

immediate danger to himself or anyone else. UMF No. 23; UMF No. 72. The evidence demonstrates that (1) Vincent had a disability recognized under the ADA that rendered him unable to comply with law enforcement commands, (2) Defendants misperceived Vincent's disability as criminal behavior, and (3) Defendants failed to accommodate Vincent's disability during the investigation and attempted arrest.

### 1. Vincent Had a Disability as Contemplated by the ADA and Was Unable to Comply with Law Enforcement Commands

Vincent had a disability as defined by Section 12102(1) (A), (B), and (C). His 34-year diagnosis of schizophrenia was a "physical or mental impairment that substantially limits one or more major life activities of such individual[.]" Section 12102(1)(A); UMF No. 83. His impairment was documented through numerous medical records (summarized by Dr. Kernon in her report) and by his social security disability benefits. *See* § 12102(B); UMF No. 75, UMF No. 76. Defendants regarded Vincent as having a mental impairment. *See* § 12102(C). Defendants had numerous documented and undocumented interactions with Vincent, and Defendants knew that Vincent suffered from mental illness. UMF No. 2; UMF No. 11-12. Dispatch on July 5, 2013 reported the call as a "10-40"—a call involving a subject with mental illness. UMF No. 7. From the description given over the air, Officer Wright recognized Vincent and described her previous interaction with him. UMF No. 11-12. Officers Bludworth and O'Guin had previously observed Vincent displaying erratic behavior. UMF No. 2.

Although he was released from the VA in April 2013 with an ongoing need for mental health care, Vincent was considered a low risk of harm to himself and others. UMF No. 77. Anger and hostility were manifestations of Vincent's illness. UMF No. 84. He lacked insight as a result of the schizophrenia, and he responded to Officer Bludworth's

commands with suspicion.  UMF No. 86.  Officer Bludworth's lights, sirens tone of command, and physical movements escalated the situation and increased Vincent's agitation. UMF No. 85; UMF No. 87; UMF No. 88.  Vincent could not understand Officer Bludworth's commands. UMF No. 87.  As a result of his mental illness, Vincent was unable to comply with APD commands or respond appropriately. *See* UMF No. 90.  Officer Bludworth's actions not only failed to accommodate Vincent, they escalated the investigation.

Under some circumstances, law enforcement will know of an individual's "need for accommodation because it is 'obvious.'" *Robertson*, 500 F.3d at 1197.  APD policies required officers to be able to recognize behaviors indicative of mental illness, to evaluate the dangerousness of a suspected mentally ill person, and to either await a CIT officer or attempt to implement SOP 2-13.  UMF No. 50-53; UMF No. 63. The officers were aware of Vincent's disability, Officer Bludworth had received CIT training, and he knew that lights, sirens, and loud voices should be avoided when interacting with individuals with mental illness.  UMF No. 2; UMF No. 60; UMF No. 70.  Vincent's appearance and behaviors on the day of the shooting additionally suggested that he suffered from mental impairments.  UMF No. 89. Vincent's need for accommodation in the course of the police encounter and arrest was obvious, and he was not required—or able—to request accommodation.  *See id.*

### 2.  *Defendants Misperceived Vincent's Disability as a Crime*

Officer Bludworth misperceived Vincent's response to his commands to stop and come talk as noncompliance.  UMF No. 28-26, 68.  Officer Bludworth and APD knew or should have known of Vincent's disability—schizophrenia—and the common

manifestations of schizophrenia that occur during encounters with police. UMF No. 84-90.

Vincent did not respond to Officer Bludworth's commands the way that Officer Bludworth

expected, Officer Bludworth perceived Vincent's response as defiant or noncompliant, and

Officer Bludworth continued his attempt to "get hands on" with Vincent, contain him, and

detain him, which escalated the investigation further, despite the fact that he had no

probable cause to arrest. UMF No. 28-36, 85, 86. Officer Bludworth had no probable

cause to arrest Vincent for the alleged assault at the bus stop or anything that he witnessed

at the Circle K prior to Vincent retrieving the knives. UMF No. 25. Officer Bludworth's

attempt to arrest Vincent was based on a misperception of Vincent's behavior as criminal,

rather than probable cause. Accordingly, Officer Bludworth's attempt to arrest violated

the ADA and Vincent's Fourth Amendment (4th) right to be free from unlawful seizures.

### 3. Defendants Failed to Reasonably Accommodate Vincent's Disability During the Investigation and Attempted Arrest

Despite having been trained to handle encounters with mentally ill individuals,

Officer Bludworth offered Vincent no accommodation during the encounter and arrest. The

DOJ has acknowledged that the ADA applies to police work, including arrests and

enforcing duties. Exhibit 20. SOP 2-13 sets forth a reasonable accommodation for

arresting an individual with a mental illness. UMF Nos. 50-55; UMF No. 58. All field

service officers are responsible for being familiar with SOP 2-13. UMF No. 56. Officers

should be able to recognize behavior indicative of mental illness. UMF No. 50. In order

to determine whether the individual presents an immediate threat to himself or others, the

officer should consider the availability of weapons, substantiated statements by the

individual, personal history reflecting prior violence in similar situations, lack of physical

control, and the volatility of the environment. UMF No. 51. If the subject is mentally ill,

the officer is "directed" to attempt to ensure backup is present when approaching the subject, try to obtain information about the subject, calm the situation, and communicate with the subject.  UMF No. 52.  Officers "calm the situation" by ceasing emergency lights and sirens, dispersing crowds, assuming a quite and non-threatening manner when approaching the subject, avoiding physical contact while assessing the situation, and moving slowly and carefully so as not to excite the subject.  UMF No. 52.  Communication with the subject should involve providing reassurance that officers are there to help, attempting to find out what is bothering the subject, allowing the subject to vent his feelings and relate his concerns, not threatening the subject with arrest or harm, being truthful, avoiding topics that may agitate the subject, and guiding the conversation to topics that will ease the situation.  UMF No. 52.

CIT officers "will respond as primary officers" if the subject of the call poses a risk to himself or others or if a mental illness or crisis resulted in the call to APD.  UMF No. 53.  A call is a "High Threat Level" if an individual is an immediate or physical danger to himself or others.  UMF No. 54.  Risk factors of a "High Threat Level" include the availability of weapons, substantiated statements to commit violence, actual acts of violence or dangerous acts, personal history of violence under similar circumstances, and corroborated information that would lead a CIT officer to believe the person is a danger to himself.  UMF No. 54. In the event of a High Threat Level, dispatch should check the "Guardian system" to verify whether entries have been made on the person.  UMF No. 55.  If there is an entry, dispatch is to notify the officers who are dispatched and the immediate supervisor.  UMF No. 55.  If there is no entry, "the call will be handled per SOP."  UMF No. 55.

Dispatch did not alert the officers to whether Vincent had an entry in the "Project Guardian" system.  UMF No. 8. Officer Bludworth did not wait for backup or a CIT officer. UMF No. 21.  Officer Bludworth did not follow SOP 2-13 in any way, nor did he provide any other accommodation to Vincent.  He recognized that Vincent was "mentally unstable" but did not believe the call was a CIT call, because he was investigating criminal activity and responding to a priority one call. UMF No. 21; UMF No. 64; UMF No. 66.  Officer Bludworth considered a CIT call to be a suicide call or a call involving an already contained scene.  UMF No. 66; UMF No. 69.  To the contrary, however, a CIT officer should be present if the call is violent in nature and should be the primary officer.  UMF No. 59. Further, Officer Bludworth would not have been able, as a field services officer, to access the "CIT watch list".  UMF No. 61. Officer Bludworth would have had to contact the CIT sergeant for information about whether CIT was tracking Vincent.  UMF No. 62.

Vincent was not an immediate threat to anyone at the scene when Officer Bludworth arrived at the Circle K. UMF No. 20; UMF No. 23. Vincent had no visible weapons and was not threatening anyone.  UMF No. 23.  Officer Bludworth believed Vincent to be the individual from the dispatch report, but he did not have probable cause to arrest Vincent for any crime at that time. UMF No. 18; UMF No. 25. Officer Bludworth did not calm the situation: he did not turn off his emergency lights, he did not disperse the crowd outside the Circle-K, and he did not assume a quiet and non-threatening manner. UMF No. 52.  He also did not provide reassurance in his communication with Vincent, he did not try to find out what was bothering Vincent, and he did not avoid threatening Vincent with arrest or harm.  UMF No. 52.

Officer Bludworth declined to use his CIT training because he was just going to talk to Vincent, he wanted to put hands on Vincent and contain him, and in order to prevent Vincent from going into the store.  UMF No. 67. He believed that Vincent was able to comply with his commands because "everyone can understand an officer pointing a gun at you and telling you to stop your actions, whether you're in your own rule or not, can make you stop."  UMF No. 68.  SOP 2-13, however, provides reasonable accommodations and precautions for communicating with individuals with mental illness.  Officer Bludworth disregarded this training, because he believed his investigation justified his actions, he did not want Vincent to go into the store, and he wanted to contain Vincent.  UMF Nos. 64-70. Officer Bludworth used his siren, got out of his police vehicle, left the lights running, and called out to Vincent in a raised voice, ordering him to come and talk.  UMF No. 26; UMF No. 28.  Vincent did not understand, was unable to comply, went into fight or flight mode, and responded in what appeared to Officer Bludworth to be a threatening manner.  UMF Nos. 29-35; UMF Nos. 84-90. Fifteen seconds later, Vincent was shot, lying on the ground, handcuffed, and expressing surprise to Officer Bludworth: "you shot me."  UMF No. 43.

Although procedures for reasonable accommodation were set forth in SOP 2-13, the procedures were ignored and not fully understood by Officer Bludworth.  Defendants failed to reasonably accommodate Vincent's disability, contrary to the ADA.

### IV. Former Chief Ray Schultz, APD, and the City of Albuquerque were all on notice that APD officers were using force, including lethal force, disproportionately against persons who suffered from mental illness.

As noted by the DOJ, "[w]e are aware that the release of our findings occurs at a time of transition for the department's leadership and amid continued tension around recent officer-involved shootings. In particular, fatal confrontations with individuals experiencing

mental health crises continue to cause significant public concern over the department's ability and willingness to consider the safety and well-being of the individuals in distress. *See* page 2 of: https://www.justice.gov/sites/default/files/crt/legacy/2014/04/10/apd_findings_4-10-14.pdf. DOJ further stated, "in September 2010, the Police Executive Research Forum ("PERF") started a nine-month study of the department's use-of-force policies and training, as well as the department's management systems. PERF did not evaluate whether officers used force appropriately. Indeed, the report noted that "[r]einvestigating officer involved shooting cases was outside the scope of this study as specified by the city." Instead, PERF focused on "common factors" in the shootings and trends and patterns in the uses of less lethal force, such as frequency of weapons use, officer and subject demographics, and the types of force used. The PERF report noted that shootings increased, even though "both violent crime and assaults on officers have been on a downward trend." The PERF report found that multiple officers were present at 81% of the shooting incidents they reviewed. Given the level of misconduct we uncovered, the presence of multiple officers is significant because officers have a duty to intervene to prevent other officers from using excessive force. *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008), cert. denied, 555 U.S. 1137 (2009) (internal citations omitted). The report also noted that in only a small percentage of shooting incidents (11%) did the officer employ less - lethal options before resorting to deadly weapons. The PERF report also noted the significant use of Tasers and pointed out serious limitations in APD's ability to track accurate force data. Our

investigation, which included incidents occurring after PERF's review, revealed similar problems."

(citations and footnotes omitted). *Id.* at pp. 5-6.

At the time Vincent was killed APD's use of force policy was unclear, deficient, and unconstitutional.  For years, APD relied exclusively on the "Reactive Control Model." The Reactive Control Model set forth what manner of force an officer could utilize in response to a given threat, but it did not, for example, set forth de-escalation techniques, emphasize that force was not the preferred outcome, apprise officers to take into consideration all surrounding circumstances prior to utilizing force, or explain that if the officer contributed to the need for use of force, the force would not be justified. Following the killing of a homeless, mentally ill camper in the foothills (James Boyd), APD began the process of drafting a new use-of-force policy, shifting from the "Reactive Control Model" to "Objective Reasonableness."   The policy also did not clearly articulate when an officer should or should not report use of force. In other law enforcement agencies, officers must report force, even when that force does not result in an injury.  APD's use-of-force policy in place at the time Vincent was killed did not, and the imprecise language of the policy allowed for broad interpretation of what constituted a use of force.  Failure to document all force, including force that does not result in injury, undermines supervisors' ability to track problematic officers.  At the time Vincent was killed, APD policy also did not require supervisors to conduct a meaningful review of a given use of force.  According to policy, officers were to fill out an offense report.   In that report, it was already presupposed that the recipient of officer force was a criminal and the force recipient was also referred to as a combatant.  The use-of-force policy did not detail the manner by which

APD should investigate a use of force, nor was there guidance for referring a case for either criminal or administrative review.  The same supervising officer who authorized force could also evaluate his or her own use of force for reasonableness and exonerate him or herself.  Further, the use-of-force policy did not describe what evidence needed to be collected following use of force incidents or require the investigating officer to seek an account from the subject of force. Without necessary evidence, APD investigating officers could not adequately investigate use of force.

As a result of the above described deficiencies in policy, training, and oversight, both of specialized units and individual officers, from 2010 to 2014, APD officers were involved in forty (40) shootings.  APD did not discipline any of the officers involved in those shootings and found that all the shootings were justified.  This is a high rate of officer involved shootings for a city of Albuquerque's size: one of the highest in the country.

As a result of the frequency APD officers utilize lethal force and in response to public outcry, the DOJ started an investigation of APD in November 2012.   The DOJ reviewed 20 officer-involved shootings, including the case at bar, from 2009 to 2012 and a random sampling of 200 force reports between 2009 and 2013.  In 2014 the DOJ found that it "had reasonable cause to believe that APD engages in a pattern or practice of use of excessive force, including deadly force, in violation of the Fourth Amendment…." [See Id. Page 1].  The DOJ found that APD had a pattern and practice of utilizing excessive force despite what it identified as APD officers' underreporting of uses of force.  [See Id. Page 27].  The DOJ described a culture of aggression within APD:  "This culture is manifested in the routine nature of excessive force and lack of corrective actions taken by the leadership to address force incidents.  This culture is evident in the department's training,

permissive policy on weapons, under-utilization of its crisis intervention team, overuse of SWAT, and the harsh approaches to ordinary encounters with residents." [See Id., Page 36.] The DOJ found that APD officers engage in a pattern and practice of unconstitutional use of deadly force by shooting and killing individuals who did not pose an imminent threat of serious bodily harm or death, shooting and killing individuals who posed no threat to anyone but themselves; and shooting and killing individuals when the officers' own recklessness sometimes led to their use of deadly force. It also concluded "Officers...used deadly force in situations where the conduct of the officers heightened the danger and contributed to the need to use force." [See Id., Page 3]. Of the 20 shootings the DOJ reviewed, it concluded that a majority of those shootings were unconstitutional, [See Id., Pages 2-3]. Noting generally that APD has, "allowed a culture of indifference to constitutional policing and insularity to develop in within the department." The DOJ findings also included that the use of excessive force by APD is not isolated or sporadic, the pattern or practice of excessive force stems from systemic deficiencies in oversight, training, and policy, and chief among these deficiencies is the department's failure to implement an objective and rigorous internal accountability system, [See Id., Page 3]. DOJ found that APD officers used force on people who were not able to comply with orders due to their mental state. Id at page 3. Most important as it pertains to this case is that DOJ found that, "[a] significant amount of the force we reviewed was used against persons with mental illness and in crisis. APD's policies, training, and supervision are insufficient to ensure that officers encountering people with mental illness or in distress do so in a manner that respects their rights and is safe for all involved." Id. The Albuquerque Police Department is the largest law enforcement agency in New Mexico, with approximately

1,000 sworn officers and over 600 civilian employees. We recognize that it is a modern policing agency that has made efforts to implement innovative programs, such as the Crisis Intervention Team ("CIT") and the Crisis Outreach and Support Team ("COAST"), which work to diffuse potentially harmful situations and assist people in crisis by providing them with access to mental health care. The use of technology and other initiatives have had limited impact in increasing accountability or promoting safer encounters with individuals suffering from mental illness. For instance, although the department is among a few of its size to mandate the use of lapel video cameras, the implementation has been highly inconsistent. The availability of trained CIT officers has not kept up with the needs in the community, and de-escalation techniques employed by these officers are too easily dismissed by heavily-armed tactical units in situations where individuals under police scrutiny are not posing an immediate threat of harm. The mental health professionals and staff on COAST teams operate in a larger mental health system with limited resources and options. It is critical that the City and the department take additional measures to identify, address, and prevent excessive force to protect the public and rebuild the community's trust. Recent shootings have heightened and confirmed the need for further reform. Id. Pages 6-7. The Tenth Circuit does consider the mental health of the suspect and the reasonableness of the officer's conduct prior to the use of force. See *Allen v. Muskogee, Okla.*, 119 F.3d 837, 840 (10th Cir. 1997) (in shooting, considering person's suicidal state and officer's conduct prior to the person's threat of force); *Cardall v. Thompson*, 845 F. Supp. 2d 1182, 1192 (D. Utah 2012) (noting that person's "mental health also weighed against the use of a [T]aser").

The DOJ stated, "We have reasonable cause to believe that officers of the Albuquerque Police Department engage in a pattern or practice of use of excessive force, including unreasonable deadly force, in violation of the Fourth Amendment and Section 14141. A significant amount of the force we reviewed was used against persons with mental illness and in crisis. APD's policies, training, and supervision are insufficient to ensure that officers encountering people with mental illness or in distress do so in a manner that is safe and respects their rights. The use of excessive force by APD officers is not isolated or sporadic. The pattern or practice of excessive force stems from systemic deficiencies in oversight, training, and policy. Chief among these deficiencies is the department's failure to implement an objective and rigorous internal accountability system. Force incidents are not properly investigated, documented, or addressed with corrective measures. Other deficiencies relate to the department's inadequate tactical deployments and incoherent implementation of community policing principles. Officers also used excessive force against individuals who suffered from mental illness or who were unable to comply with officers' commands for reasons beyond their control. The Tenth Circuit has recognized that a "detainee's mental health must be taken into account when considering the officers' use of force . . . under Graham." *Cardall*, 845 F. Supp. 2d at 1190-91 (quoting *Giannetti v. City of Stillwater*, 216 Fed. Appx. 756, 764 (10th Cir. 2007) (unpublished)); *see also Estate of Mathis v. Kingston*, No. 07-2237, 2009 U.S. Dist. LEXIS 32040, at *13-14 (D. Colo. Apr. 16, 2009) (observing that when a subject's diminished capacity is immediately apparent there may be occasions when failure to follow commands may not constitute a refusal to comply). We reviewed many incidents in which we concluded that officers failed to consider an individual's physical, mental, or emotional state in making

36

force determinations. Consequently, we found instances where individuals did not pose an immediate threat to the safety of the officer or the public, and officers deployed a level of force that was unreasonable under the circumstances. Id. 20-22. "We also believe that the way officers have communicated with (or failed to communicate with) individuals in mental health crisis show a clear lack of appropriate training on mental illness." Id. at 32.

The DOJ found that under-use of the CIT team contributes to the pattern and practice of unconstitutional force stating: "As noted above, the Crisis Intervention Team ("the Team") is a specialized unit in APD that is trained and equipped to create safer encounters with individuals who are in mental health crisis and may harm themselves or others. After interviewing and observing the Team and some of the patrol officers they have trained and certified, we are encouraged by the innovations and passions that many on the Team have brought to the department. In many ways, the Team provides a template for the department as it considers how to remedy its pattern of unreasonable uses of force. Members of the Team demonstrate an understanding of the illnesses that individuals suffer, they are informed about the challenges those individuals face, and they approach encounters with an eye toward preserving the health and safety of everyone involved. Given the Team's skills, the department could gain substantially—and could greatly impact its overemphasis on the use of force—by involving the Team in far more of its encounters than it currently does and by permitting the Team greater latitude in the course of an encounter to broker a peaceful outcome. Reaching this goal may require adding personnel to the Team and training and certification of additional patrol officers across the city. Our understanding is that currently, if officers encounter someone in mental health crisis, they can call for a Team member or a specially trained patrol officer assigned to their part of

the city, but there is no guarantee that either will be available. We recommend that the department conduct a staffing study to determine how many officers would need to be added to the Team, as well as how many patrol officers would need to be trained and certified, to ensure that someone with the appropriate skills is always available in all parts of the city when an encounter with someone in mental health crisis occurs. The department could also make a significant impact on officers' tendency to use force during stressful encounters by providing officers more training on the use of de-escalation techniques. The Team currently provides this kind of training to new recruits at the police academy, but our observations of, and interviews with, officers indicate that the Team's training has so far failed to make an impact on the overall culture of the department and the general approach of most officers. We also found it troubling that many officers did not seem conversant with the Team's function or its relevance to their encounters with those in mental health crisis. A clear example of this lack of familiarity was evident in the use-of-force reports that we reviewed. In far too many of those reports, officers encountered a person who was clearly in mental health crisis, but they made no attempt to contact the Team or patrol officers in their area who had been trained and certified by the Team. Partially as a result of the officers' failure to use the resources available to them, far too many of these encounters had a violent outcome. Id. at 34-35.

### V.     CONCLUSION

Vincent was disabled, Defendants knew Vincent was disabled, Defendants misperceived Vincent's disability as criminal behavior, and Defendants failed to reasonably accommodate Vincent's disability when he was detained and arrested. At the initiation of the encounter, Vincent was not a danger to himself or others.  The undisputed

material facts support summary judgment in Plaintiff's favor on the ADA claim, and the

Court should grant the *Motion*.

Respectfully Submitted,
LAW OFFICE OF FRANCES CROCKETT

*/s/ Frances Carpenter*
Frances Carpenter
925 Luna Circle NW
Albuquerque, NM 87102
Phone (505) 314-8884
Fax (505) 835-5658
frances@francescrockettlaw.com
*Attorney for Plaintiff*

I hereby certify that a true and correct
copy of the forgoing was served to all
parties and counsel of record via the
CM/ECF filing system this 6th day of
May, 2016.

*/s/ Frances Carpenter*
Frances Carpenter