Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

HOPE IRVIN, as Personal Representative
of the ESTATE OF VINCENT WOOD, Deceased,

       Plaintiff,

  vs.             15cv00550 SCY-KBM

KATHERINE WRIGHT, individually and in her
Official capacity as an Albuquerque Police Officer
JEFFREY BLUDWORTH, individually and in his
Official capacity as an Albuquerque Police Officer,
and CITY OF ALBUQUERQUE,

       Defendants.


VIDEO DEPOSITION OF OFFICER JEFFREY BLUDWORTH
December 10, 2015
9:11 a.m.
609 12th Street, Northwest
Albuquerque, New Mexico

PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:
TAKEN BY:  FRANCES CROCKETT CARPENTER
     Attorney for Plaintiff


REPORTED BY: Mary L. Fulton, RPR, CCR 132
     Trattel Court Reporting & Videography
     P.O. Box 36297
     Albuquerque, New Mexico 87176

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 1 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.                    December 10, 2015
Jeffrey Bludworth                                                  15cv00550 SCY-KBM

Page 18

1   Police Department.
2       Q.   What unit?
3       A.   Field services.
4       Q.   I mean -- I'm sorry.  Was she northeast?
5   southeast?
6       A.   Southwest, I believe.
7       Q.   Is she still a sergeant with southwest?
8       A.   No.
9       Q.   What is she now?
10      A.   She's sergeant of the FASST team, F-A-S-S-T.
11  It's a domestic violence and stalking unit.
12      Q.   So when your sister picked you up from the
13  incident, you didn't talk to her at all about it, just
14  said that there's a police shooting?
15      A.   Yes, ma'am.
16      Q.   Okay.  So other than your sister and your
17  wife, did you speak to your parents about it?
18      A.   We went to my parents' house afterwards.  I
19  ate some dinner with them, and that was that.  But we
20  didn't really talk about it.  We mainly just -- my
21  parents were asking if I was okay.
22      Q.   Okay.  So when your parents said, "What
23  happened?" what do you say in response -- what did you
24  say in response?
25      A.   "It will be on the news."

Page 19

1       Q.   Okay.
2       A.   So...
3       Q.   So that's all you said to them about the
4   incident, "It will be on the news?"
5       A.   Yes, ma'am.
6       Q.   Okay.  So if we took your parents'
7   depositions and your wife's deposition, that's what
8   they'd say?
9       A.   Not my wife, no.  I told my wife what
10  happened.
11          MS. GRIFFIN:  No, but -- object on the merits
12  of privilege as to any conversations with his wife.
13      Q.   But with your parents, you just said, "Watch
14  it on the news"?
15      A.   Yes, ma'am.
16      Q.   All right.  What are your parents' names?
17      A.   My dad's formal name is Marvin Bludworth, III.
18  And my mom's name is Sabrina Bludworth.
19      Q.   Do they live in Albuquerque?
20      A.   Yes, ma'am.
21      Q.   All right.  Have you ever been sued in your
22  capacity as an officer?
23      A.   No.
24      Q.   Okay.  Have you ever been sued in your
25  capacity as -- not an officer, as a civilian?

Page 20

1       A.   No.
2       Q.   Do you have any military background?
3       A.   No.
4       Q.   Tell me about your education.
5       A.   I graduated from Del Norte High School here in
6   Albuquerque in 2008.  I attended a few CNM classes.  And
7   then I worked as a police service aide from 2008 to
8   2009.  And then I joined the police department in 2012.
9       Q.   In 2012?
10      A.   Yes, ma'am.
11      Q.   When did you graduate from the academy?
12      A.   2012.
13      Q.   What month?
14      A.   October 5th of 2012 is our graduation date.
15      Q.   What jobs had you had prior to becoming an
16  Albuquerque police officer?
17      A.   In high school, I worked as a bread boy,
18  essentially.  It was kind of like an on-the-side job.  I
19  stocked bread at Walmart -- not for Walmart, but for a
20  company that stocked bread for them, I guess.
21      Q.   Okay.
22      A.   I only worked for them for a few months.  And
23  then I worked at Smith's on Central and Coors for a
24  while.  And then I also worked at Car & Truck Gallery,
25  which on Central and Eubank, just a buy-here/pay-here

Page 21

1   car lot.
2       Q.   Yeah.
3       A.   Then as soon as I graduated high school, I
4   joined the -- I became a police service aide for a year,
5   and then -- at which -- in 2009 -- August of 2009 to
6   August of 2011, I served a mission for the Church of
7   Jesus Christ of Latter-day Saints, or Mormon Church, in
8   San Jose, California.  When I came back, I worked at
9   Jiffy Lube from, essentially, September until April of
10  -- so September of 2011 until April of 2012, when I
11  started the academy in April of 2012.
12      Q.   Okay.  I understand at the time of this
13  incident, you were a P2/C?
14      A.   Yes, ma'am.
15      Q.   What does that mean?
16      A.   I was still on probation.  So I was still kind
17  of a, technically, at-will employee, so -- I was a
18  rookie.
19      Q.   What does that mean, that you're an at-will
20  employee?
21      A.   That I can still -- I was still not, at that
22  time, necessarily covered by the union.  I was still --
23  if I -- you know, if I did anything wrong, then I could
24  just be terminated right away.
25      Q.   So when you're a P1/C, if you do something

6 (Pages 18 to 21)

Trattel Court Reporting & Videography
505-830-0600

Electronically signed by Mary Fulton (001-060-973-7022)                                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

---

Page 22

1  wrong, you don't get terminated right away?  Is that
2  your understanding?
3      A.   My that's understanding.  As long as you don't
4  do anything too extreme.
5      Q.   What do you mean "too extreme"?  Give me an
6  example.
7      A.   As long as I don't go murder someone in cold
8  blood.
9      Q.   Okay.  Would you walk me through what
10  happened, Jeffrey.
11      A.   Through the incident?
12      Q.   Yep.
13      A.   Around 7:30 at night, I was dispatched to a
14  Priority 1, 39, or disturbance -- that's what it's coded
15  as -- at an address on San Mateo -- I don't know what
16  the exact address is.  It was a bus stop -- where a
17  security guard called, saying that a male had threatened
18  two juveniles with two butcher knives.
19      Q.   Did you hear that call come out?
20      A.   Yes.
21      Q.   Okay.  How did you hear that call come out?
22      A.   Dispatch raised me before -- by "raise me,"
23  she called me over the air -- and I said, Ida 434 --
24  that was my call sign at the time -- to basically tell
25  me that she was going to send me a Priority 1 call.

---

Page 23

1      Q.   Okay.  And my understanding is that this was
2  actually a Priority 2 call originally.  Was that your
3  understanding?
4      A.   No.  My understanding was that it always came
5  out as Priority 1.
6      Q.   How old were you when you shot Mr. Wood?
7      A.   I had just turned 23 a few days prior.
8      Q.   Okay.  How long had you been on the force on
9  your own without any backup person, a ride-along?  I
10  understand when you first graduate, you're supposed to
11  have someone who is -- you're supposed to ride with
12  someone for, what, three or four months; is that
13  right?
14      A.   Yeah, I believe it's like three months.
15      Q.   Yeah.  Okay.  How long had you been alone?
16      A.   Let's see.  So January, February, March,
17  April, May, June, July -- about seven months, I believe.
18      Q.   How many Priority 1 calls had you responded
19  to?
20      A.   Hundreds.
21      Q.   Alone?
22      A.   What do you mean by "alone"?  Sorry.
23      Q.   My understanding is that a Priority 1 call
24  is a -- is a -- is a big deal; right?
25      A.   Yes, ma'am.

---

Page 24

1      Q.   Do you agree with me on that?
2      A.   Yes, ma'am.
3      Q.   Okay.  So -- and my understanding, also, is
4  that you're trained at the academy that if it's a
5  Priority 1 call, you should always try to wait for
6  backup when possible.  Do you agree or disagree with
7  that, Jeffrey?
8          MS. GRIFFIN:  Object to the form and
9  foundation.
10      A.   When possible, yes.
11      Q.   Okay.  When is it possible?
12      A.   When circumstances arise.
13      Q.   Okay.  When are those -- give me an example
14  of some of those circumstances of when you could
15  respond to a Priority 1 without waiting for a backup
16  officer.
17      A.   One call that we take quite often that are all
18  Priority 1s that we do by ourselves are down-and-outs,
19  when, essentially, there's a subject who is extremely
20  intoxicated and is passed out on the side of the road.
21  Officers take those by themselves all the time.
22      Q.   And why is it okay to take -- why is it okay
23  to respond to that call without waiting for a backup?
24          MS. GRIFFIN:  Object to form and foundation.
25      A.   It's not one.  It's just a type of routine

---

Page 25

1  call that turns into a rescue call 99 times out of 100,
2  where rescue comes out and takes a subject either to the
3  hospital or we take them to MATS.
4      Q.   Jeffrey, is it because, in part, that these
5  subjects do not pose an immediate threat to you or to
6  the public because they're passed out?
7      A.   Yes.
8      Q.   Okay.  Give me another example of when you
9  can respond to a Priority 1 call without waiting for
10  backup.
11      A.   Anything that is actively occurring.  It's
12  beneficial if you wait for backup, but you don't have to
13  wait for backup for things that are actively occurring.
14      Q.   Okay.  Like what's an example of a call -- a
15  Priority 1?  You said you'd gone to hundreds.  Give me
16  an example of a Priority 1 call that you responded to
17  by yourself in which it was actively occurring, using
18  your words.
19          MS. GRIFFIN:  Object to form and foundation.
20      A.   Like a robbery in progress.  I've shown up to
21  a robbery in progress before.  And, essentially, you
22  show up, and you get out of your car, and you wait, and
23  you see what's going -- and you start observing details
24  of the scene that is going on, so...
25      Q.   Do you withdraw your firearm immediately

---

7 (Pages 22 to 25)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 3 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

---

Page 26

1   when you get to the scene?
2       A.   To a robbery scene, yes.
3       Q.   Okay.  So using that particular example, you
4   responded to a Priority 1 call in which an active
5   robbery was occurring.  You did not wait for backup;
6   is that correct?
7       A.   Correct.  I was fairly close.  So I wasn't
8   going to just stop at an intersection and wait for
9   someone to come behind me.
10      Q.   Okay.  When you got to that call, did you
11  retrieve your service weapon?
12      A.   Yes.
13      Q.   And what happened with that call?
14      A.   The robbers were already gone, and the
15  employees were coming out.
16      Q.   Oh.  This was at a business?
17      A.   Yes.
18      Q.   Okay.  All right.  How long did it take for
19  your backup to arrive?
20      A.   Maybe 30 seconds later, a minute later.
21      Q.   Okay.  And in fact -- you don't believe you
22  deviated from your training at all in your actions in
23  regards to the call that you're talking to me about?
24      A.   No.
25      Q.   Okay.  Do you believe in regards to this

---

Page 27

1   particular case that you deviated from your training
2   at all in any respect?
3       A.   No.
4       Q.   Everything that you did in responding to
5   this call, you did in accordance with how you were
6   trained at the Albuquerque Police Academy?
7       A.   Yes.
8       Q.   All right.  So you got dispatched to this
9   call.  You were at Rex's, eating with your sergeant;
10  right?
11      A.   Correct.
12      Q.   Okay.  So you and Sergeant Altman were
13  sitting there eating lunch?
14      A.   Essentially.
15      Q.   All right.  Anyone else with you?
16      A.   Nope.  Just me and my sergeant -- me and
17  Sergeant Altman.
18      Q.   Okay.  Is there any particular reason that
19  you didn't inform the detectives the day after that
20  you were eating with your sergeant at Rex's?
21           MS. GRIFFIN:  Objection.  Form and foundation.
22      A.   I stated that I was eating at Rex's.
23      Q.   Right.  My question is -- and I'll repeat --
24  is there any reason that you didn't tell them that you
25  were with your sergeant at the time that you were

---

Page 28

1   eating?
2       A.   I told them that I was eating at Rex's, so...
3       Q.   I'll repeat the question.  Is there any
4   reason you didn't tell them that you were with your
5   sergeant at the time that you gave this interview --
6   when you were eating at Rex's?
7       A.   Like I was saying, I said that I was eating at
8   Rex's.  I guess I didn't believe that me telling them
9   that I was eating with Sergeant Altman pertained to the
10  case, so...
11      Q.   Fair enough.  Just wondering.
12           Okay.  So it came out a Priority 1, meaning
13  what?  What does a Priority 1 call mean?
14      A.   It's a high priority to get to.  It's actively
15  going.  It presents -- there's multiple different
16  aspects to each different Priority 1 call.
17      Q.   What did you think about this particular
18  call?  What did it mean to you?
19      A.   That it was actively occurring and that I
20  needed to find the subject that was threatening the
21  juveniles.
22      Q.   Okay.  So what did you do next?
23      A.   As I left Rex's, I drove my marked patrol
24  vehicle, my cop car, westbound on Montgomery.  And then
25  I turned right onto San Mateo, which would be northbound

---

Page 29

1   San Mateo.
2       Q.   Okay.  Jeffrey, have you ever read the
3   complaint in this case?
4       A.   The criminal complaint?
5       Q.   Is there a criminal complaint in this case?
6       A.   That's what I was just asking.  I don't know
7   if there is or not, because I haven't seen one.
8       Q.   Yeah, me neither.  No, I mean the complaint
9   that we filed that names you in the lawsuit.
10      A.   Yes.
11      Q.   Okay.  So you've read it?
12      A.   Yes.
13      Q.   Okay.  When did you read it?
14      A.   When it was given to me.
15      Q.   When you were served?
16      A.   Yes.
17           (Exhibit 25 and Exhibit 26 marked.)
18           MS. CARPENTER:  These are Exhibits 25 and 26.
19      Q.   What I've done is I've printed out a couple
20  of Google Earth maps of the scene.  And as you're
21  talking to me about, what I would like for you to
22  do is, using any of these pens, to draw as you're
23  describing things to me.  So here is Exhibit 25.
24           All right.  So you said that you were at
25  Rex's.  Do you see Rex's on this map?

---

8 (Pages 26 to 29)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 4 of 43

Electronically signed by Mary Fulton (001-060-973-7022)

7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

---

Page 30

1  A.  (No audible response.)
2  Q.  How close is Rex's to the --
3  A.  Rex's is at San Pedro and Montgomery.
4  Q.  Okay.
5  A.  And the incident -- I'm trying to figure out
6  -- okay.  So if I'm correct, the further -- the furthest
7  intersection, full intersection, is at the top, is going
8  to be San Mateo and McLeod; correct?
9  Q.  That's right.
10  A.  So Rex's is not seen in this picture because
11  Rex's is south and to the east.
12  Q.  Okay.  Okay.  Fair enough.  So can you
13  circle Circle K?  Do you see where Circle K is on
14  that?
15  A.  Yes.  It's right here to the top.
16  Q.  Correct.  Okay.  So let's -- let's -- are
17  you using a black pen?  Do you feel like it's showing
18  up?
19  A.  It showed up in my picture.
20  Q.  Okay, that's fine.
21  A.  Is that all right?
22  Q.  Yeah, that's great.  So this -- he's taking
23  a video of it, so maybe -- there you go.  Perfect.
24  A.  Circle K is right here.
25  Q.  Okay.  So where were you when -- what

---

Page 31

1  direction of travel did you travel from when you first
2  were trying to get to the scene?
3  A.  When I was first trying to get from the scene,
4  Rex's -- so San Mateo and Montgomery is essentially
5  right here.  This is Del Norte High School.  San Mateo
6  and Montgomery is about here.  And so San Pedro and
7  Montgomery would be over here.  And so that's
8  essentially where I was -- I came down Montgomery,
9  westbound Montgomery, to, then, northbound San Mateo.
10  Q.  Did you have your lights and sirens engaged
11  at that time?
12  A.  I did not have any lights and sirens engaged
13  at that time, no.
14  Q.  Why not?
15  A.  Because I was right there.  I was close.
16  Q.  So you didn't have your sirens and lights on
17  because you were close.
18  A.  Correct.  At that -- at this time, I -- at
19  this time, I believed that the subject was going to be
20  over here (indicating).  And by "the subject," I mean
21  Mr. Wood.
22  Q.  Okay.
23  A.  I believed Mr. Wood was going to be over in
24  this area, which he was not.
25  Q.  Why did you believe that he was going to be

---

Page 32

1  in that area?
2  A.  That is where I had seen him before.
3  Q.  When was the last time you had seen him
4  there?
5  A.  I don't know specific dates.
6  Q.  You thought he was going to be there because
7  you had seen him there before?
8  A.  Yes, ma'am.
9  Q.  Can you elaborate a little bit more?
10  A.  He's known to frequent the intersection of San
11  Mateo and Montgomery.
12  Q.  I need you to elaborate on that more for me
13  as well.  What do you mean he's known to frequent that
14  area?
15  A.  He's typically there, standing at the bus
16  stop, yelling and screaming.
17  Q.  Is he yelling and screaming at a particular
18  person or object?
19  A.  Usually just at nothing.
20  Q.  Okay.  When you said "it is known," what do
21  you mean "it is known"?  It's known by whom?
22  A.  It was known by me, as I would frequent that
23  intersection quite often.  I would just see him there.
24  Q.  Did you ever have any interactions
25  personally with Mr. Wood prior to shooting him?

---

Page 33

1  A.  No, I never had any interactions with
2  Mr. Wood.
3  Q.  Prior to July the 5th?
4  A.  Prior to July the 5th.
5  Q.  Okay.  So did you know him to be mentally
6  unstable?
7  A.  I did not know of any diagnosis of him being
8  mentally unstable, no.
9  Q.  Meaning that you didn't actually speak to
10  any of his healthcare providers and confirm his
11  particular diagnosis?
12  A.  No, I never talked to any healthcare providers
13  about Mr. Wood.  And I never...
14  Q.  All right.  So my -- let's go back to my
15  question.  Did you suspect that he had mental health
16  issues?
17  A.  I assumed that he possibly did.  But, again, I
18  did not know, so...
19  Q.  So what?
20  A.  I -- I didn't need to know.
21  Q.  You didn't need to know.  Why didn't you
22  need to know?
23  A.  I had never responded to any call with him
24  before.
25  Q.  Okay.  So if you had responded to a call

---

9 (Pages 30 to 33)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 5 of 43

Electronically signed by Mary Fulton (001-060-973-7022)

7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

Page 34

1    with him, why would you need to know that?
2        A.   So that way, I could best help him.
3        Q.   In responding to that call?
4        A.   While I was helping him, while I was dealing
5    with Mr. Wood.
6        Q.   Okay.  Why would that have helped you,
7    knowing?
8        A.   Can you rephrase that?  Because I don't -- I'm
9    not understanding what you're trying to say.
10       Q.   I'm a little bit confused over this, what
11   you're telling me.  So let's break it down.
12            You said that it would be helpful to know
13   when you were -- in responding to a call with
14   Mr. Wood; correct?
15       A.   I said that it would be helpful to know if he
16   was diagnosed with anything while I was assisting with
17   -- assisting him to best help him if he was diagnosed
18   with anything.
19       Q.   Did you have any doubts that -- that he had
20   mental health issues?
21       A.   Any doubts?
22       Q.   Yeah.
23       A.   I -- I assumed that he possibly had a mental
24   health issue, but I just -- again, I had never dealt
25   with him, never responded to any call with him prior to

Page 35

1    July 5th, so I did not know -- did not want to
2    positively say, yes, he had one.
3        Q.   Okay.  What were you basing you assumptions
4    on?  What facts do you have to base those assumptions
5    on?
6        A.   Assumptions of -- that I believe that he
7    possibly had a mental illness?
8        Q.   Right.
9        A.   Just by the way -- when he was standing at the
10   intersection of San Mateo and Montgomery frequently just
11   waving his hands around, as well as just kind of
12   screaming and talking to nobody.
13       Q.   Okay.  And you got -- when you received
14   dispatch on this call, they actually -- dispatch
15   actually informed you that he was 10-40; correct?
16       A.   I believe that dispatch says Security says
17   that he is extremely 10-40, or is a mental -- has a
18   mental health issue.
19       Q.   Okay.  So you had -- you had information
20   from -- from seeing him before, waving his hands and
21   talking to nobody, cars passing by at the bus stop,
22   which made you assume that he had mental health
23   issues.  And then you had dispatch -- a security
24   officer saying that he was extremely 10-40.  And then,
25   also, didn't you hear Katherine Wright say over the

Page 36

1    air that she had had prior interactions with him and
2    that he was 10-40?
3        A.   Yes.
4        Q.   Okay.  So you had all that information prior
5    to arriving at Circle K; correct?
6        A.   Correct.
7        Q.   Now, let's talk about your CIT training for
8    a moment.  We're going to pop in and out of that a
9    little bit.  Okay?
10       A.   (Nods head.)
11       Q.   When you were trained at the academy, you
12   received CIT training as well; correct?
13       A.   Correct.
14       Q.   However, at the time of this incident, you
15   were not a certified CIT officer; correct?
16       A.   Correct.
17       Q.   What is the difference?
18       A.   Between the CIT training in the academy and
19   the CIT training afterwards?
20       Q.   What is the difference between being a
21   CIT-certified officer -- and I'm talking about on the
22   date of the incident -- a CIT-certified officer versus
23   you?  What are the different -- at the time of the
24   incident, what was the difference between you and a
25   CIT-certified officer?

Page 37

1        MS. GRIFFIN:  Objection.  Form and foundation.
2        A.   One has a special badge -- or not badge, but a
3    little pin that says "CIT," and I did not.
4        Q.   So you didn't have a pin?
5        A.   Essentially, no.
6        Q.   That's the only difference?
7        A.   Essentially, a CIT officer took the same
8    40-hour CIT class that I took in the academy, just
9    outside of the academy, for a certificate.
10       Q.   And when you were trained in the academy,
11   what did they train you about CIT-certified officers?
12   What did they tell you about those people?
13       MS. GRIFFIN:  Objection.  Form and foundation.
14       A.   That CIT officers essentially had -- were able
15   to -- they were there to try to de-escalate situations.
16       Q.   And when should CIT officers be involved?
17       MS. GRIFFIN:  Objection.  Form and foundation.
18       A.   CIT officers should be involved, when possible
19   and when feasible, to any mental health -- to any person
20   that has a mental health issue or illness in crisis.
21       Q.   Now, in your CIT training, did they tell you
22   that you have to have confirmation that someone is
23   mentally -- has a mental health issue in order to
24   approach them as such, or do you -- if you suspect, is
25   that enough?

10 (Pages 34 to 37)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 6 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

---

Page 38

1      A.   (No audible response.)
2      Q.   Because, Jeffrey, let me make myself clear
3  here.  I'm a little bit confused because you keep --
4  in the beginning, you kept saying, well, I didn't have
5  any -- I didn't talk to his doctor.  I didn't have any
6  confirmation.  Is that necessary in order to talk to
7  somebody or use your CIT training?
8      A.   No.
9      Q.   Okay.  So why was that important to tell me
10 that?
11      MS. GRIFFIN:  Object to form and foundation.
12      A.   I just said that I didn't know positively if
13 he had or had not been diagnosed.
14      Q.   Okay.  Does that matter in any way to how
15 you respond to a call?
16      A.   To a -- to this type of call, no.  Whether or
17 not he -- if I knew he had or had not been diagnosed,
18 no, this would not have changed my response.
19      Q.   Okay.  Isn't suspecting -- aren't you
20 trained at the academy that if you have any suspicion
21 that someone may have mental health issues or, in
22 fact, any disability, that you are to treat them as
23 such?
24      A.   If --
25      MS. GRIFFIN:  Object to form and foundation.

---

Page 39

1      A.   If circumstances and if the scene and -- if
2  officer safety is not compromised, then, sure, yes.
3      Q.   Okay.  And so tell me if all those things
4  are present -- in other words, your officer safety is
5  compromised -- then you do -- you throw your CIT
6  training out the window?
7      MS. GRIFFIN:  Objection.  Form and foundation.
8      A.   I'm not going to compromise my safety to try
9  and just sit and talk to someone that is not responding.
10      Q.   Okay.  And I guess that's not really my
11 question.  At the academy -- I want to know
12 specifically what you were taught at the academy.
13      A.   Again, that officer safety and the public
14 safety paramounts.
15      Q.   Paramounts what?
16      A.   Paramounts over sitting and talking and trying
17 to talk to someone that is not responding.
18      Q.   It paramounts your CIT training?
19      MS. GRIFFIN:  Object to form and foundation.
20      A.   Yes.
21      Q.   Okay.
22      A.   Because --
23      MS. CARPENTER:  Let's go ahead and mark
24 Exhibit 26.  This is a closer view of -- it's sort of a
25 closer view of Exhibit 25.

---

Page 40

1      Q.   All right.  Now, let's go back to Exhibit 25
2  and -- so you've left Rex's.  You showed the video how
3  you left Rex's, and you were driving up to the area
4  where you thought Vincent would probably be, on with
5  your lights or sirens on, because you had seen him in
6  that intersection often.  Is that where we left off?
7  Is that fair?
8      A.   San Mateo and Montgomery, yes.
9      Q.   All right.  So you -- he wasn't there.  So
10 what did you do next?
11      A.   He wasn't there, and so at that point,
12 dispatch had advised that Mr. Wood was seen at the
13 Putt-Putt at San Mateo and McLeod.
14      Q.   All right.  And what did you do next?
15      A.   So I then continued northbound on San Mateo,
16 towards the Putt-Putt at San Mateo and McLeod.
17      Q.   Okay.  And what happened next?
18      A.   At that point, I observed Mr. Wood in the
19 parking lot of Circle K, so I then --
20      Q.   Let me stop you for a second.  I'm sorry to
21 interrupt you, Jeffrey, but I thought that you had --
22 you had tried to make contact with the initial
23 teenagers, the teenagers that had allegedly been
24 confronted by Mr. Wood.  Isn't that true?
25      MS. GRIFFIN:  Ms. Carpenter --

---

Page 41

1      MS. CARPENTER:  Yes, ma'am.
2      MS. GRIFFIN:  -- I hate to -- I just want to
3  interject.  And it's not necessarily an objection, but a
4  comment.  It's that you've asked him questions as to
5  what happened next, and then you indicated at the
6  beginning of this deposition you weren't going to
7  interrupt one another.  And throughout this process
8  where he's trying to explain things, you're interrupting
9  him and asking him questions.  So I just want to put
10 that out there.
11      MS. CARPENTER:  Yeah.  I appreciate that,
12 Stephanie.  You're right.
13      I apologize, Jeffrey.
14      Q.   Let me -- let me ask you about the bus stop
15 question, and then I'll try not to interrupt you
16 anymore.  I apologize.  I know it breaks up your flow.
17      MS. CARPENTER:  Thank you for that, Stephanie.
18      Q.   So let's talk about -- my understanding is
19 that you did try to make contact with these juveniles
20 at a bus stop; is that correct?
21      A.   When I was at the intersection of San Mateo
22 and Montgomery, there is a bus stop on northbound San
23 Mateo.  It's not on this picture --
24      Q.   Okay.
25      A.   -- at all.  It would be -- essentially where

---

11 (Pages 38 to 41)

Electronically signed by Mary Fulton (001-060-973-7022)

7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

---

**Page 42**

1  this 400 would be is kind of where that bus stop would
2  be.
3      Q.   Do you mind marking that?  And I understand
4  that it's just an approximation, for the record.
5      A.   So I'm drawing a line and I'm writing "bus
6  stop."  And that's where I believed that Mr. Wood would
7  possibly be.
8          At the time when I made that right-hand
9  turn -- this bus stop is kind of like in an alcove-type
10  deal, so the bus can pull over so traffic can continue
11  to move freely.  I pulled into there.  I put my back
12  lights on, so just the back part of my marked patrol
13  lights came on.  So that way, traffic knew not to come
14  in or a bus knew not to come in.
15          I saw some juveniles there, some teenagers,
16  all who appeared not to be in distress, and all who were
17  laughing, joking and having a good time.  Due to
18  their nature, I knew that they had not just been
19  threatened with knives.  Because anyone that has been
20  threatened with a knife, especially as a young juvenile,
21  it would be a traumatic episode and they wouldn't be
22  just joking and laughing about that.  They would be --
23  they would appear to be upset a little bit more.
24          So due to their nature and due to the -- due
25  to the call -- or due to dispatch updating the call

---

**Page 43**

1  stating that they had seen Mr. Wood at the Putt-Putt at
2  San Mateo and McLeod, I -- again, I continued to go
3  northbound on San Mateo to go towards the Putt-Putt.
4      Q.   Okay, Jeffrey.  Thank you.
5          Can you describe these individuals that you
6  saw at the bus stop?  How many were there, roughly?
7      A.   I do not know.  I -- two, three.
8      Q.   Okay.
9      A.   Maybe a couple more, but I don't know.
10      Q.   And were they male or female?
11      A.   They were male.
12      Q.   Okay.  And how old would you say they were,
13  roughly?
14      A.   I'd say 16, 17, maybe.
15      Q.   How close is that bus stop to the movie
16  theater?
17      A.   So the bus stop -- so the movie theater is --
18  this -- where it says "McLeod Crossing" --
19      Q.   Yes --
20      A.   -- the movie theater is this one in the back
21  (indicating).  And so I'm going to put an X over the
22  movie theater.
23      Q.   Thank you.
24      A.   So the X.  And iT'Z -- I'll just write "iT'Z"
25  -- and then Hooters is here.  And I labeled Hooters and

---

**Page 44**

1  iT'Z by writing the name.
2      Q.   Thank you.  Okay.
3      A.   So it's close, but it is still a distance
4  away.  I would say half a mile.
5      Q.   Okay.  There's a -- it looks like there's a
6  blue icon in front of the movie theater here.
7      A.   Yes.
8      Q.   Did you pass by that bus stop on your way to
9  respond to this call?
10      A.   By passing by, I drove -- I drove northbound
11  on San Mateo.
12      Q.   Yeah.
13      A.   And that bus stop is for southbound San Mateo.
14  So I drove by northbound; but, no, I did not stop.  I
15  did not look.  I did not see anything at that bus stop,
16  because it -- again, when dispatch updated that Mr. Wood
17  was at Putt-Putt now, my priority and my focus was to --
18  to contact Mr. Wood --
19      Q.   Okay.
20      A.   -- at that point.
21      Q.   I guess I'm a little bit confused, because I
22  thought the initial call came out at the -- was coming
23  from the bus stop that was in front of the movie
24  theater.  Is that right or...
25      A.   Correct, that is right.

---

**Page 45**

1      Q.   Okay.
2      A.   And the reason why I stopped at the bus stop
3  at San Mateo and Montgomery, was, again, because I just
4  happened to see a few teenagers there.  And I knew that
5  that -- that intersection is a frequent area where
6  Mr. Wood was at.  And so that was just the first bus
7  stop.  And I did not hear the address of the call.  I
8  just heard the bus stop at San Mateo when it first came
9  out.  And so that was my first thought was, Okay, it's
10  going to be this bus stop.
11          Upon dispatch updating the call and upon me
12  getting to that area and noticing that the teenagers
13  were not in distress and Mr. Wood was not there, that's
14  when I noticed that, yes, it was up the road.
15      Q.   Okay.  Were you able to see the call, the
16  details of the call on your computer in your unit?
17      A.   Yes.
18      Q.   That's called a KDT, isn't it?
19      A.   Correct.
20      Q.   Okay.  So you were able to see the address
21  and all salient details on your computer screen;
22  correct?
23      A.   Correct.
24      Q.   Okay.  So when you passed by the bus stop
25  where the dispatch had provided the location, did you

---

12 (Pages 42 to 45)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 8 of 43

Electronically signed by Mary Fulton (001-060-973-7022)

7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

---

Page 46

1  see anyone at that bus stop?
2      A.   Again, I was focused on attempting to contact
3  Mr. Wood at the Putt-Putt that I didn't even look.
4      Q.   Okay.  Did you think it was important to
5  have someone, another officer or yourself, try to
6  locate these juveniles to see if they needed any
7  medical attention or anything otherwise, or certainly
8  to give a statement as to what had occurred?
9      A.   At the time of the incident, I believed it was
10  more important to contact Mr. Wood and then to contact
11  the juveniles, primarily because Mr. Wood had already
12  left the scene, as well as the juveniles were with a
13  security officer.
14      Q.   Did you have confirmation that the juveniles
15  were still with the security officer?
16      A.   From the way the call came out and from my
17  understanding, was that, yes, the juveniles were still
18  with the -- the security guard.
19      Q.   All right.  Were you assuming or did you
20  feel like you had confirmation of that fact?
21      A.   I was assuming.
22      Q.   Okay.  Have you received any special
23  training -- at the time of the incident, did you have
24  any special training on certain behaviors of people?
25          MS. GRIFFIN:  Object to form.

---

Page 47

1      A.   By "certain behaviors of people," are you
2  talking about through mental illnesses?
3      Q.   Sure.  Let's -- we'll talk about that as
4  well.  Let's start there.
5      A.   Okay.  Through our -- through our CIT block,
6  our 40-hour block inside the academy, they did go over
7  -- sorry for dropping the pen -- they did go over what
8  -- what mental illnesses can cause people to do, such as
9  like delusions and depression and anxiety.  They kind of
10  went over things like that.
11      Q.   Okay.  Did they talk about schizophrenia?
12      A.   Yes.
13      Q.   And what are some of the behaviors exhibited
14  by persons who suffer from schizophrenia?
15      A.   That sometimes they go into these delusions,
16  as well as they can be -- they can be paranoid, because
17  they believe that someone is following them or talking
18  -- and following them and trying to hurt them, as well
19  as that they can constantly be hearing voices, from one
20  voice to multiple voices, telling them to do different
21  things.
22      Q.   And how are you to interact with people who
23  are suspected -- who may exhibit these particular
24  signs?
25          MS. GRIFFIN:  Objection to form and

---

Page 48

1  foundation.
2      A.   The way that you are supposed to interact with
3  them is you are supposed to be -- I like to say cool,
4  calm and collected.  But essentially you want to be
5  calm.  You don't want to yell at them.  You don't want
6  to scream at them.  And you want to explain to them
7  everything that you're doing, so that way they can -- so
8  that way, they can process it as best as they can,
9  especially if they are in these delusions.
10      Q.   Yeah.  Okay.  And when you approach them,
11  whether in your unit or in your -- just on foot, how
12  are you supposed to approach these people, people that
13  exhibit signs of schizophrenia, as you've just
14  described?
15          MS. GRIFFIN:  Objection.  Form and foundation.
16      A.   You're supposed to not rush and not use -- I'm
17  trying to think of the best way to put it.  Sorry.  I'm
18  not a very good person with words.
19          Like you don't want to just run up and grab
20  them or anything like that.  You want to take your time.
21  You want to talk to them.  And you don't want to use any
22  sudden movements.  That's what I was looking for.  You
23  don't want to use sudden movements, things like that.
24      Q.   What about lights and sirens?
25          MS. GRIFFIN:  Objection.  Form.

---

Page 49

1      Q.   How do they respond to lights and sirens?
2      A.   Lights and sirens can agitate a subject more
3  if they are on.
4      Q.   If they're what?
5      A.   If they're on.
6      Q.   If the lights and sirens are on?
7      A.   Yes.
8      Q.   All right.  Okay.  What about -- and the
9  reason I'm asking you that, Jeffrey, is that you had
10  talked in great deal, in my mind, about the fact that
11  you didn't think these were the same teenagers that
12  had been assaulted, because they were laughing, they
13  were joking, and these are not the types of behaviors
14  that are exhibited by people who have been, as you
15  say, threatened with a knife.  How do you know that?
16  Did you get some special training about that?
17      A.   It's a traumatic event.  If you get threatened
18  with any type of weapon, it's scary.  You're not going
19  to just sit and laugh it off and joke about it.  You're
20  going to -- you are -- you're going to act scared.  It's
21  the common reaction to getting threatened with a weapon
22  -- or even getting threatened with fists -- is to be
23  scared.
24      Q.   But -- and I'm -- my question is did you
25  receive any special training about that or any

---

13 (Pages 46 to 49)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 9 of 43

Electronically signed by Mary Fulton (001-060-973-7022)

7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.                    December 10, 2015
Jeffrey Bludworth                                                  15cv00550 SCY-KBM

---

Page 50

1  training at all in regards to that, or is that just
2  you telling me that from just being you?
3      A.  I believe that's -- that's more just like life
4  knowledge.
5      Q.  Okay.  Fair enough.  Jeffrey, I'm not trying
6  to be difficult.  I apologize if I'm coming across
7  that way.  I'm asking certain questions because I need
8  to know if you're telling me things based on your
9  training or you're telling me things based on just
10  being a person that lives life every day.
11         So throughout the course of this deposition,
12  it would be very helpful to me if you could clarify
13  those things.  And that's why I'm asking you that,
14  just -- do you know that from anything that you
15  learned at the academy?
16      A.  Yes, ma'am.
17      Q.  Okay.  All right.  So I don't want to
18  interrupt you.  Ms. Griffin, your counsel, is correct.
19  So I'm going to try not to do that.
20         We're now at the scene.  You get to
21  Circle K.  We can refer to Exhibit 26 or 25, whichever
22  is best for you, Jeffrey, in telling me your initial
23  approach into the intersection.
24      A.  I'm going to use Exhibit 26 --
25      Q.  Thank you.

---

Page 51

1      A.  -- just because it's blown up and I can see
2  more.
3         So as I approached --
4      Q.  Would it be pos- -- I'm so sorry to
5  interrupt you.  Would it be possible for you show the
6  camera?
7      A.  Yes.  Before I show the camera, I'm going to
8  kind of --
9      Q.  Fair enough.
10      A.  -- draw outs parts, and I'll break it all the
11  way up, so that way it's easy to show, so I'm not -- so
12  I can see better.
13      Q.  Sounds good.
14      A.  As I approached the intersection, I was in the
15  left lane.  So I'll just put like a little X.  I don't
16  know if this one is showing up as good.  So I was --
17  left lane, coming up to the intersection.  Again, at
18  this time, my lights and sirens were off.  And I
19  observed Mr. Wood in the parking lot of Circle K.
20         So I then got into the left lane.  And I'm
21  drawing an arrow to indicate the left turn lane as I
22  approached.  As I was coming up to this intersection in
23  the left turn lane to make a left-hand turn onto McLeod
24  is when I initiated my lights and sirens.  So I'll draw
25  a little car with little Xs.  That is me.

---

Page 52

1         I was in the middle of the intersection when
2  the light was turning red.  And so I initiated my
3  lights, and I gave a -- I initiated my siren as well.
4  When I initiated my siren, I gave a "whoop-whoop."  You
5  can control it, so I just turned it over just once so it
6  -- it went real quick.  And I turned it off.  It went
7  real quick, and turned it off.  So that way, it would --
8  it would advise everyone else at the intersection that I
9  was in the intersection and that I was clearing it to
10  essentially conduct a police matter.
11      Q.  Jeffrey -- sorry -- can you remind me where
12  you were when you -- where was your car when you first
13  saw Vincent?  I think you said, and I apologize.
14      A.  I believe it was pretty much right at this --
15  like kind of right at the X.  I started observing him
16  over here.
17      Q.  Okay.  Thank you.  So where the X is.
18      A.  Yes, ma'am.
19      Q.  When you first observed him, where was he?
20      A.  He was, essentially, like right at the
21  beginning of like this parking lot.
22      Q.  Okay.
23      A.  And I can put like a little dot.  I don't know
24  exactly where he was right there.  I just know that I
25  happened to see him in that Circle K area.

---

Page 53

1      Q.  What was he doing?
2      A.  He was walking towards the front of the store.
3      Q.  So you -- you didn't -- could you only see
4  the back of him?
5      A.  Yes.
6      Q.  Okay.  And what was he wearing?
7      A.  He had a black leather jacket, I believe black
8  jeans, and he had, from what I remember, was two
9  backpacks.
10      Q.  Okay.  Fair enough.  Thank you.
11      A.  So, again, I initiated my -- my siren and my
12  lights.  I gave a "whoop-whoop," just two real quick
13  little things on my siren, to make sure that everyone
14  around knew that I was there to -- one, clearing the
15  intersection; and, two, was going to be conducting a
16  police matter.
17      Q.  Okay.
18      A.  I then pulled -- I did -- then made the
19  left-hand turn and pulled into the Circle K at the front
20  entrance here.  And pretty much right where that --
21  where the arrow is, so that line, I parked
22  my vehicle.  And I got out of my car, and I knew that --
23  I observed Mr. Wood about 50 feet away from the entrance
24  of the door, maybe a little bit closer.  And at that
25  point, I exited my vehicle.  And I did not draw my

---

14 (Pages 50 to 53)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 10 of 43

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

---

Page 54

1 service weapon.  I just had my door open, and I asked
2 Mr. Wood to come and talk to me.
3    Q.   Okay.  So what I would like for you to do is
4 if you could stand up and show the camera what you
5 looked like when you stepped out of your unit.  You
6 were in your police uniform; correct?
7    A.   Correct.  I was in my police uniform with my
8 badge -- displayed my badge of office.  I did have my
9 whole entire gun belt with me like that.
10    Q.   Okay.
11    A.   So --
12    Q.   I'm sorry.
13    A.   Go ahead, ma'am.
14    Q.   I was going to say, can you literally give
15 us details of like -- so you get out of the car, you
16 open your unit, and where maybe the door is and how
17 far you are from your door and all those details?
18    A.   Yes.  So I was sitting -- so I'm sitting.  I
19 get out of my vehicle.  I open my door.  My door
20 essentially can be this chair.  It's kind of like at the
21 angle --
22    Q.   Okay.  Thank you.
23    A.   -- when you open the door.  So I'm standing at
24 the -- a part of the -- between the door and the opening
25 of where my car would be, my driver's side.  As I'm

---

Page 55

1 standing here, I just asked Mr. Wood -- I said, "Sir,
2 can you come back and talk to me."  Mr. Wood was already
3 looking at me.  I don't remember if he was looking over
4 the right or left shoulder or anything like that.
5       At that point, Mr. Wood started coming back.
6 And at that point, I was going to have Mr. Wood walk
7 back to about the front of my car, and then I was going
8 to have him turn around and face away from me.  So that
9 way his back would be to me.  And, again, I was using my
10 door to my car as cover.
11       But as Mr. Wood began to walk towards me,
12 instead of coming towards me, towards the driver's side,
13 he began to divert and go towards the passenger side of
14 my car.  At that time, I then turned a little bit, I
15 started to watch him; and thinking that he was possibly
16 going to run or try to get away, I then -- I don't want
17 to smash this cord -- but I then ran -- I shut the door
18 to my car as he began to come across the other side of
19 my car, and I began to mirror him.
20       So as he was at the passenger side of my door,
21 a little bit further back, I was at the front, and I
22 began to mirror him.  Again, I had -- I did not draw my
23 service weapon.  At that time, I still had nothing in my
24 hands, and I was still asking Mr. Wood just to come and
25 talk to me.

---

Page 56

1    Q.   Jeffrey, so at that time, you were -- as
2 Mr. Wood is walking around to the back part of the
3 unit, your unit, you're still issuing commands to him
4 to come talk to you.  Is that what you just said?
5    A.   Yes, I'm still asking him, you know, to talk
6 to me, not to -- not to just walk away.  Because he
7 wasn't -- he was looking at me, but he was not
8 responding to me.  He was not talking back to me or
9 anything.  He wasn't making any noises.  He was just
10 looking at me.
11    Q.   Okay.  Jeffrey, can you tell me -- and I
12 understand that we're in a room, but I need you to do
13 this for the video -- can you literally -- if you can
14 recall, and say it the way that you said it that day,
15 when you first uttered any words to Vincent, how did
16 you say it to him?
17    A.   So when I first got out of my vehicle, he was
18 -- like I said, he was a little bit closer to the door
19 of the entryway of Circle K.  So I said, "Sir, can you
20 come back and talk to me."  My voice was a little raised
21 so that way I could be heard over the traffic, but it
22 wasn't -- like I wasn't screaming at him.  I wasn't
23 yelling at him.  I wasn't yelling at him to get on the
24 ground or anything like that at that point.  I just
25 said, "Sir, can you come back and talk to me."

---

Page 57

1       At that point, like I said, he looked, and he
2 was looking already at me.  And then he began to walk.
3 And then I kept saying, "Sir, I just want to talk to
4 you.  I just want to talk to you.  I just want to talk
5 to you," and as -- as he just kept going across.  I
6 guess -- is that where you want me to stop?
7    Q.   So you had asked him -- when you first got
8 out of your unit, you asked him to come over to you,
9 correct, to come talk to you?
10    A.   Yes, I asked him to come talk to me.
11    Q.   And he was walking over to you; correct?
12    A.   He was walking towards me, but not necessarily
13 towards where I was at.  He was walking towards the
14 passenger side of my car.
15    Q.   He was gaining distance on you -- or
16 creating distance on you, to use your words.
17    A.   Can you -- I'm sorry, because I don't --
18    Q.   Yeah.  I --
19    A.   I don't like the phrasing of that, because I
20 don't --
21    Q.   No.  I understand that.  When I read the
22 police report, as well, as you said that you had,
23 that's what's stated in there is that you were
24 concerned -- that you had some concerns because he was
25 gaining distance on you.

---

15 (Pages 54 to 57)

Electronically signed by Mary Fulton (001-060-973-7022)

7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.                    December 10, 2015
Jeffrey Bludworth                                                  15cv00550 SCY-KBM

---

Page 58

```
 1        I'm trying to understand when he was gaining
 2   distance.  Because the police report seems to indicate
 3   that you were saying that he was gaining distance when
 4   he was -- instead of coming directly to you, like
 5   you've said, he was walking around the other side
 6   of your unit, thereby creating distance to you, and
 7   that was concerning to you.  So I want to understand
 8   why that was concerning to you that he was gaining
 9   distance on you.
10        MS. GRIFFIN:  Object to form and foundation.
11        A.   I believe I didn't say he gained distance.  I
12   believe I stated gaining cover.
13        Q.   Okay.
14        A.   He was using my vehicle as cover.
15        Q.   Okay.
16        A.   And that was -- what was discomforting and
17   concerning for me was because he was now in a position
18   where I could no longer see his whole body, and that he
19   was -- again, like he was moving forward and away, but
20   that he was using my car to distance himself and -- but
21   to essentially use my car for his cover.  And, again,
22   that is discomforting for any police officer with any
23   subject.
24        Q.   Okay.  But isn't it true, too, that you had
25   your car to use as cover as well; correct?
```

Page 59

```
 1        A.   Correct.  And that's the way that I was using
 2   it at the beginning.
 3        Q.   Okay.  So if you were concerned, why didn't
 4   you move around your car and continue to keep cover
 5   from him, using your car, instead of mirroring him and
 6   losing any position of cover and concealment?
 7        MS. GRIFFIN:  Objection to form and
 8   foundation.
 9        Q.   I'm happy to ask it again, unless you think
10   you can answer.
11        A.   The reason why I began to mirror him was
12   because I was concerned that he was going to, again --
13   essentially, again, elude officers.  Because we had to
14   find him in the first place, and so at that time, I
15   wanted to detain him and contain him so, that way, we
16   could investigate this crime that had occurred.  And it
17   wasn't until he was at the edge of my car and I was at
18   the edge of my car that he had presented himself and
19   armed himself with the knives.
20        Q.   But you don't feel like -- you didn't feel
21   like he was such a threat to you at that time that it
22   was better for you to seek a position of cover from
23   him?
24        A.   I believe that the knives were inside of the
25   backpack that he had.  And I believe that -- again, I
```

Page 60

```
 1   didn't want him to -- to get away.  I didn't want to
 2   play like a Ring Around the Rosey around my car or
 3   anything like that.  I wanted to mirror him, and I
 4   wanted to make sure that he wasn't able to elude and
 5   escape from officers.
 6        Q.   Do you feel like he was a threat to you at
 7   that time?
 8        A.   At the time when I was talking to him when I
 9   first got out of the car, no; but as we began to come
10   across, I believed that the threat was going to be
11   getting presented too.
12        Q.   And what did you base that belief on?
13        A.   It was just a feeling that I was receiving in
14   my own personal belief.  My heart was telling me that
15   something bad was about to happen.
16        Q.   Okay.  When you were feeling that something
17   bad was about to happen, was he obeying your commands
18   at that time?
19        A.   No.  Again, he was just -- he was looking at
20   me, but he wasn't making any noises or anything like
21   that.  He was -- I knew he was hearing my commands
22   because he was looking at me.  He was talking -- not
23   talking to me, but he was looking at me, and he was
24   making eye contact with me.  But he wasn't listening to
25   my commands.  He wasn't stopping.  He wasn't talking to
```

Page 61

```
 1   me or anything like that.
 2        Q.   Did you ask him to stop?
 3        A.   I don't know if I said, "Hey, stop," but I did
 4   ask him, "I just want to talk to you.  Let's just talk."
 5        Q.   Okay.
 6        A.   So...
 7        Q.   So what I'm trying to understand, Jeffrey,
 8   is exactly what -- tell me all the commands that you
 9   gave to Vincent.  What did you tell him that you
10   wanted him to do?  To come to you, right?  We've got
11   that one down; right?
12        A.   I just said, "I just want to talk to you.
13   Come back and talk to me."
14        Q.   Okay.
15        A.   "Come talk to me."
16        Q.   So the only command --
17        A.   Sorry.
18        Q.   I interrupted you.
19        A.   So -- yeah, only commands from -- again, from
20   the beginning to when I got out of my car, until the
21   edge of the car before he had presented himself with the
22   knives, is that I wanted to talk to him and that I
23   needed to talk to him.
24        I don't specifically remember saying "stop" or
25   anything like that.  Again, because I -- I was trying to
```

16 (Pages 58 to 61)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 12 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.                    December 10, 2015
Jeffrey Bludworth                                                  15cv00550 SCY-KBM

---

Page 62

1    -- to be calm.  I was trying to -- I was keeping my tone
2    of voice low.  And I was trying to talk to him
3    one-on-one as a person, so that way he could focus on
4    me.  And so that way I could essentially talk to him and
5    detain him until officers arrived on scene.  And so
6    that's why I just kept saying, "Come talk to me.  Come
7    talk to me."
8        Q.   So come to talk to you is the only command
9    that you can recall giving to Mr. Wood?
10       A.   Yes, ma'am.
11       Q.   Now, one of the things that I'm not very
12   good about is -- you've been standing for a long time.
13   I'm asking you to -- throughout the course of you
14   describing this, I am going to have you describe
15   things, but please know that you're welcome to sit
16   down until I tell you to describe things again.  But
17   if you feel more comfortable standing up -- sometimes
18   I do -- feel free to stand.
19       A.   Yeah, I'll probably just stand for a little
20   while.  I've got to stretch my knee.
21       Q.   Okay.  Sounds good.
22            So -- all right.  So at the -- he's at the
23   back of your police unit about now --
24       A.   No, ma'am.
25       Q.   -- is that right?

---

Page 63

1            Okay.  And you drew on the diagram -- and I
2    apologize.  You had drawn on the diagram your unit.
3    Did you ever move your unit at all before shooting
4    Mr. Wood?
5        A.   No.  My unit -- once I parked my unit, my unit
6    was parked until -- until essentially I picked it up at
7    PINO.
8        Q.   All right.  So when Mr. Wood, you said, was
9    at -- we've got a dot there.  Where was he when --
10   when you said you had gotten that feeling in your
11   heart that something was going bad or -- I don't want
12   to put words in your mouth, but --
13       A.   Right.
14       Q.   Can you draw like a -- I don't know, we have
15   different colors here, Jeffrey.  I don't know if that
16   would be better or a red pen or --
17       A.   So I'm -- I'm kind of just going to go a
18   little back just real quick.
19       Q.   Absolutely.  Yeah.
20       A.   Because, again -- so that first blue dot is
21   where I saw him when I was on McLeod.
22       Q.   Right.
23       A.   So when I pulled into the parking lot, he was
24   closer.  And he was closer so -- to the front doors of
25   the Circle K.

---

Page 64

1        Q.   All right.
2        A.   And so I'll use the red dot for that.
3        Q.   Thank you.
4        A.   Just so that way, there's no misinformation or
5    misclarification in any of that.
6        Q.   Okay.
7        A.   As he -- when I began to feel that something
8    was wrong was when he was about there (indicating).  And
9    then I'll put like a -- like a circle for me.
10            So I put a dot for Mr. Wood and a circle for
11   me.  We were both essentially at the back of my vehicle.
12   He was on the passenger's side, and I was on the
13   driver's side.
14       Q.   Okay.  All right.  What -- and what command
15   had you given him at that point?  "Come to me.  I want
16   to talk to you"?
17       A.   At that point, I was just saying, "Hey," you
18   know, "sir, I just want to talk.  I just want to talk."
19       Q.   And no response from Vincent?
20       A.   No response other than, again, he was -- he
21   kept eye contact with me throughout this whole incident.
22       Q.   Now, I understand that Vincent -- I
23   understand from Katherine Wright -- we've taken
24   Katherine Wright's deposition -- as well as what is
25   contained inside the case files -- that Mr. Wood would

---

Page 65

1    sometimes be difficult to understand.  Is there any
2    possibility, Jeffrey, that at this time he was trying
3    to communicate with you, i.e., grunting or making some
4    verbal communication to you, but that you didn't
5    understand it to be that?
6        A.   Between red dot and green dot --
7        Q.   Yes, sir.
8        A.   -- there was no grunting, there was no type of
9    communication.
10       Q.   Thank you.  All right.
11       A.   He was quiet.
12       Q.   Okay.
13       A.   Now, when he presented himself with the knives
14   and armed himself with the knives and I began to give
15   him commands to get on the ground and to drop his
16   weapons and drop the knives --
17       Q.   Yeah.
18       A.   -- that's when he began his grunting and his
19   inaudible and un -- oh, man, I'm trying to think of a
20   word -- essentially just --
21       Q.   Inarticulate?
22       A.   Yeah, just inarticulate.
23       Q.   Is that a good -- okay.
24       A.   That's -- just complete -- kind of like
25   gibberish, almost like a baby talk, just un --

17 (Pages 62 to 65)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 13 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

---

Page 66

1  unununderstandable.
2  Q.  Okay.  When you -- on the diagram you've
3  drawn those green dots -- and that's where you felt
4  that in your heart, that danger -- why didn't you mace
5  or tase him?
6  A.  Due to the training in the Albuquerque Police
7  Academy, the RCM, or the reactive control module, when
8  deadly force is presented, then you essentially react
9  with deadly force.  And so at that time, when he
10  presented himself with the knives, that was -- I reacted
11  by pulling out my service weapon, which was matching his
12  deadly force with my deadly force.
13  Q.  All right.  What about before he presented
14  the knives?  I'm just talking about -- my
15  understanding is that at the green dot, he had not
16  presented the knives yet, but that the way he was that
17  looking at you and the fact that he was moving around
18  the car -- I don't want to put words in your mouth --
19  how you testified before about that, and that's what
20  made you feel that way.  My understanding is he had
21  not presented the knives at the green dot.  Is that
22  right?
23  A.  Correct.  It was pretty much like right at the
24  green dot.  Right after is when he presented himself
25  with it.

---

Page 67

1  Q.  So I'm talking about at the green dot,
2  before he presented his knives, why didn't you mace or
3  tase him?
4  A.  There was -- there was no justification for me
5  use to that type of use of force at that time.
6  Q.  Is it because he wasn't posing an immediate
7  threat to your safety?
8  A.  Essentially, he was just a noncompliant
9  person.  I can't just walk up to someone and -- because
10  they're being noncompliant, I can't just tase them for
11  no reason, or I can't just mace them for no reason.
12  Q.  Okay.
13  A.  They have to actively be resisting at that
14  time.
15  Q.  Okay.
16  A.  And he was -- he was just a noncompliant
17  subject at that point, in my eyes.
18  Q.  Did you feel like you had probable cause?
19  Do you understand what that means, probable cause?
20  A.  Yes.
21  Q.  Okay.  Did you have -- do you feel like at
22  the green dots that you had probable cause to arrest
23  him?
24  A.  At that time I had probable -- I felt that I
25  had probable cause and more reasonable suspicion to

---

Page 68

1  detain him to investigate a crime that occurred.
2  Q.  Okay.
3  A.  And then as soon as that investigation would
4  be over, I would then determine if I had probable cause
5  or not probable cause to arrest or not arrest.
6  Q.  Okay.  So -- because I don't want to put
7  words in your mouth -- at that time, you had
8  reasonable suspicion to investigate whether or not a
9  crime had been committed by Mr. Wood; correct?
10  A.  Correct.
11  Q.  But you did not feel at that time that you
12  had probable cause to place him in handcuffs?
13  A.  I had reasonable suspicion to investigate and
14  to detain, and so I would place him into handcuffs.
15  Q.  Okay.  And when you would place him in hand-
16  -- if you would have been able to place him in
17  handcuffs -- again, we're at the green dot, just for
18  clarification -- that would have been not because you
19  had confirmation that he had committed a crime but in
20  order to -- for officer-safety reasons to conduct your
21  investigation.
22  A.  Correct.
23  Q.  Thank you.
24  A.  Again, to make sure that he didn't have -- or
25  did have or did not have any weapons at that point.

---

Page 69

1  Q.  All right.  Okay.  All right, Jeffrey.  So
2  what happened -- did you see any other officers around
3  -- we're at the green dot still -- did you see any
4  other officers?
5  A.  No.
6  Q.  What was coming through dispatch at that
7  time?  Anything?  Did you hear Katherine or O'Guin or
8  anybody talking?
9  A.  The only thing that I remember coming through
10  dispatch prior to -- prior to the use of force was when
11  I was coming up to this intersection, I remember Bike 46
12  calling that he was 56, in the area.
13  Now, Bike 46 is Officer -- or was Officer
14  O'Guin or Jon O'Guin.  That was his call sign.  And 56
15  is saying that he has arrived on scene, stating that he
16  was in the area.  And that was essentially the last
17  thing that I had heard over the radio at that point.
18  Q.  Okay.
19  A.  Other than my transmission of saying that,
20  "Hey, I see him at Circle K.  I'll be 56."
21  Q.  56 means arriving on scene?
22  A.  Right.  Correct.  Arrived at scene.
23  Q.  All right.  All right.  So --
24  Jeffrey, can you tell me why you didn't have your
25  lapel camera running at that time?  In other words, my

---

18 (Pages 66 to 69)

Trattel Court Reporting & Videography
505-830-0600

Electronically signed by Mary Fulton (001-060-973-7022)                                      7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

---

Page 70

1  understanding from your -- from the standard operating
2  procedures, as well as from the training received, is
3  that you are supposed to turn your lapel camera on as
4  you are approaching any Priority 1 call, not that you
5  turn it on when the scene starts to unfold but rather
6  you are to turn it on as you approach the scene.  Is
7  that correct?
8      A.   Correct.  So essentially at that time, the
9  lapel cameras that we had were not the Taser cameras,
10  which you can just hit the button twice and it turns on,
11  and it records 30 seconds back.  The Taser cameras and
12  the Taser lapel cameras are an amazing difference in
13  technology than what -- the camera at the time that I
14  had.
15      The camera at that time that I had was a
16  Scorpion camera, which you would have to flip a thing
17  on, wait five seconds for it to kind of get itself
18  moving, I guess.  And then you'd have to hit the button
19  twice and wait for the green-and-red or
20  green-and-yellow-type light to then start cycling
21  through, showing that it was recording.  And if didn't
22  work the first time, then you had to do it again a
23  second time, by hitting it twice again, to continue to
24  try to get it to go.
25      And the only way for you to know that that

Page 71

1  camera was on was you had to look down, specifically
2  straight down, to make sure that the light was going.
3  The Taser camera has the beep, so that way you know that
4  it is going.  It beeps every like 30 seconds or
5  something like that.
6      And so I believed that I had turned my camera
7  on as I was approaching that intersection when I saw
8  him, inside my car still.  When I looked down after he
9  had presented himself with the knives is when I noticed
10  that my camera was not on, and then I attempted to turn
11  it back on, which then caused -- which essentially
12  recorded that -- my lapel is when I was able to turn my
13  camera on.
14      Q.   Okay.  So there's not a 30-second kickback
15  -- loopback, to use technical terms, on those Scorpion
16  cameras, Jeffrey?
17      A.   No, ma'am.
18      Q.   Okay.  How do you know that your camera is
19  -- how did you know your camera was on?  Is it a
20  blinking green light, or was it a solid green light?
21      A.   It's like a blinking green light with like
22  another color.  I don't remember if it was like a red or
23  a yellow.  It was -- like I said, it was a very
24  complicated camera, and that -- to -- blatantly, that
25  camera got, and could get, a lot of officers hurt

Page 72

1  because of how not technically sound it was.  It was not
2  meant for police work.  Because it causes you to look
3  down to continue to make sure that it records.
4      Q.   Okay.
5      A.   So...
6      Q.   So if it's -- if the light is solid green,
7  that means it's on?  Is that how you would know that
8  it's on?
9      A.   The way that I remember it being on was that
10  was green with it blinking.  So it would blink green
11  with a like red.
12      Q.   Okay.
13      A.   Or a yellow.  I don't remember the exact
14  color, but it was either a green and a red or a green
15  and a yellow, showing that it was recording.
16      Q.   So would the light ever turn off as it was
17  recording?  Let's say you're recording a call that's
18  lasting 10, 20 minutes.  Does the light stay on or
19  does it eventually turn off as it's recording?
20      A.   I want to say it had a run time of 15 minutes.
21  And so at 15 minutes, it would shut off; and then you
22  would have to turn it back on and continue to record.
23  So it would record 15 minutes of video at a time.
24      Q.   While it was running, was the light on the
25  whole time, or would it fade out?

Page 73

1      A.   It could continue to like blink.
2      Q.   Okay.
3      A.   From my understanding.  That's the way that I
4  always remember it.
5      Q.   All right.  I appreciate that.  I'm sorry to
6  ask you so many questions about that.
7      You had said that you have to -- turn it on,
8  you have wait five seconds for it to cycle, and you
9  have to hit the button again and then let the light
10  cycle through.  How long would it take for that second
11  cycle to last, for that light to cycle through,
12  generally?
13      A.   Well, as the light was cycling through, it was
14  recording.  But you had to make sure that it was like
15  doing it.  Otherwise, if it wasn't, then essentially you
16  had to keep pushing on it or turn it off and turn it
17  back on, wait for five seconds and keep doing that.
18      And so that's -- that's why when you're
19  watching the news and things like that, during that
20  period of time, that's why you saw a lot of issues with
21  the lapel cameras, because it was such a difficult
22  camera to operate in such a fast operation.  It wasn't
23  meant for police work.
24      Q.   Okay.  What -- so you had on your -- on your
25  person -- is your knee feeling okay?

19 (Pages 70 to 73)

Trattel Court Reporting & Videography
505-830-0600

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 15 of 43

Electronically signed by Mary Fulton (001-060-973-7022)

7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.          December 10, 2015
Jeffrey Bludworth                                        15cv00550 SCY-KBM

Page 74

1    A.   Yes.  Is it all right if I sit down?
2    Q.   Absolutely.
3    A.   I don't know if --
4    Q.   I want you to be comfortable.  So, yeah,
5    absolutely.  I'm going to ask you some questions about
6    your unit and what you had in your unit.  So we'll
7    take a little break from the scene.
8         Do you want a bathroom break or anything?
9    Are you good?
10   A.   I'm good.
11   Q.   Okay.  So tell me about what you had on your
12   person.  You had your -- what kind of gun did you have
13   on?
14   A.   So I'll just go through my whole entire belt.
15   Q.   Yeah.  Scorpion camera.
16   A.   Yeah.  So -- okay.  So I had the Scorpion
17   camera on my chest.
18   Q.   Got it.  Okay.
19   A.   Badge on my -- on my left side of my uniform
20   as well.
21   Q.   All right.
22   A.   Do I need -- like I had a name tag on --
23   Q.   Yeah.
24   A.   -- saying Jeff Blud- -- or J Bludworth.  On my
25   belt, going from the middle all the way to the right to

Page 75

1    the back to the middle, I had a flashlight, a can of OC
2    spray, which is mace.  I then had my Smith & Wesson
3    9-millimeter M&P9, which was my duty-issued handgun.
4    Q.   Okay.
5    A.   I then had two handcuffs.  And then I had a
6    flashlight holder.  It was like a ring for my big
7    flashlight.
8    Q.   Okay.
9    A.   Then I had a baton.  And then I had my Taser.
10   And then -- or sorry.  Before my baton and -- between
11   the flashlight ring and my baton was my radio.  And then
12   it was baton, then my Taser, and then my two extra
13   magazines for my Smith & Wesson.  Sorry.
14   Q.   No, you're all right.  All right.  Let me
15   break this down a little bit.
16        So your OC spray, what's the distance that
17   it can spray?
18   A.   I don't know, like 15 feet maybe, I think.
19   Q.   Okay.
20   A.   It has a -- it has a long reach.  I've never
21   used it, because it's not a fun tool.
22   Q.   What do you mean "it's not a fun tool"?
23   A.   Like it -- it affects everybody.  So like if
24   it -- when you spray, it gets in everybody's eyes, and
25   it affects everything.  Like I -- I'm just not a big fan

Page 76

1    of it.
2    Q.   Does it affect you too?  Can it kick back on
3    you is what you mean?
4    A.   Yeah, it can kick back on me.  And that's why
5    I don't like to use it.  And, again, like I've never
6    been presented with any time that I have to use it so...
7    Q.   Okay.
8    A.   I just remember in the academy when we were
9    all sprayed with it, it was not a pleasant experience.
10   Q.   Uh-huh.
11   A.   That's what I meant by that.  It wasn't like,
12   Oh, this is not a fun tool, I never want to use it.
13   It's just I don't like the experience, so...
14   Q.   What did it make -- what does it make you
15   do, when you got sprayed at the academy?
16   A.   My eyes got really red and itchy and watery.
17   And my nose started draining.  And then it felt like my
18   throat was closing up.  It wasn't.  It was just the
19   reaction.  It causes you not to be able to breathe.
20   Q.   What are you -- at the academy what are you
21   trained -- I want to know specifically in regards to
22   OC.  When are you -- what is the purpose of OC?  Is it
23   to sort of -- now I'm looking for words, right?  Is it
24   to sort to take the person back or stun them or -- I
25   mean when are you supposed to use spray and what is it

Page 77

1    for?  What's the purpose of it?
2    A.   Essentially kind of like you said.  It's for
3    someone that is actively resisting.  And it does, it
4    takes them aback and stuns them, because that is -- it's
5    something that does affect your whole entire body.  Like
6    I said, it causes your eyes to start watering and itch
7    and get red, and your whole skin starts to burn.
8         It's harder to breathe through your nose.  Any
9    type of mucus that you have is just coming out, no
10   matter what.  I mean, it's coming out your nose.  It's
11   draining down your throat.  So it does.  It causes
12   people to essentially -- the hope is the effects will
13   stop someone from their actions.
14        Now, like we learned in the academy, you can
15   always fight through it, because that's what we had to
16   do was after we were sprayed with it, then we had to sit
17   there and for a couple seconds -- probably about 10, 15
18   seconds of it, just letting the effects get at you.  And
19   then you had to fight someone, fight an instructor and
20   wrestle them and place them into handcuffs.  And then
21   you had to find a radio and call out on the radio at
22   that time.  So you can continue to fight and resist
23   during that whole entire ordeal.
24   Q.   Okay.  What about your 9-millimeter -- your
25   Taser.  What kind of Taser did you have on?  What was

20 (Pages 74 to 77)

Trattel Court Reporting & Videography
505-830-0600

Electronically signed by Mary Fulton (001-060-973-7022)                                      7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.                    December 10, 2015
Jeffrey Bludworth                                                  15cv00550 SCY-KBM

Page 78

1  the make and model?
2      A.   It's a Taser X26.
3      Q.   And was that -- that had the prongs; right?
4      A.   Yes.
5      Q.   Okay.  How far do those prongs shoot?
6      A.   I want to say the ones that I have are rated
7  for 25 feet.
8      Q.   And how many volts?  Is it the 440-volt, do
9  you know?
10     A.   It's the one that all standard officers use,
11  so...
12     Q.   Were you trained at the academy how many
13  volts the Taser will put out?
14     A.   Yes.
15     Q.   How many?
16     A.   I don't recall.
17     Q.   You don't remember.  Okay.
18     A.   I just know it works.
19     Q.   Okay.  How do you know it works?
20     A.   I've been tased before.
21     Q.   With this Taser?
22     A.   Yes.
23     Q.   What did it make you do?
24     A.   It makes your whole body stiffen.
25  Essentially, where the prongs land or enter into your

Page 79

1  body, depending on where it's at, your -- what you want
2  is kind of lower back to upper back area, because it
3  causes all the muscles to contract, which causes you to
4  -- to -- I don't want to say seize, because you're not
5  like convulsing, but you seize up and you stop, and it's
6  hard to move again.  And essentially that lasts for
7  five seconds.
8          As soon as that five seconds is over, the
9  prongs are still in your back, but you no longer have
10  the electricity running through you, so you don't --
11  you're free to move again.  You're free to start
12  fighting or whatever.
13     Q.   When you -- after the -- after the cycle had
14  gone through on you --
15     A.   Yes, ma'am.
16     Q.   -- were you -- I mean, were you able to --
17  would you -- were you able to be normal again, or did
18  you feel some aftereffects of that?
19     A.   No, ma'am, there were no aftereffects.
20     Q.   Okay.
21     A.   I guess, technically, the only aftereffect was
22  I still had prongs in me, so they just had to pull them
23  out.
24     Q.   Yeah.
25     A.   But, again, like I could -- I was getting up.

Page 80

1  I was standing up, and I was ready to go.  At the time,
2  the instructors actually were showing different things.
3  So I had two prongs.  And then he contact-tased me at
4  the same time, so I had three points of electricity
5  going at the time.  So I had it worse than what anyone
6  else would typically ever deal with, and I was able to
7  just get up just fine.
8      Q.   Okay.  Now, in a real-world scenario, you
9  tase somebody, the prongs go in, can you then -- and
10  the cycle ends, can you then pull the trigger and
11  cycle it again?
12     A.   If that force is justified, then, yes; if it's
13  not, then, no.  You have to justify and you have to
14  explain each and every single one of your cycles.  So if
15  I -- if I Taser you and I cycle through it 20 times, I
16  have to explain why I cycled through every single time.
17  Eventually it can become overkill.
18     Q.   Okay.  Jeffrey, you said that at the green
19  dot, you did not feel that it was appropriate to use
20  the mace and Taser at that time.  I know that he then
21  bends -- he then puts his -- starts to go through his
22  backpack.  Did you feel that at that time you would
23  have been justified to use the Taser or the mace?
24     A.   If I was able to -- to explain right, then
25  yes.  But at that time, again, it happened in such a

Page 81

1  fast moment that I didn't think about, you know,
2  grabbing my OC or my Taser.
3      Q.   What do you mean, if you could explain it
4  right?  What do you mean by that?
5      A.   Just making sure that like -- like explaining
6  the -- the threat that I was like experiencing at that
7  time.  Like, you know, I saw him start to reach in for
8  his backpack, and that I knew that he was possibly armed
9  with knives, due to the nature of the call; so, thus, I
10  pulled my out Taser and tased him.  So that's kind of
11  like what I meant, not...
12     Q.   Do you mean that you would have had -- you
13  don't feel like you would have been able to justify
14  the tasing based on that or -- I'm sorry.  I don't --
15  I'm still confused.
16          I understand what you just said, that you
17  were afraid because you knew that he probably had the
18  knives in the backpack and that he was
19  digging in the backpack, so that would have been your
20  justification for using the Taser at that point.
21          Would it also have been justification,
22  Jeffrey, because you had told him to come talk to you,
23  he had not talked to you, and he had gone around the
24  police unit, getting a position of cover.  Do you feel
25  like that would have been additional justification for

21 (Pages 78 to 81)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 17 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

---

Page 82

1  you in making your use of force on him to your
2  supervisors?
3     A.   Yes.
4     Q.   But you did not use your Taser or your mace,
5  as you said, because you just didn't -- you didn't
6  think about it at the time?
7     A.   Correct.  Because it happened so fast.
8     Q.   Okay.  When you say "it," can you -- can
9  tell me what do you mean by "it"?  Do you mean from
10  the time that he was at the green dots to the time
11  that he was digging in his backpack?
12     A.   Yeah.  Correct.  From essentially the time
13  that he was at the green dots to the moment that I saw
14  the knives, I felt like -- like I blinked, essentially.
15  And that's how fast he had pulled his knives out of the
16  backpack and that -- so my first thought was here are
17  knives.  Here is a deadly force.  And so I then went to
18  -- and reacted upon his force -- to match his force with
19  my force.
20     Q.   How far away were you -- so let's -- so
21  you've -- have you drawn any indication of where he
22  was when he pulled the knives out of the backpack and
23  where you were?  Have we already been there?
24     A.   No.
25     Q.   We haven't.  Do mind taking us there with

---

Page 83

1  any color.
2     A.   So I got a black marker now.
3     Q.   Okay.
4     A.   Again, this is a little dot.  And like a --
5  they're going to overlap, essentially in the same spot,
6  and he's kind of right there.  So, again, I have a black
7  dot.
8     Q.   Okay.
9     A.   And it's going to go blue, black, green.  And
10  then I have a green circle and a black circle.  And they
11  were all right next to each other.
12     Q.   Okay.  So you were in the black circle?
13     A.   Yes.
14     Q.   And he was in the black dot when he started
15  pulling the knives out of his backpack?
16     A.   Correct.
17     Q.   What is the distance between the black
18  circle -- I mean, what was the distance between the
19  two of you?
20     A.   At that point, I would say about 15 feet.
21     Q.   15 feet. Okay.
22     A.   At that point, yes.
23     Q.   When he pulled the knives out, what did you
24  -- what was the first thing you said to him?
25     A.   "Drop the knives."

---

Page 84

1     Q.   How did you say it?  Could you say it
2  exactly how you said it.
3     A.   "Drop the knives.  Drop the knives.  Drop the
4  knives."
5     Q.   Okay.  So you said it loud.
6     A.   Yes, ma'am.
7     Q.   Okay.  Did you see any other police cars at
8  that point?
9     A.   No, ma'am.
10     Q.   Okay.  Did you have any independent
11  knowledge -- or firsthand knowledge, rather, that
12  officers were on scene -- any other officers were on
13  scene?  Did you ever hear that on your radio?
14     A.   No, ma'am.  Like I said before, the last thing
15  that I even remember hearing over the radio was when
16  Officer O'Guin stated that he was in the area.
17     Q.   What did you do at that -- what did
18  he do when you said "drop the knives"?
19     A.   Again, he -- he had his eyes already fixated
20  on me, and we were already making eye contact at that
21  point.  I'm going to use two markers to kind of explain
22  what he --
23     Q.   Thank you.
24     A.   -- what he did.  And, again, I'm going to
25  stand and use hand gestures.  And I'll try to explain

---

Page 85

1  them the best I can for --
2     Q.   Okay.
3     A.   -- for the record.
4     So as he pulled them out -- again, I believe
5  that he had two backpacks on.  One was like slung on
6  him, like his right shoulder.
7     Q.   Okay.
8     A.   And he reached and he grabs the knives out
9  with both hands.
10     Q.   Well -- I'm sorry, Jeffrey -- I thought he
11  had put the backpack down on the ground.  No?
12     A.   Not from my recollection.  The way that I had
13  seen it was that he had the backpacks and he reached for
14  them while it was still slung on his shoulder.
15     Q.   Okay.
16     A.   That was the way that I had seen it and the
17  way that -- you know, that's the way that I testified,
18  and that's -- again, that's just the way I see it and
19  perceived it, so...
20     Q.   Okay.
21     A.   So as he pulls the knives out, he has them
22  both -- one in left hand and one in right hand.
23     So I flip-flopped that on accident.
24     And he has both of them standing up straight,
25  and he is fixated on me.  So he's looking straight at

---

22 (Pages 82 to 85)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 18 of 43

Electronically signed by Mary Fulton (001-060-973-7022)

7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.                    December 10, 2015
Jeffrey Bludworth                                                  15cv00550 SCY-KBM

---

Page 86

1   me.  And he's like this.  And as I tell him to "Drop the
2   knives.  Drop the knives," he then lowers his arms and
3   his hands to about a 45-degree angle.  As -- in the way
4   that I perceived it and the way that I see it today,
5   still, is that in a way to hack and to attack somebody.
6       Q.   Right.  But he wasn't -- he was doing that.
7   He wasn't making those arm motions that you're making.
8       A.   No, he was making the motions.  Again, like I
9   was saying, he just had his arms at a 45-degree angle,
10  kind of with the wrists at a 45-degree angle, with the
11  knives at a 45-degree angle.  They weren't like -- they
12  weren't up, they weren't down.  They weren't at his
13  side.  They were up.  And they were ready, again, in my
14  view, in my perception, to be ready to attack and to
15  start a scene.
16      At that point, again, I kept giving him
17  commands: "Drop the weapons.  Drop the weapons.  Drop
18  your knives.  Drop your knives."  He was not.  And I
19  began to walk backwards in an attempt to retreat.  And
20  as I was doing so, I looked down at my lapel camera to
21  confirm or not confirm if my lapel camera was on.  I did
22  not see that my lapel camera was on and recording.
23      So I looked and I saw -- again, I still had my
24  service weapon out -- I'll use like this pen -- it was
25  still out in my right hand.  And I had my left hand --

Page 87

1   and as I looked down, I lost complete view of Mr. Wood.
2   And I pushed with my index finger on my left hand on my
3   lapel camera to attempt to get it to work again.  And as
4   I looked up, he was essentially about 5 feet away.  I'd
5   say about from me to the chair, if not maybe a foot
6   back.  Like if I come back a little bit.
7       Q.   So Mr. Wood is that black chair?
8       A.   Yes, ma'am.
9       Q.   In the camera.
10      MS. CARPENTER:  Are you getting this?
11      THE VIDEOGRAPHER:  Yes.  Yeah, I'm getting it.
12      MS. CARPENTER:  Okay.
13      A.   He's an extremely close distance at that
14  point.  As I come back up and I realize that he has
15  closed distance on me, at that point, again, he still
16  has the knives in his hands, still at a 45-degree angle,
17  and his eyes are fixated on me, and he is looking
18  specifically at me.  He's making some grunting noises,
19  some inaudible sounds, ununderstandable, as I'm telling
20  him to get on the ground and to drop his knives.  But,
21  again, as I come up from my lapel camera, I notice that
22  he is this close.  And at that time, I discharged my
23  firearm.
24      Q.   Okay.  Jeffrey, what I would like for you to
25  do is I would like to break that down a little bit.

Page 88

1   You said that -- at the black -- the black circle is
2   when he started to get the knives; correct?
3       A.   Correct.
4       Q.   Okay.  And you were about 15 feet from him
5   at that point?
6       A.   About, yes, ma'am.
7       Q.   Okay.  And he never put the backpack down on
8   the ground to get the knives.  He got them out,
9   reaching around; correct?
10      A.   That's the way that I saw it, yes.
11      Q.   Okay.  And the backpack stayed on him?
12      A.   I believe it did, but I don't know if it did
13  or not.
14      Q.   Okay.  And so he has the knives, and he's
15  walking towards you -- moving towards you from the
16  back of the unit; right?
17      A.   Yes.  So --
18      Q.   Okay.
19      A.   -- so this table, the edge of the table, could
20  essentially be the trunk of my car.
21      Q.   Okay.  All right.  And then when you first
22  -- so when you -- when you -- can you draw where you
23  were when you turned on the lapel camera.
24      A.   We're running out of colors.
25      Q.   We are.  Maybe we can use some different shapes,

Page 89

1   like a triangle.
2       A.   So I'll do a triangle.
3       Q.   Okay.
4       A.   Essentially like in the same spot.
5       Q.   Okay.
6       A.   And --
7       Q.   Just a few feet back from the black circle?
8       A.   Yeah.  And he was pretty close.
9       Q.   Okay.
10      A.   He was like right -- and, again, so the
11  triangle is here, and the red dot is essentially at the
12  edge of my trunk on the driver's side.
13      Q.   Okay.  Were you on the curb?  Do you see
14  where there's that like median-looking thing?
15      A.   I was not on the curb, no.  I was still in the
16  parking lot.
17      Q.   Did you ever step back into that median-curb
18  thing that's -- let me make sure we're --
19      A.   That median right here?
20      Q.   Yeah, exactly.
21      A.   No.  I -- in my recollection, I had never
22  entered that area.  I was always in the parking lot.
23  Like on that asphalt in the -- in the actual parking
24  lot.  I never entered into that median.
25      Q.   Okay.  And so at that red dot, which is

23 (Pages 86 to 89)

Trattel Court Reporting & Videography
505-830-0600

Electronically signed by Mary Fulton (001-060-973-7022)                                   7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.                                    December 10, 2015
Jeffrey Bludworth                                                                  15cv00550 SCY-KBM

---

Page 90

1    where you turned your lapel camera on, is that also
2    the same location from where you fired your first
3    round?
4         A.   I believe so, yes.
5         Q.   Okay.
6         A.   Because I don't remember moving after that
7    point.
8         Q.   Thank you.  When you fired your first round,
9    were you standing still, backing up, or moving towards
10   Mr. Vincent?
11        A.   So at that time I was standing still, kind of
12   bladed, not -- you know, not straight up.  My left foot
13   was slightly in front of my right foot, and my right
14   foot was a little bit back, kind of as a plant-type
15   foot.  And then I came upon Mr. Wood with my firearm.
16        Q.   All right.  And so you turned your lapel
17   camera on.  You're looking down to do that.  And then
18   you look up and you see Mr. Wood has closed more
19   distance on you, and that's when you fire.
20        A.   Yes, ma'am.
21        Q.   When you turned on your lapel camera, did
22   you feel at that moment that he was posing an
23   immediate threat to your safety?
24        A.   Yes.
25        Q.   Why didn't you shoot him at that point?

---

Page 91

1         A.   Why didn't I shoot him before I turned my
2    lapel camera on?
3         Q.   Yes.
4         A.   To be completely honest, it's because I felt
5    that if my lapel camera was not on, that the way that
6    everything was going at that time, that I would be --
7    one, I'd be fired; two, I'd lose my -- well, lose my
8    job.  But by losing my job, I would lose my house that I
9    just bought.  I would no longer be able to provide for
10   my family that I have, because I'm the sole and only
11   provider for my family.
12            I thought my name was going to be completely
13   slandered throughout the news, and I thought, again,
14   that the chief was going to essentially either suspend
15   me or give me some type of discipline for not having it
16   on, if I did not, at the end of the day, have my job.
17        Q.   You said "the way everything was going at
18   that time."  What do you mean by that?  You mean
19   within the department?
20        A.   Kind of -- both the department and mainstream
21   -- I shouldn't say mainstream media, but local media.
22   Just the way that they were presenting officers at that
23   time with the amount of police shootings.  And I believe
24   DOJ was in the talks of coming into town or was in town,
25   I believe, at that time, actually.

---

Page 92

1             And so just how everything was at -- and the
2    culture of all that was just on my mind.  And I
3    specifically mentioned in my interview that I was
4    extremely upset because I put my own -- my own safety at
5    risk to make sure that I satisfied the news.
6         Q.   Okay.  All right.  Do you feel like the
7    Albuquerque Police Department was being held in a
8    negative light at that time because of all the police
9    shootings?
10        A.   Yes.
11        Q.   Do you feel like that wasn't right?
12        A.   Yes.
13        Q.   Okay.  You don't think Albuquerque Police
14   Department at that time had a problem with its use of
15   force?
16        A.   No, ma'am.
17        Q.   Okay.  All right.  So that's what you were
18   thinking, that's what was running through your mind
19   that made you turn on your camera?
20        A.   Yes, ma'am.
21        Q.   You said "if I'm going to be absolutely
22   honest."  Jeffrey, I would assume -- and I certainly
23   hope -- that you're being absolutely honest throughout
24   the course of this testimony.  Are you?
25        A.   Yes, ma'am.  I -- it's just more for the

---

Page 93

1    political correctness, I guess you would say, just that
2    I was extremely upset about the news always having to
3    have a lapel video, otherwise officers are always at
4    fault.
5         Q.   I think it's important for officers like you
6    to speak your mind and say what you think and feel
7    about these things.  I think that's important.
8             Have you voiced this to your commanders?
9         A.   I've voiced it to some people, but it doesn't
10   go very far.
11        Q.   Okay.  Well...
12        A.   And the time is different.  Taser cameras are
13   completely different, and I have no issues with the
14   Taser camera, so -- and, again, like I -- it's not that
15   I have an issue with recording events, because I believe
16   that helps everybody at the end of the day.  I just
17   believe that sometimes equipment does not function -- or
18   equipment doesn't work the way that it's designed to.
19   And especially when you have obsolete equipment, it's
20   not always going to work in a satisfactory way.
21        Q.   If you want to sit down -- I'm going to take
22   a break and sort of talk about some stuff.  But let's
23   talk about Scorpion cameras for a minute.
24             You didn't receive -- I know that with the
25   Taser cameras, you guys got a -- you guys went to a

---

24 (Pages 90 to 93)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 20 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                                7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.                                    December 10, 2015
Jeffrey Bludworth                                                                        15cv00550 SCY-KBM

---

Page 102

1    did you ever see the security guard?
2        A.   No.
3        Q.   Did you ever talk to the security guard?
4        A.   No.
5        Q.   Okay.  Can you tell me all the things that
6    you relayed over the air to dispatch from the time
7    that you received the call to the time that you
8    cleared the call?
9        A.   So I advised that I was en route from when I
10   got the call.
11       Q.   At Rex's?  When you were at Rex's?
12       A.   At Rex's.
13       Q.   Okay.  Yeah.
14       A.   And then I stated on-air that I saw the
15   subject at Circle K and that I was 56, or arrived on
16   scene.  And that is the last time I remember getting on
17   the air.  I -- I don't get on the air very often.
18       Q.   Okay.  Can you tell me what you're trained
19   about -- how are you trained at the academy to talk
20   over the radio?  In other words, when you're -- in
21   regards specifically to an incident like this one,
22   where you have a Priority 1 call like this involving a
23   subject who has threatened another individual with, as
24   you say, a deadly weapon, are you supposed to maintain
25   communication and alert, "I have a visual on the

Page 103

1    subject, I'm not waiting for backup"?  Do you have to
2    say that?
3        A.   No.
4        Q.   Do you -- are you -- what are you supposed
5    to say and not supposed to say?  I'm just assuming
6    here, so I'm just throwing things out.  I don't want
7    to do that.  You tell me.  What are you trained at the
8    academy to -- as far as communication goes?
9        A.   Essentially to give like good information or
10   vital information.  So like I said, when I arrived on
11   scene -- or when I saw him, that was something that was
12   vital.  Officers needed to know where he was and where I
13   was going to be at.  So that way they could then find
14   me, because -- not find me, but come to me, because we
15   were trying to find him.
16       And so when I advised them that he was at
17   Circle K, and then I advised that I was at Circle K,
18   then that's pretty much the last information I was able
19   to give.
20       Now, if Mr. Wood had started to run or if he
21   had pulled out his knives and he -- you know, he was
22   still a good distance away, like further than, you know,
23   20 or 30 feet, then I would advise over the radio, if it
24   was plausible and if it was safe, that he's armed
25   himself with knives again.  And then so that way we

Page 104

1    could try to start positioning officers in better ways
2    so that way we can contact him, as well as contain him
3    to make sure that no one got hurt.
4        Q.   Okay.  Did you ever communicate to dispatch
5    or -- did you ever communicate at all that Mr. Wood
6    was not complying with your commands?
7        A.   No.
8        Q.   Did you ever communicate, over the
9    air or otherwise, that you feared for your officer
10   safety?
11       A.   No.  Those are things that you don't have to
12   communicate over the air.
13       Q.   Okay.  Did you ever ask over the air, "Where
14   is backup?  Where is 56?"
15       A.   No.
16       Q.   Or not 56.  What is the 10 code for backup?
17       A.   82.
18       Q.   82.  Okay.  So you never conveyed over the
19   air that you -- "Where is backup?  I need backup"?
20       A.   No, ma'am.
21       Q.   Okay.
22       A.   Because Officer O'Guin said that he was in the
23   area, so I figured he was -- I figured that he was right
24   there when he said that he was...
25       Q.   When did you figure that?  Where were you

Page 105

1    when you figured that?
2        A.   Basically when I got in contact with -- like
3    when I saw Mr. Wood.  Because he had stated that -- like
4    I see -- or like "I'm 56, in the area."  So I figured he
5    was going to be in this intersection somewhere, but I
6    never saw him.
7        Q.   Okay.  Okay.  Got it.
8        When you saw Mr. Wood, as you had indicated
9    on Exhibit 26 with the dot -- remember you just drew
10   that one dot?
11       A.   Yeah.  Like a little blue dot.
12       Q.   Yeah.  And that's where you first saw him.
13   You said he was walking towards the entrance of
14   Circle K; correct?
15       A.   Yes.
16       Q.   How was he walking?
17       A.   Just kind -- not super fast.  Not slow.  Not
18   -- a little bit faster than normal.  Like a normal pace,
19   but not like a quick pace.  Not like he was running.
20   Not like -- anything like that.  But he was just walking
21   in.  And he was walking like a normal adult.
22       Q.   Okay.  And when he -- did he -- and he
23   wasn't armed.  He didn't have anything in his hands?
24       A.   No, he had nothing in his hands at that time.
25       Q.   Okay.  Now, at that time, do you feel like

27 (Pages 102 to 105)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 21 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.                                    December 10, 2015
Jeffrey Bludworth                                                                    15cv00550 SCY-KBM

---

Page 106

1   you had tunnel vision, or do you feel like you had an
2   awareness of your surroundings?
3       A.   At that time, I still had awareness of my
4   surroundings.  The tunnel vision didn't essentially set
5   in until he pulled the knives out.
6       Q.   Okay.  All right.
7           You said that you had gotten a 40-hour block
8   of CIT training at the academy, Jeffrey?
9       A.   Yes, ma'am.
10      Q.   Did you -- have you -- did you receive any
11  more CIT training other than that?
12      A.   We did like scenarios throughout the --
13  throughout the academy, like extra CIT scenarios.  And
14  then that's kind of -- I mean, every time we talked
15  about situations, we would also bring in like the CIT
16  factor of active listening skills and being calm and
17  trying to de-escalate situations and being smooth, calm
18  and methodical about situations rather than just rushing
19  in as fast as you can all the time.
20      Q.   Okay.  After the academy, did you receive
21  any other CIT training?
22      A.   I finished CIT training two weeks ago.
23      Q.   What do you mean by that?  What kind of CIT
24  training?
25      A.   I'm CIT certified now.

---

Page 107

1       Q.   Okay.
2       A.   That's the only other CIT training that I
3   received after the academy.
4       Q.   So now you are a certified CIT officer.
5       A.   Yes, ma'am.
6       Q.   Are you going to get a pin?
7       A.   I have a pin, and I'm wearing it.  Not now,
8   but I'm wearing it on my uniform.
9       Q.   Okay.  Are you going to get an increase in
10  pay?
11      A.   That's the rumor, but I don't think so,
12  because the whole department is going to be CIT
13  certified, so...
14      Q.   Okay.  So -- because my understanding is
15  that when you get -- maybe it's -- back in the day, at
16  least, right --
17      A.   Yes.
18      Q.   -- at the time of incident, like Jon O'Guin
19  was getting additional pay.  It's called hazard pay or
20  danger pay?
21      A.   Yes.  So he gets like an extra 40 a paycheck
22  or -- like an extra $40 a paycheck or something like
23  that to be CIT certified.  But that's really it.
24      Q.   Right.  Did you feel like -- and was this --
25  was the CIT training that you got -- or your CIT

---

Page 108

1   certification that you got two weeks ago, was that in
2   response to House Rule 93 --
3           MS. GRIFFIN:  Objection.  Form and foundation.
4       Q.   -- do you know?
5       A.   I believe it was kind of also -- I believe
6   it's part of that, but I also believe it's more so of
7   the DOJ.  So they wanted like 49 percent of the
8   department to be CIT trained.  And at the time,
9   79 percent was trained.  So our chief said let's just
10  make it a full 100 percent.  So everyone is doing it
11  now.
12      Q.   Okay.  So when you say chief, do you mean --
13      A.   Chief Gordon Eden, Jr.
14      Q.   Okay.
15      A.   Chief Schultz was -- left right after my
16  shooting.
17      Q.   He left --
18      A.   I think he left in August of 2013, so...
19      Q.   Okay.  All right.  Did you feel like the CIT
20  training that you got and that you completed two weeks
21  ago gave you -- did you learn anything in addition to
22  what you already knew?
23      A.   Not really.  Like the same -- it was the same
24  CIT training, maybe a little bit more in-depth on like
25  -- on medicine and things like that than it was in the

---

Page 109

1   academy.  And then -- but that's just really the only
2   difference.  And we visited a hospital to essentially
3   kind of show like the reasons to admit and not to admit
4   people.  But that was it.
5       Q.   Okay.
6       A.   That's like kind of the only difference I
7   noticed from the CIT training.
8           Now, it's good training, and it's training
9   that I've always kind of just gone throughout -- through
10  like my life is -- I try not to escalate situations.  If
11  someone's yelling, I don't yell back at them.  I just
12  talk to them.
13          Maybe it's just because I have older siblings.
14  And so when they yelled, I would talk quieter, because
15  it would get them upset -- well, not upset, but it would
16  calm them down, and then the whole fight would be
17  resolved.
18      Q.   Yeah.
19      A.   So that's just kind of how I lived my life.
20      Q.   Okay.  Did you feel like when you arrived --
21  first arrived on the scene that the scene was calm, or
22  did you feel like it was not calm?
23      A.   I felt that it was calm.  You know, like I
24  said, I got out of the my car, and I just said, you
25  know, "Sir, I just want you to come back and come talk

---

28 (Pages 106 to 109)

Trattel Court Reporting & Videography
505-830-0600

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 22 of 43

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

---

Page 110

1  to me."  And then so that way -- like I said, so we
2  could keep it calm, on a smooth level.  So that way
3  things just didn't escalate like...
4        You know, I know, depending on the response
5  and how some people would do it and -- which is totally
6  justified -- some officers would jump out and they would
7  already have their gun out and pointed on them, telling
8  them "Get on the ground.  Get on the ground," because of
9  the nature of the call.  But instead, I decided to take
10  it more of a cool, calm and collected, methodical way
11  rather than just jumping out with my gun drawn.
12        Q.  Okay.  Are you -- are you married today?
13        A.  Yes, ma'am.
14        Q.  You are.  I was noticing you're not wearing
15  a wedding ring.
16        A.  I play basketball on Tuesdays at my church.
17  And I jammed my finger, and it -- my swelling has
18  finally gone -- starting to go down so I can get my ring
19  back on.
20        Q.  So you didn't lose it, and you're not in
21  trouble at home?
22        A.  No, I'm not in trouble.  We're still married,
23  happily, two kids.  All that good junk, so...
24        Q.  Thank God.
25        A.  Yes.

Page 111

1        Q.  All right.  My husband lost his ring once,
2  and it was bad -- bad news.
3        MS. CARPENTER:  Mostly because I bought the
4  ring, Stephanie.
5        Q.  All right.  All right, Jeffrey.  So
6  where we had left off in regards to you talking about
7  the scene was that at the time that -- you had
8  indicated where you were when you shot Mr. Wood;
9  correct?
10        A.  Correct.
11        Q.  Okay.  When you shot Mr. Wood, was he
12  face-to-face with you?
13        A.  I believe that he was face-to-face with me.
14        Q.  Okay.  I only want you to tell me what you
15  know.
16        A.  From my recollection and from my point of
17  view, I believe that he was face-to-face with me.
18        Q.  Do you -- have you been led to an
19  alternative thought?  Because you seem that -- it
20  seems like you're not 100 percent sure about that.
21        A.  I haven't really seen like criminalistics or
22  anything like that to say otherwise, if he was bladed at
23  me or anything like that, so I don't know.  Just the way
24  that I -- I guess the way that I felt like you were
25  asking the question was maybe you had more information.

Page 112

1  But that's the way I saw him was face-to-face.
2        Q.  Yeah.  No.  I'm -- so -- when you say
3  "bladed," what do you mean?  Just for the record or
4  from a layman's --
5        A.  Bladed like one foot in front of the other,
6  like at an angle, 45-degree angle, 60-degree angle.
7        Q.  Okay.  So maybe if this is -- if this is --
8        A.  So if you -- instead of face-to-face like
9  this, maybe he was like this or like this
10  (demonstrating).
11        Q.  Okay.
12        A.  So -- but I like said, when I saw him, he was
13  face-to-face.  And when I disengaged my firearm, I
14  believe he was face-to-face.
15        Q.  Okay.  Do you believe that you fired first?
16        A.  Yes.
17        Q.  Where do you believe that you hit him first?
18        A.  I believe that I hit him -- and where I was
19  aiming was the upper-torso area, where we're trained to
20  shoot.
21        Q.  Center mass?
22        A.  Center mass.
23        Q.  Did you -- when you -- do you believe that
24  your bullet impacted him center mass, your first shot?
25        A.  That's what I believe.

Page 113

1        Q.  Okay.  When you shot him, how did Mr. Wood
2  react to your shot?
3        A.  From the shooting to when he was on the ground
4  is all I really remember.
5        Q.  Okay.  Are you trained at the academy to
6  shoot once at center mass, or are you -- how are you
7  trained to shoot?
8        A.  We're trained to shoot two to center mass and
9  then to essentially disengage, observe if he's
10  continuing his actions; and then if he's continuing his
11  actions, then to engage again.  Because we're -- we're
12  trained to -- we're trained to stop the action.  We're
13  not trained to like kill or anything like that.  We're
14  trained to stop the action, so...
15        Q.  Are you pretty confident that if you shoot
16  someone in the middle of their chest that it is more
17  than likely going to kill them?
18        A.  It's going to stop the action.
19        Q.  What kind of bullets are you using?
20        A.  9-millimeter hollow points.
21        Q.  Yeah.  Do you know what hol--- those
22  bullets -- have you ever seen ballistics on what those
23  bullets do when they enter the body?
24        A.  Yes.
25        Q.  And what do they do?

29 (Pages 110 to 113)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 23 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                                              7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.                    December 10, 2015
Jeffrey Bludworth                                                  15cv00550 SCY-KBM

---

Page 114

1    A.   They balloon out, mushroom out.
2    Q.   That's right.  Yeah.  So did you do that?
3  Did you follow your training?  Did you shoot twice and
4  then wait?
5    A.   I felt that I only shot twice, but from what
6  I've been told, I believe I shot four times.
7    Q.   Do you recall pausing and waiting to see if
8  the danger had ceased or anything?
9    A.   No, ma'am.  It happened so fast, I don't even
10 really remember.  Like I remember pulling the trigger,
11 but I don't remember hearing my gunshot go off.  I don't
12 remember -- like I don't remember feeling any recoil or
13 anything like that.
14         Like when I go to the range, I remember, you
15 know, every single shot that I've shot.  I can remember
16 feeling recoil.  But at the scene, I don't remember
17 anything of that nature.  I was just so tunnel-visioned
18 and so overwhelmed emotionally that essentially
19 something like this was occurring.
20    Q.   Okay.  You said that they give you scenarios
21 in regards to CIT training.  Let me step back to the
22 shooting for a second, and I'll get there.
23         So when you shot, was it just "boom, boom,
24 boom, boom," four shots?
25    A.   I guess that's exactly what happened.  Because

Page 115

1  I don't remember -- like I said, I don't -- I didn't
2  pause or anything like that.
3    Q.   Why did you stop shooting?
4    A.   Because I remember seeing Mr. Wood go to the
5  ground.
6    Q.   Okay.  Can you stand up and show the camera
7  what you remember Mr. Wood -- as you're firing at him,
8  what he was doing.  Unfortunately, we didn't have the
9  benefit of seeing Mr. Wood.  I understand that you
10 turned your lapel camera on, but you've watched your
11 lapel camera, and Mr. Wood is blocked from view.  Do
12 you know why that is?
13    A.   Can you say that again?  Sorry.
14    Q.   Yeah.  I'm interrupting you.  I'll come back
15 to the question.  But I'm just curious.  When you --
16 your lapel camera is on, and you can see Katherine
17 Wright in the lapel camera, but you can't see
18 Mr. Wood.  Do you know why that was?
19    A.   The lapel cameras, they sit -- and where mine
20 was sitting, the Scorpion lapel camera is sitting on
21 your chest, on your buttons, and it's on like a clip
22 right here.  And so as you -- as you arm yourself, you
23 put your hands up.  And so I'm looking like this
24 (demonstrating).  And so it's going to be in line with
25 my lapel video.  So I'm blocking it with my arms.

Page 116

1    Q.   So the lapel camera, where it -- the view
2  that it shows is basically whatever is in front of
3  your chest?
4    A.   Yes, ma'am.
5    Q.   Okay.
6    A.   There's not like any other better option to
7  where to put it.  You can't put it on your shoulder
8  because it points straight up.  You know, you can't put
9  on like your belt, because then, you know, it doesn't
10 really like connect to a belt.  And like on pockets or
11 anything like that, there's no real spot to put it.
12 That's the only spot that I know officers put it is on
13 the chest.
14    Q.   Okay.  Were you trained to put it there?
15    A.   That's just where everyone was always putting
16 it.  I mean, in the academy, that's essentially kind of
17 what everyone did, because we wanted to be -- we had to
18 be uniform -- we want to be uniform, and so that's where
19 we would put it is just right there.  And then -- like I
20 attached like a string to it that would go like inside,
21 and then I attached it to my vest.  So that way if it
22 did come off -- because they were prone to falling off,
23 because the clips aren't very strong -- it would just
24 swing and not just go missing.  I would still be able to
25 hold on to it because it was attached to my bulletproof

Page 117

1  vest.
2    Q.   Got it.  So where I had left off, before I
3  interrupted you again, is you were going to describe
4  Vincent as you were shooting him.  If you want to use
5  the pens again.
6    A.   Do you want me to like show how he fell?  I
7  guess I don't really understand.
8    Q.   Sure.
9    A.   Because I know --
10    Q.   I just want you to show me what he looked
11 like right before you shot him, and then as you're
12 shooting him what he's doing.
13    A.   Okay.
14         THE WITNESS:  And the table mike will pick me
15 up, correct?
16         THE VIDEOGRAPHER:  Yes.  That's fine.
17         THE WITNESS:  Just making sure.
18    A.   So from what I remember, as Mr. Wood --
19    Q.   And if you want to pretend like the camera
20 is you.
21    A.   Okay.  So as Mr. Wood is standing with the
22 knives out at the 45-degree angle, and then as I -- as
23 we began to shoot -- well, specifically, me -- I
24 remember him kind of crumbling.  And by crumbling, I
25 mean brought his arms in, and then his knees kind of

30 (Pages 114 to 117)

Trattel Court Reporting & Videography
505-830-0600

Electronically signed by Mary Fulton (001-060-973-7022)                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.                    December 10, 2015
Jeffrey Bludworth                                                  15cv00550 SCY-KBM

---

Page 122

1  was going, I -- that's where I assume he was going to
2  was towards the inside of the store.
3      Q.   Okay.
4      A.   He had never gone into the store, but he was
5  just -- he was close to the doors.
6      Q.   Okay.  Earlier you said that there was
7  nothing obstructing your view of Mr. Wood when you
8  first saw him.  Was there anything obstructing your
9  view of -- in looking at Exhibit 26 -- of any of this
10  area, like the gas pumps?
11      A.   No.  It was clear there was -- I know there
12  was cars inside the gas pumps.  There was a few cars
13  parked in the front.  Like there was a white van right
14  there.  I know that there's -- there's some more parking
15  spots, a couple of those were filled.  There was quite a
16  bit of people.  And that's -- you know, that's all I
17  remember.  The only thing kind of blocking my view,
18  essentially, was my car when we started to obstruct the
19  mirroring process.
20      Q.   Now, tell me about -- you didn't
21  personally have any past experiences with Mr. Wood;
22  correct?
23      A.   Correct.
24      Q.   But you knew that a lot of calls had come in
25  for him?

---

Page 123

1      A.   Correct.
2      Q.   Okay.  Now, my question is you had conveyed
3  over the air that you had a visual on Mr. Wood when
4  you were -- as you've indicated on Exhibit 26, roughly
5  in the X, the blue X.  How did you know that he was
6  the actual subject that you were looking for?
7      A.   He was in -- when he came in, the call came in
8  as an older BMA, or black male adult.
9      Q.   Okay.
10      A.   And so he was an older African-American male
11  adult.  And he was also wearing a black jacket with
12  black -- with black jeans, which matched the description
13  of the clothing of the call.  So that's where I --
14  that's who I thought it was.
15      Q.   Okay.  But you didn't have any confirmation;
16  i.e., you had not gotten any confirmation from Vincent
17  or from any -- the security guard or any of the
18  children or teenagers, that, yeah, that's the guy.  No
19  one had positively identified Mr. Wood as being the
20  same person that was the person in the 911 call?
21      A.   Correct.
22      Q.   Okay.  The day after the incident when you
23  gave your statement -- and I'm just going to call it
24  "your statement" for the record -- you indicate that a
25  lot of calls -- there were a lot of calls about

---

Page 124

1  Mr. Wood because he was a mental patient.  Do you
2  remember saying that?
3      A.   10-40 is a mental patient.
4      Q.   Okay.
5      A.   So I thought I said 10-40, and I clarified
6  mental patient.
7      Q.   I just want to understand why you -- what do
8  you mean by there were a lot of calls because he was a
9  mental patient?  What did you mean by that statement?
10      A.   There was lots of calls created and generated
11  by him, because he did -- like I said, he liked to hang
12  out at that corner of Montgomery and San Mateo.  And by
13  talking to himself and yelling and screaming and waving
14  hands, a lot of people called and -- essentially called
15  for officers to come and talk to him.  I never responded
16  to those calls because I was never dispatched to those
17  calls.
18      That intersection is split up between two
19  different beats, 422 and 431; and I was beat 434, which
20  is a lot further north.  So that's more of where I tried
21  to stay in my beat so I could take care of the
22  neighborhoods that I was around.  The only times I took
23  calls outside of my beat were these Priority 1s where
24  things need to be taken care of right away.
25      Q.   So this call was actually outside of your

---

Page 125

1  normal beat?
2      A.   Yes.  Same area of command, same sector, 43.
3  This was 431, and I'm 434.  It's the same sector of 43,
4  so I'm very familiar with the area.  I just didn't take
5  very many calls in 431.
6      Q.   Did you ever call before you arrived at the
7  scene?  Did you ever call or ask dispatch to not make
8  you the Priority 1 but instead can you ensure that --
9  or not Priority 1, but to make you the priority in the
10  call but, instead, say, Hey, given that this is a
11  10-40, we need to make sure that a CIT officer is
12  first to respond?
13      A.   No.  Because it's a Priority 1 call, so -- and
14  it came out as a 39 call.  And it probably should have
15  came in as a 274, which is an aggravated assault or
16  battery call.  And so it didn't matter who was going to
17  arrive first.  I was dispatched as primary.  And so I
18  was just going to the call to begin the investigation.
19      Now, the way things typically go is if a CIT
20  officer arrives on the scene and -- there -- you can be
21  -- and the reason why they get paid extra is so that way
22  they take -- you know, they're going to do a little bit
23  more on the CIT side.  They might write a report and
24  send it to our CIT detectives to see if they could help
25  that subject with -- with other resources, to help them

---

32 (Pages 122 to 125)

Trattel Court Reporting & Videography
505-830-0600

Electronically signed by Mary Fulton (001-060-973-7022)                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.  December 10, 2015
Jeffrey Bludworth  15cv00550 SCY-KBM

Page 126

1   try to get stable again, so...
2       Q.   That's the only reason that a CIT officer
3   needs to respond; correct?
4       A.   Correct.  And also, I mean, like on suicide
5   calls and straight 10-40 calls, mental patient calls is
6   -- that's what they're called -- like at people's houses
7   and things like that, it's easier for them to respond
8   for -- you know, you can sit outside and wait for
9   officers to arrive and then go in together.  But due to
10  the nature of this call and the public -- being in a
11  public area, it wasn't a matter of, Hey, let's wait 20,
12  30 seconds -- 30, 60 seconds or even a couple of minutes
13  to get a CIT officer there.  It just didn't allow it at
14  that time.
15      Q.   I guess that's why I really don't -- I'm
16  having a hard time understanding.  Is that what -- why
17  didn't the situation allow you to wait for O'Guin when
18  you knew, as you've indicated, that he was 56?
19      A.   Because, like I said, when I got out of my
20  car, I was just going to talk to him.  Just like how any
21  CIT officer would be talking to him.  "Sir, can you come
22  talk to me.  Let's talk."
23           And then I was just going to walk him back
24  unless he -- and if things went according to the way
25  that I was going to have it, he was going to walk back

Page 127

1   to the front of my car.  He was going to turn, and I was
2   going to explain to him, Okay, you know, sir, the reason
3   why I'm having you turn away from me, so that way, I
4   can, you know, see -- you know, I want you to put your
5   hands behind your back.  I'm going to come up to you.
6   I'm going to place you into handcuffs at this time for
7   this reason.  You know, I'm placing one cuff onto this
8   hand now.  Placing the cuff onto this hand.  Okay.  I'm
9   going to explain to you why I'm patting you down, where
10  I'm patting you down.
11           And I'm going to explain -- during all of
12  this, I'm going to continue to explain, the reason why
13  I'm stopping you, the reason why I'm detaining you is
14  because right now you match the description of a suspect
15  who threatened teenagers with two knives.
16           And during that time, as I started to bring
17  him back, I was thinking Officer O'Guin would then, you
18  know, arrive and come out, and essentially either take
19  over that role or just continue to let me talk.  And as
20  soon as he came over, then we could work together in
21  placing him into handcuffs and detaining him in a
22  correct manner.
23           THE VIDEOGRAPHER:  It's 11:45.
24      A.   And I didn't want to wait any longer to allow
25  him to go inside of Circle K, because I didn't know how

Page 128

1   many people were inside of Circle K or if anything was
2   going to happen inside of Circle K.  I -- I couldn't
3   live with myself if he walked into Circle K and hurt
4   someone.
5       Q.   Okay.  So -- but when you first got there,
6   you said he -- he noticed you?
7       A.   Yes, ma'am.
8       Q.   And he stopped, right?  He turned around?
9       A.   Yes, ma'am.
10      Q.   Okay.  Facing you?
11      A.   Yes, ma'am.
12      Q.   So he wasn't indicating that he was going to
13  go into Circle K at that point, when you first arrived
14  on the scene, right?  I'm just trying to break it down
15  step-by-step.
16      A.   Right.  I was coming in when he started to
17  notice me, and he stopped walking towards the doors of
18  Circle K, and that's when he looked.
19           MS. CARPENTER:  Okay.  All right.  Well, let's
20  stop, then.  And then -- we'll come back at 1 o'clock.
21           THE VIDEOGRAPHER:  The time is 1146.  We are
22  off the record.
23           THE VIDEOGRAPHER:  The time is 1305.  This is
24  the beginning of DVD 3 in the videotaped deposition of
25  Officer Jeffrey Bludworth.  We are back on the record.

Page 129

1       Q.   All right.  Jeffrey, we took about an
2   hour-and-15-minute break for lunch.  Anything at
3   lunch -- do you want to change your testimony or add
4   anything to your testimony since...
5       A.   I just need to add that someone that I talked
6   to after my shooting was IA investigators as well.
7       Q.   Okay.  I'm --
8       A.   And I forgot about that, so...
9       Q.   So I guess -- that's what I'm trying to find
10  out is that -- you know, before the DOJ -- I've been
11  doing this for a while -- before DOJ did their
12  investigation, you know, you would have IA -- you
13  would get an investigation.  But now it's my
14  understanding -- and tell me if I'm incorrect -- that
15  in this particular case, your IA investigation is not
16  complete?
17      A.   In this particular case?
18      Q.   Yes.
19      A.   I have no idea.  I know I gave like an
20  interview, but that's the last I heard of it.
21      Q.   Okay.  So you don't know, as you sit here
22  today, whether or not the internal affairs
23  investigation in this particular matter is complete or
24  not.
25      A.   Correct.

33 (Pages 126 to 129)

Trattel Court Reporting & Videography
505-830-0600

Electronically signed by Mary Fulton (001-060-973-7022)                                     7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.   v. Katherine Wright, et al.                    December 10, 2015
Jeffrey Bludworth                                                   15cv00550 SCY-KBM

---

Page 138

1  door --
2      A.  Behind the driver.
3      Q.  Got it.  Okay.  Do you know if those were
4  from your weapon or from Katherine's?
5      A.  I -- I still to this day do not know what
6  bullets went where.
7      Q.  Okay.
8      A.  So...
9      Q.  You know for a fact, though, that you fired
10  four rounds?
11      A.  Yes.
12      Q.  How do you know that?
13      A.  Just from the report.
14      Q.  Okay, so you don't have the knowledge,
15  standing -- without the report, you don't a memory of
16  firing four rounds?
17      A.  No, ma'am.
18      Q.  Do you -- did you have a memory of how many
19  times -- and I think you answered this, and I
20  apologize, but do you -- did you have an understanding
21  of how many times you had fired when you were done
22  firing?
23      A.  When I thought I was done firing, I thought --
24  I thought I had only shot three times.
25      Q.  Got it.  Okay.

Page 139

1      A.  So...
2      Q.  Okay.  Thank you.  All right.
3          Now, in your statement -- and when I say
4  "statement," the day after the incident --
5          MS. CARPENTER:  And, Stephanie, on page 10,
6  line 10 through 11 of his statement.
7      Q.  Starting -- I'll just read it -- starting at
8  page 8 -- or line 8, page 10.  "I had never come in
9  contact with him, but I had seen him a lot at the
10  intersection of San Mateo and Montgomery."  Giving you
11  a little backdrop.  "He talks to himself.  He gets
12  very agitated when other people talk to him."
13          Why did you tell them that?
14      A.  Because I think they were asking me if I had
15  ever had contact with him or if I knew who he was.
16      Q.  Okay.  And where did you get that
17  information from?  How did you know that he gets very
18  agitated when other people talk to him?
19      A.  Just from all the calls that had come in about
20  him were, typically, him getting agitated because
21  someone had talked to him.  And, again, like I had
22  stated before, I -- I know that area, and so I've seen
23  the calls come in.  And I've seen him standing there
24  getting agitated and things like that.
25      Q.  When he would get agitated, how would he

Page 140

1  exhibit his agitation?
2      A.  Swinging his arms, yelling a little bit
3  louder.
4      Q.  Did you ever feel the need to -- I mean, did
5  you feel like that was disorderly?
6      A.  Whenever I was present, no.  I never saw him
7  acting to the point where law enforcement needed to get
8  involved.
9      Q.  Okay.  All right.  So you had seen him with
10  -- you had seen him swinging his arms and -- is that
11  because someone was talking to him?
12      A.  It was someone talking to him or just even him
13  just standing there by himself, so both.
14      Q.  Okay.  All right.  Next --
15          MS. CARPENTER:  Same page, Stephanie.
16      Q.  You said, "I believe he's either --
17  approximately two weeks prior to a week prior, he got
18  into an altercation at the Walgreens at San Mateo and
19  Montgomery, was arrested as well as given a criminal
20  trespass notice there."  How did you know that?  Were
21  you on that call?
22      A.  No.
23      Q.  Okay.  How did you know about that Walgreens
24  call?
25      A.  I think I saw it somewhere.  I don't

Page 141

1  remember -- I don't recall how I found that out.
2      Q.  But you knew about it?
3      A.  Yes, ma'am.
4      Q.  Did you know that Katherine Wright was
5  involved in that call?
6      A.  No, ma'am.
7      Q.  You didn't.  When did you find out that she
8  was?
9      A.  Just now.
10      Q.  Okay.  Fair enough.
11          You said, "I believe it was even mentioned
12  on the call."  Do you recall the dispatcher advising
13  that they had a prior call with him at Walgreens?
14      A.  Not at this moment, no; but possibly then.
15      Q.  Okay.  So a day after the incident, you said
16  you recalled it being mentioned on the call.  Are you
17  talking about this particular dispatch call?
18      A.  Yes, ma'am.  That's what it would have to be.
19      Q.  Okay.
20      A.  I don't know if maybe it's on the CAD
21  somewhere, like really far down or something like that.
22      Q.  Okay.  And do you agree with everything you
23  told detectives?
24      A.  Yes.  I'm not recanting anything that I've
25  said to them.

36 (Pages 138 to 141)

Electronically signed by Mary Fulton (001-060-973-7022)                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

Page 142

1	Q.	You state, "I believe it" -- let's see.
2	We've already read that.
3		Okay.  You said, "So I -- I immediately knew
4	that that gentleman was not of sound mind and that
5	there -- there could have been -- that there -- he
6	wasn't thinking correctly because of that."  Are you
7	saying he wasn't thinking correctly because of that --
8	because he's not of sound mind?  I just want a
9	clarification on that statement.
10	A.	I -- can I see --
11	Q.	Absolutely.
12	A.	-- what exactly?
13	Q.	Yeah.  Absolutely.
14	A.	Because I don't know what context it is or
15	anything like that.
16	Q.	Sure.  Yeah.  So I just read you that
17	paragraph.
18	A.	Yes, ma'am.
19	Q.	And then I starred next to where I need
20	clarification.  So here is the section here where you
21	say, "Could have been -- that there -- he wasn't
22	thinking correctly because of that."  I'm wondering,
23	is that the sound mind?  Are you making reference to
24	sound mind?
25	A.	I guess.  I don't know.  I -- this interview,

Page 143

1	like you have stated, was the day after.
2	Q.	Right.
3	A.	And essentially it was me just talking.  So
4	there's parts like where -- like here, where I don't
5	even make sense in my own head right now, where I think
6	it was just because, again, I was still in a state of
7	shock and, you know, still nervous about everything that
8	was going on.
9	Q.	Okay.  So you don't why you said that?
10	A.	I don't know why I said that.  I do not.
11	Q.	I appreciate that.
12		Did you think he was -- did you think he was
13	not of sound mind?
14	A.	Yes.
15	Q.	Now, throughout the statement, you're making
16	reference to a diagram.
17	MS. CARPENTER:  I'm going to mark as Exhibit
18	-- what are we on?
19	THE COURT REPORTER:  27.
20	MS. CARPENTER:  27.
21	Q.	I have two --
22	MS. CARPENTER:  And let's mark this as a 28.  I
23	apologize.
24	(Exhibit 27 and Exhibit 28 marked.)
25	Q.	I've marked as Exhibit 27 and 28, two

Page 144

1	diagrams.
2	A.	Yes.
3	MS. CARPENTER:  Can I see 27 again?  Okay.  I
4	wanted to make sure I have the same one to give to
5	Stephanie.
6	Here you go.
7	MS. GRIFFIN:  Thank you.
8	MS. CARPENTER:  The top one is 27 and then the
9	second one is 28.
10	Q.	Can you tell me -- I see that they're both
11	dated and time-stamped the same, 7/6/2013 at 5:09 p.m.
12	Do you see that?
13	A.	Yes, ma'am.
14	Q.	What's different about those two?  Can you
15	tell me what Exhibit 28 depicts?
16	A.	28 is the bus stop at San Mateo and
17	Montgomery.
18	Q.	Okay.
19	A.	And 27 is the intersection and Circle K at San
20	Mateo and McLeod.
21	Q.	Okay.  Why did you draw Exhibit 28?
22	A.	Because they asked me the same questions about
23	stopping to talk to teenagers at the bus stop at San
24	Mateo and Montgomery.
25	Q.	Okay.  So what are these lines?  You have a

Page 145

1	line that says "bus" and then -- you have the word
2	"bus" and then a line underneath it.  And then "stop"
3	and then lines underneath it.  What are those lines
4	depicting?
5	A.	Those little lines are essentially like the
6	bus stop, like --
7	Q.	Oh --
8	A.	-- carved into the road or whatever.
9	Q.	Got it.  Okay.  Is there anything about
10	Exhibit 28 that depicts anything else about the
11	incident?
12	A.	There's a "north" sign and a "west" sign, so
13	-- showing north and west.
14	Q.	Okay.
15	A.	But that's it.
16	Q.	Okay.  All right.  Now, Exhibit 27, what is
17	that a diagram of?
18	A.	It's a diagram of the intersection of San
19	Mateo and McLeod, mostly depicting the Circle K, my
20	position, my car position, Katherine Wright's vehicle's
21	permission -- per -- sorry.  My position, my vehicle
22	position, Vincent Wood's position, as well as Katherine
23	Wright's vehicle position.
24	Q.	Okay.  What I would like for you to do,
25	Jeffrey, is if you could show the camera -- hold that

37 (Pages 142 to 145)

Trattel Court Reporting & Videography
505-830-0600

Electronically signed by Mary Fulton (001-060-973-7022)

7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

---

Page 146

1  up to the camera.  Can you tell me what Number 1 is.
2      A.   Number 1, the little circle here, is the first
3  spot where I guess I saw -- is where I saw Vincent Wood
4  at.  As it dashes down to 2 is essentially his path to
5  where -- Number 2 is where he pulled out the knives.
6  Number 3 is where I then stated -- where I then began to
7  fire my weapon.
8          My position was from A and it goes down to
9  dash B.  But it has kind of like a little rainbow-type
10  deal where it shows I kind of mirrored a little bit and
11  then started to retreat backwards.
12      Q.   Okay.  And what is the triangle with --
13  looks like a dot next to it?
14      A.   I don't know.  I don't remember.
15      Q.   Okay.  Fair enough.  Jeffrey, why didn't you
16  -- why didn't you retreat back -- why didn't you
17  continue to retreat back?
18      A.   Because at that time, it wasn't, to me, a
19  plausible option just to keep retreating.  I just needed
20  to meet force with force.
21      Q.   Okay.  All right.  Was it -- was there
22  anything behind you that -- like a large building,
23  that prevented you from moving backwards?
24      A.   No.
25      Q.   Okay.

---

Page 147

1      A.   I was in the free parking lot.
2      Q.   You were in the what?  I'm sorry.
3      A.   In the parking lot, where I was like free to
4  walk, so...
5      Q.   Okay.  So there was nothing preventing you
6  from walking backwards other than you just didn't want
7  to do it?
8          MS. GRIFFIN:  Object to form.
9      A.   Not that I didn't want to do it.  It's just
10  that I wasn't going to just continue to allow him to
11  come at me with knives.
12      Q.   Okay.  All right.  Is it possible that
13  Vincent was going to give you the knives?
14      A.   I don't believe so, no.
15      Q.   Okay.  Mr. Wood never pointed the knives at
16  you, and I -- never pointed them like this at you;
17  correct?
18          (Interruption.)
19      Q.   Go ahead.
20      A.   So the way that I saw the knives were, again,
21  at a 45-degree angle, pointed at me.  And so they were
22  pointed at me.
23      Q.   Okay.  All right.
24      A.   In a threatening manner.
25      Q.   Okay.  You never told Mr. Wood, or Vincent,

---

Page 148

1  "Drop the knives or I'll shoot"; correct?
2      A.   Correct.  I never told him that I was going to
3  shoot.  I just told him to drop the knives, but...
4      Q.   You can elaborate if you want.
5      A.   Well, you were saying "okay," so I didn't know
6  if you were stopping me or not.
7      Q.   I want you to give as much of an answer as
8  you want.  So if you want to tell me more, I'm
9  listening.
10      A.   Just, again, you know, when you see a gun
11  getting pointed at you and you get told to drop the
12  knives, most people will drop the knives and recognize
13  that an immediate use of force or -- a threat of use of
14  force is immediate.
15      Q.   Were you told at the academy -- and
16  specifically during CIT training -- or otherwise, that
17  you're always to give a warning before you use deadly
18  force?
19      A.   No.
20      Q.   Okay.  Were you told in CIT training or
21  otherwise in the academy that with people who suffer
22  from mental health issues that you must communicate
23  every action with them including, but not limited to,
24  your use of force?
25      A.   No.

---

Page 149

1      Q.   Okay.  I'm going to ask you this question
2  again.  It was one of the first questions I asked you,
3  Jeffrey.  Do you believe anything you did during this
4  incident deviated in any way from what you were
5  trained?
6      A.   No.
7      Q.   Okay.  Thank you.
8          Is there anything depicted on Exhibit 27
9  that you feel like you want to tell me about that you
10  haven't already told me?
11      A.   I have just a little north arrow just
12  explaining which way is north.  And then, like I say,
13  there's a little rectangle that says -- that's above
14  McLeod.  And that's where I believe Officer Wright's
15  vehicle was parked.
16      Q.   Okay.  So the triangle maybe shows where
17  Officer Wright's vehicle was, or where she was?
18      A.   No.  The rectangle.
19      Q.   Oh, I'm sorry.  The rectangle.
20      A.   Is her car.  The triangle, I do not know what
21  it is.
22      Q.   Thank you for that clarification.
23          All right.  We're going to go through your
24  statements, and I want to get some clarification on
25  some of the stuff you're saying.

---

38 (Pages 146 to 149)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 29 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                                                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.   v. Katherine Wright, et al.                         December 10, 2015
Jeffrey Bludworth                                                        15cv00550 SCY-KBM

Page 150

1          You never told Vincent your name; correct?
2      A.  No.
3      Q.  You never told Vincent when you first
4    encountered him, and before he got his knives, why you
5    were there; correct?
6      A.  No.
7      Q.  Okay.
8      A.  I was never presented with the opportunity to
9    do so.
10     Q.  Why were you not presented with the
11   opportunity to tell Vincent why you were there?  What
12   was preventing you from saying, I'm investigating a
13   call?
14     A.  Because I'm not going to automatically just
15   tell him what was going on.  I was going to have him
16   come closer to me, walk him back toward my car, and when
17   I was -- and while I was in the process of detaining --
18   or hoping to be in the process of detaining him, that's
19   when I would be explaining to him why he was being
20   detained and why I was investigating -- or what I was
21   investigating.
22     Q.  Were you taught in CIT training that with
23   people who suffer from mental health issues that
24   you're to calmly communicate with them after you have
25   detained them, or should you do that before you detain

Page 151

1    them?
2      A.  While.
3      Q.  Okay.  So aren't you also trained with CIT
4    one of the first things that you should do is
5    introduce yourself, tell them your name, why you're
6    there?
7      A.  If it was a CIT call, then; yes; but this
8    wasn't a CIT type of call.
9      Q.  But this call involved someone who was
10   mentally unstable; correct?
11     A.  This call involved someone that was, yes,
12   mentally unstable.  But it doesn't change my response to
13   the call due to the nature of the call being a criminal
14   activity.
15         This person wasn't necessarily in a state of
16   crisis where a CIT officer can show up and just
17   automatically begin to just talk and say, "Hi, my name
18   is Jeff and this is why I'm here."  It wasn't that type
19   of call.  This doesn't change -- how I responded to this
20   call would not change whether or not Mr. Wood was or was
21   not mentally stable.
22     Q.  How did you know that Mr. Wood was not in
23   crisis, as you just said?
24     A.  Can you explain that?  I don't --
25     Q.  You said Mr. Wood was not in crisis.  How do

Page 152

1    you know that he was not in crisis?
2      A.  I guess I can't, technically, say he was not
3    in crisis.  But this wasn't a CIT call where someone can
4    just stop and begin to take it as such.
5      Q.  What is a CIT call?  You keep saying this is
6    a not a CIT call.  In your mind, what is a CIT call?
7      A.  Like a suicide call where we arrive on scene
8    and can begin to just talk to someone who is not
9    actively, you know, trying to walk away, someone that
10   isn't trying to hurt themselves -- or trying to hurt
11   others, and one where the scene is already contained
12   where we can sit and talk rather than having to continue
13   to move around, where I have someone free to go and do
14   as they please.
15     Q.  Okay.  Are you aware of the Kenneth Ellis
16   case?
17     A.  Not very much, no.
18     Q.  Were you on the force when -- at the time
19   when he was shot by Brett Lampiris-Tremba?
20     A.  When was that?
21     Q.  You don't know when that occurred?
22     A.  No.
23     Q.  Were you on the force in 2012?
24     A.  Yes.
25     Q.  Okay.  You don't know anything about the

Page 153

1    Ellis case?
2      A.  No.  I didn't study it or anything like that,
3    no.
4      Q.  Okay.  I was just wondering if you thought
5    that was a CIT call or not.
6      A.  I don't know.  I wasn't there.
7      Q.  Okay.  All right.  So CIT calls are when --
8    whenever -- it's a suicide call, basically; correct?
9      A.  If the circumstances permit for a CIT officer
10   to arrive on scene and to begin to build rapport such as
11   by introducing themselves and beginning to just
12   automatically talk and say why we're here, then, yes,
13   it's a CIT call.  But if someone is actively moving
14   around and can elude police officers still, then at that
15   point, no, it's not a CIT call.
16     Q.  Can you give me every single fact to support
17   your claim that you were not able when you first
18   opened your vehicle, as you've shown in your diagram
19   to me, and where Mr. Wood was standing, can you give
20   me every fact to explain why you could not communicate
21   with him in the way that you were trained per CIT?
22       MS. GRIFFIN:  Object to form, foundation.
23     Q.  Do you understand my question?
24     A.  No.
25     Q.  Okay.  I want to know when you got to the

39 (Pages 150 to 153)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 30 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

Page 154

1  scene -- and you've drawn a diagram -- that when you
2  got there -- and you've shown for the camera that you
3  opened your door, so you were -- you opened your door
4  and you were standing behind your door, correct?  And
5  you saw Vincent.  And he was about, you said, 50 feet,
6  roughly, standing in front of Circle K, looking at
7  you; correct?
8      A.   Correct.
9      Q.   He was unarmed; correct?
10         MS. GRIFFIN:  Object to form.
11     A.   He did not have any knives in his hands at
12  that time, no.
13     Q.   Okay.  And did you have any firsthand
14  knowledge that he still had the knives on his person?
15     A.   No.
16     Q.   Okay.  So you didn't have any firsthand
17  knowledge that he, in fact, was armed at that
18  particular moment in time?
19     A.   No.
20     Q.   Okay.  Was he actively threatening anyone?
21     A.   At that time, no.
22     Q.   Was he actively threatening to harm himself?
23     A.   No.
24     Q.   Okay.  In fact, all Mr. Wood was doing was
25  standing there looking at you; correct?

Page 155

1         MS. GRIFFIN:  Object to form and foundation.
2      A.   Mr. Wood was walking into the store and looked
3  back and didn't stop to look at me until I called.
4      Q.   Okay.  And that's what I mean.  When you
5  called him, instead of saying, "Hey, you, I want to
6  talk to you" -- I want to be very clear, I want you to
7  tell me all the facts which support why you're saying
8  that you could not talk to him in the way that you
9  were trained to speak to mentally ill people in your
10  CIT-training block that you received at the academy.
11         MS. GRIFFIN:  Objection.  Form and foundation.
12     Q.   Please give me -- please give me every fact.
13     A.   Again, as I saw him, I wanted to make sure
14  that he did not go inside the store.  So I wasn't going
15  to say, "Hey, my name is Jeff" and just have him look at
16  me and continue to move on.  I wanted to say why -- I
17  stated, "I want you to come talk to me" -- "Sir, I need
18  you to come talk to me."
19         And as he started to then start walking away
20  from me and started making his way towards the
21  passenger's side of my vehicle, I wasn't going to stop
22  and start saying, "Sir, my name is Jeff and this why I'm
23  here," because that is not a reasonable option at that
24  point.  He needed to know that I was there to talk to
25  him, and that's why I was asking him to talk to me.

Page 156

1         And at that point, I felt that he was trying
2  to elude and to escape from the scene.  And so that's
3  why I did not mention my name, and that's why I didn't
4  state, "This is why I'm here to investigate you."  And I
5  was -- again, as I stated before, if he would have come
6  back to me and followed my commands, I would have
7  explained to him everything that was going on, and I
8  would have explained who I am and my name is Jeff.
9      Q.   Weren't you trained at the academy that
10  people who suffer from schizophrenia and other mental
11  health disorders oftentimes don't even know their own
12  reality?  Like you said, they could be living in an
13  alternate reality, so you have to speak to them in a
14  different way?
15     A.   They could be in their own little delusion,
16  yes.
17     Q.   Were you thinking that when you arrived on
18  scene?
19     A.   No, I was not.
20     Q.   Why not?
21     A.   Because I was responding to an aggravated
22  assault that had occurred.  And it wasn't going to
23  change the way that I am responding to this call.  This
24  is a criminal-nature call that needed to be dealt with
25  right away.

Page 157

1      Q.   Okay.  On page 11 of your statement, you
2  state, "Again, he had nothing in his hands" --
3         MS. CARPENTER:  I'm on line 1, Stephanie.
4      Q.   "Again, he had nothing in his hands, so I
5  was thinking, okay, as soon as he comes over, what
6  I'll do is I'll just go hands-on right away.  I'll
7  place him in cuffs for my safety."  Do you agree or
8  disagree with that?
9      A.   I agree.  And --
10     Q.   Okay.  I'm sorry, Jeffrey.  Go ahead.
11     A.   The reason -- to clarify, going hands-on was
12  as he would walk back to me, I would have him turn
13  around, place his hands behind his back, and then I
14  would explain to him, you know, Sir, I'm placing the
15  handcuffs on you at this time because of this.  And then
16  I -- as I would be patting him down, I'd explain, Okay,
17  I'm patting you down to look for knives, etc., and I
18  would have explained to him why he was being detained.
19     Q.   I understand.  Thank you for that
20  clarification.
21         Now, on the same page --
22         MS. CARPENTER:  And I'm at line -- starting at
23  line 13, Stephanie.
24     Q.   -- it says, "It kind of set me off -- set
25  off that alarm tone to me.  It was -- he's avoiding me

40 (Pages 154 to 157)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 31 of 43

Electronically signed by Mary Fulton (001-060-973-7022)

7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.                         December 10, 2015
Jeffrey Bludworth                                                       15cv00550 SCY-KBM

---

Page 158

1  and he's getting cover."  Did you learn during your
2  CIT training that people who suffer from mental health
3  disorders often will avoid confrontation?  You don't
4  recall that?
5      A.  I do not recall that, no.
6      Q.  Fair enough.  All right.
7          MS. CARPENTER:  Page 12, Stephanie.
8      Q.  The next line starts -- at page 12, line 11,
9  you state, "I immediately drew out my service weapon,
10 and I pointed it at him, and I started giving
11 commands: 'Get on the ground.  Get on the ground.
12 Drop the knives.  Drop the knives.'  He didn't saying
13 anything.  All he was doing was just making grunting
14 noises."
15         My question in regards to that is did you
16 ever ask him to take a seat?  When you first
17 encountered him and he was standing in front of
18 Circle K, did you ever say, "Mr. Wood, do you mind
19 sitting down so that I can talk to you?"
20     A.  No, I did not.  Again --
21     Q.  Sorry.
22     A.  Again, because I didn't have that opportunity
23 to ask him to take a seat.  One, I didn't know his name;
24 and, two, I was going to have him come to me, and,
25 again, just have him walk towards me, turn around, and

---

Page 159

1  then I was going to sit him in my car, so that way, I
2  could talk to him.
3      Q.  I'm confused by your use of the words "I
4  didn't have an opportunity."  When I say I didn't have
5  an opportunity, it means that something prevented me,
6  physically or otherwise, from doing that.  For
7  example, I didn't have an opportunity to go to Harvard
8  because I was poor.  Money prevented me from going to
9  a school like that.
10         So what prevented you -- you're saying --
11 you keep saying "I didn't have an opportunity."  What
12 prevented you from using -- from saying three words,
13 "take a seat"?  Was there anything blocking your
14 mouth, or why couldn't you say those words?
15         MS. GRIFFIN:  Object to form.
16     A.  The reason why I didn't tell him to take a
17 seat was because he was still too far away from me and
18 because he was in the middle -- in the front of a
19 convenience store which was busy.  And so I wasn't going
20 to have him just sit down in the middle and have me
21 still 50 feet away.  So that opportunity and that option
22 was not presented at that time.
23     Q.  Okay.  So let me break that down.  You
24 couldn't tell him to take a seat so that you could
25 talk to him, because he was too far away from you?

---

Page 160

1      A.  Right.  If I was --
2      Q.  Let me -- so let me just break -- I'm sorry,
3  Jeffrey.  I know that you keep elaborating, but it's
4  actually causing, I think, a little bit more confusion
5  in the deposition, because I have to keep going back
6  and reiterating what I'm saying.  So I think it's
7  better if we just try to answer the -- I'll break it
8  up for you so we can be clear.
9          So you're saying he was too far away from
10 you.  Were you worried that he couldn't hear you?
11     A.  No.  I was worried that there was too many
12 people that were still coming in and out of that store;
13 that he was just going -- if I had him just sit right
14 there that that would create an issue with all the
15 people coming in and out.
16     Q.  Okay.  Thank you.  All right.  Anything
17 else?
18     A.  No.
19     Q.  Okay.  Were you taught at the academy that
20 asking someone to sit down, whether they had a mental
21 health disorder or not, actually puts you in a better
22 vantage point?
23     A.  Right.  Yes.
24     Q.  Okay.  But you still declined to use that
25 option with Mr. Wood?

---

Page 161

1      A.  I didn't feel that that was the right option
2  at that time, no.
3      Q.  Thank you.  Okay.
4          Now, the next reason that you said you
5  couldn't ask him to sit down -- what was the second
6  reason you gave?  Do you recall?  No?
7      A.  Just that I was going to have him walk back
8  towards me, and then I was going to place him in the
9  handcuffs and put him into my car while I investigated
10 the crime.
11     Q.  Okay, so you had, in your mind, what you
12 wanted -- how you wanted to do it and how you wanted
13 it to go down; correct?
14     A.  Yes.
15     Q.  Okay.  And anything that deviated from that
16 is -- what you're saying, you didn't have an
17 opportunity; correct?
18         MS. GRIFFIN:  Object to form and foundation.
19     A.  It didn't seem like the best option; so, no,
20 the opportunity -- in my opinion, because it was no
21 longer the best option made it not present.
22     Q.  Okay.  I need to take a look at Exhibit 27
23 again.
24     A.  (Hands document).
25     Q.  Okay.  On page 14, starting at line 2, you

---

41 (Pages 158 to 161)

Trattel Court Reporting & Videography
505-830-0600

Electronically signed by Mary Fulton (001-060-973-7022)                                7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

---

Page 162

1  stated, "When he goes to the ground, the daggers come
2  out."  What do you mean -- what did you mean by that?
3  Did you mean that when he fell they were underneath
4  his body or something?  What did you mean by that?
5      A.   They came out of his hands.
6      Q.   Oh, okay.  Thank you.  All right.
7      You said Officer O'Guin was -- in your
8  statement, Officer O'Guin was running at you?
9      A.   Yes.  It appeared that he was running like at
10  us.
11     Q.   Okay.  Did he have his weapon drawn?
12     A.   I do not know.
13     Q.   Okay.  And where do you first recall seeing
14  him running at you?
15     A.   Like right at the front of my car.
16     Q.   Okay.  On page 19, starting at line 10 in
17  your statement, you said, "I saw that he had nothing
18  in his hands, so I figured, okay, let's just try to be
19  casual -- not casual but, you know --"  What did you
20  mean by that?
21     A.   Essentially let's do this like a -- talk to
22  him in a cool, calm and collected manner.
23     Q.   Okay.  And why didn't you -- why didn't you
24  talk to him as you were trained to talk to people who
25  suffer from mental health disorders?

---

Page 163

1      MS. GRIFFIN:  Object to form.
2      A.   Again, because I wanted him to come towards me
3  and to be with me while I detained him, before I started
4  introducing myself or explaining, anything like that.  I
5  was there to conduct an investigation on a crime, and
6  that was the way that I was responding was to conduct an
7  investigation on a crime.
8      Q.   Okay.  Were you taught when you received CIT
9  training that you were to use your CIT training always
10  except for when you're responding to a call of this
11  nature?
12     A.   We were taught to use our CIT training when --
13  when officer safety is not like -- I'm trying to think
14  of the word -- jeopardized.
15     Q.   Okay.  Can you give me every fact to support
16  that when you first got there how your officer safety
17  was jeopardized by Mr. Wood when he was a position of
18  number one, as exhibited -- as shown in Exhibit 27?
19     A.   Officer safety at that time was not
20  jeopardized.
21     Q.   Okay.
22     A.   Again, I was trying to have him walk back
23  towards me.  I didn't want him to just sit down.  And I
24  wanted him to recognize that I was there as a police
25  officer, there to contact him.  I wasn't -- it was too

---

Page 164

1  -- it was the best option, in my opinion, to have him
2  come back towards me and not to -- not to introduce
3  myself and not to just start saying, hey, this is why
4  I'm here.  I wanted him to be with me while I was
5  telling him all that.
6      Q.   So you were -- your plan was to put him in
7  handcuffs before you started asking him questions;
8  correct?
9      A.   Yes.
10     Q.   Okay.  So you were going to arrest someone
11  that you did not have 100 percent confirmation that
12  committed a crime?
13     MS. GRIFFIN:  Object to form.
14     A.   I was not going to arrest him.  I was going to
15  detain him.  And we've -- we, as in police officers,
16  myself included -- have placed multiple subjects into
17  handcuffs while investigating a crime, and then taken
18  those handcuffs off and let them be free as soon as we
19  determined that they were no longer -- they were no
20  longer the suspect in the crime.
21     Q.   All right.  So on page 24, at the very
22  bottom, starting at line 21, you state, "Yeah.  So
23  again, I'm in position A" -- with reference to
24  Exhibit 27 -- "with my door open, and I'm asking him,
25  'Hey, come talk to me.  Come talk to me.'  I'm not CIT

---

Page 165

1  trained, but I had to -- you know, in the academy you
2  all have" -- "you have all that training for CIT.  So
3  I started having him -- I wanted him to come talk to
4  me, so that way, I could try to de-escalate the
5  situation right away."
6      So I'm a little bit confused because you
7  said you didn't -- couldn't use your -- use that type
8  of technique if the opportunity didn't allow you, but
9  it seems like in your statement you're saying that you
10  were trying to do that.  So can you clarify that for
11  me?
12     A.   Yes.  Because I was trying to be cool, calm
13  and collected while I was talking to him, not raising my
14  voice.  I mentioned before that, if presented, the --
15  some officers that I know of on the department -- and it
16  would be justified -- would come up and they would have
17  their guns drawn, and they would just have Mr. Wood, you
18  know, immediately lie on the ground.  They would prone
19  him out and completely -- do a complete different
20  spin-off.
21     And the way that I felt, that was just the
22  best option was for me to get out and to be calm and
23  collected with him and to talk to him in a soft tone of
24  voice and ask him to come back to me.  I felt that if I
25  came essentially, in quotation marks, "guns blazing"

---

42 (Pages 162 to 165)

Trattel Court Reporting & Videography
505-830-0600

Electronically signed by Mary Fulton (001-060-973-7022)

7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

---

Page 166

1  that that would escalate the situation to something that
2  wouldn't need to be there.
3      Q.   Do you remember studying anything about the
4  Americans with Disabilities Act when you were at the
5  academy?
6      A.   The ADA laws?  Just that -- I think there was
7  like some training on it, but basically just to try to
8  -- not compromise, because that's not the right word,
9  but try to help them and be considerate of their
10 disabilities, to -- I can't think of the word.
11        MS. GRIFFIN:  I can't help.
12        THE WITNESS:  I know.
13     A.   Essentially --
14     Q.   Accommodate?
15     A.   Yes, accommodate.  Thank you.  That's the word
16 I was looking for.  To accommodate them to the best that
17 you can, again, not regarding officer safety.
18     Q.   Okay.  Were you trained at the academy that
19 mental illness is a recognized disability under the
20 Americans with Disabilities Act?
21     A.   Yes.
22     Q.   Okay.  Can you tell me how you accommodated
23 Mr. Wood in regards to his mental disabilities?
24     A.   I was talking to him in a calm, collected
25 manner.  I wasn't rushing to him.  I wasn't grabbing him

---

Page 167

1  and throwing him to the ground.  I wasn't coming out of
2  my vehicle with my gun already drawn, making him lie
3  down and prone out right away.  I was trying to -- to
4  accommodate him the best I could, again, regarding the
5  circumstance of the nature of the call, by talking to
6  him and having him come closer to me, so that way then I
7  could then start explaining to him while I was detaining
8  him.
9      Q.   Okay.  How does the City of Albuquerque and
10 the Albuquerque Police Department accommodate persons
11 who suffer from mental health disorders?
12         MS. GRIFFIN:  Objection.  Form and foundation.
13     A.   They gave us the essentials of CIT training.
14 We create CIT officers, CIT detectives, to help
15 accommodate those with mental illnesses.
16     Q.   Do you also agree that the standard
17 operating procedure in regards to people who suffer
18 from mental health disorders, the standard operating
19 procedure that deals with CIT and how to deal with
20 persons who suffer from mental disabilities, is also
21 another way that the City of Albuquerque and the
22 Albuquerque Police Department accommodate -- try to
23 accommodate people who suffer from mental health
24 issues?
25     A.   Yes.

---

Page 168

1      Q.   Okay.
2         THE WITNESS:  It is all right if we take like
3  a quick break just so I can go to the bathroom?
4         MS. CARPENTER:  Absolutely.
5         THE VIDEOGRAPHER:  The time is 1353.  We are
6  off the record.
7         THE VIDEOGRAPHER:  The time is 1357.  We are
8  on the record.
9      Q.   I'm going to ask you some follow-up
10 questions.  Before the lunch break, I -- you had
11 mentioned a 39 call.  The jury is not going to know
12 what a lot of that means, so I want to make sure that
13 we are clear.  What is a 39 call?
14     A.   Disturbance.
15     Q.   Okay.  All right.  Why didn't you ask
16 Vincent to drop his backpacks?
17     A.   I didn't -- I didn't know.  No reason.
18     Q.   Okay.  How many times -- were you ever
19 disciplined in regards to anything involving this
20 case?
21     A.   No.
22     Q.   Okay.  Have you ever been disciplined
23 before?
24     A.   No.
25     Q.   Okay.  Have you ever had any complaints

---

Page 169

1  against you as an officer?
2      A.   I think I've had like a driving complaint, and
3  that was it.
4      Q.   Okay.  So you've never had any complaints in
5  regards to abuse of force?
6      A.   No.
7      Q.   Okay.  And you've never been spoken to about
8  any uses of force that you've ever had?
9      A.   No.  Up to this point, that was my first use
10 of force.
11     Q.   Well, what about -- I'm talking about as you
12 sit here today --
13     A.   Even still, yeah.  No.
14     Q.   Just to be clear, these questions involve
15 your entire career history at APD to present date.
16 Yes?
17     A.   Yes.  I've never had any complaints.
18     Q.   Okay.  You never had an early -- EIS hit?
19 Do you know what that is?
20     A.   No.
21     Q.   Okay.  No, you don't know what it is?
22     A.   No, I don't know what it is.
23     Q.   Okay.  Do you know if you've ever had one?
24     A.   If I had an EIS hit, I guess I'd know what an
25 EIS hit is.

---

43 (Pages 166 to 169)

Trattel Court Reporting & Videography
505-830-0600

Electronically signed by Mary Fulton (001-060-973-7022)                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.   v. Katherine Wright, et al.                                    December 10, 2015
Jeffrey Bludworth                                                                   15cv00550 SCY-KBM

---

Page 170

1      Q.   Okay.  Fair enough.  Fair enough.  A
2   question that answers itself, really.
3        Now, let me ask you a question about the
4   lapel cameras.  My understanding from speaking with
5   Katherine is that there's a hard drive in your
6   vehicle.  Do you have a hard drive in your vehicle?
7      A.   A hard drive?
8      Q.   Yeah.  That's what I wrote down.
9      A.   No.  The only thing I have in my vehicle is a
10  -- my KDT, and that's what we download it to.
11     Q.   Okay.  So with your Scorpion videos, you
12  would -- you could go back to your unit and you could
13  take out an SD card and load it into your laptop
14  that's in your unit?
15     A.   Yeah.  But you had to have like a USB port
16  thing to stick it into and then stick it in.  Nine times
17  out of ten, you just go to the sub, plug it into the
18  computer at the sub, and then just download it and
19  whatnot, put all the videos that needed to be tagged
20  into a CD on the CD.
21     Q.   Okay.  How long you are required to keep
22  video footage?
23     A.   At that time, I don't know if we had like a
24  true date or time.  Just because it was on -- we only
25  had one little memory card.  And, essentially, if it

---

Page 171

1   didn't belong on the evidence, then you just kind of got
2   rid of it.
3      Q.   Okay.  And how would you get rid of it?
4      A.   You'd just get on the computer and delete it
5   off the memory card, so...
6      Q.   Okay.
7      A.   And the only times that I would hold on to
8   like memory cards or anything like that were in cases of
9   -- where I thought maybe like a complaint might come
10  from, or use -- just things like that.  Like if I
11  thought a complaint would come out of it, or -- that's
12  really the only time I hold on to it.
13     Q.   Were you ever told about the Tort Claims Act
14  when you were in the academy, that you should hold on
15  to evidence for a minimum of 90 or 120 days, anything
16  like that?
17     A.   If it was like evidence for a crime, yes; if
18  it was just like you and I talking on the streets, and
19  there was no investigation or anything, like it was just
20  like a civilian contact saying, Hey, there's like a
21  suspicious vehicle in the neighborhood, then I wouldn't
22  hold on to that, because -- in my opinion.  And the way
23  those memory cards were, it wasn't necessary to hold on
24  to it, so...
25     Q.   Okay.  All right.  I want to talk to you

---

Page 172

1   about after Mr. Wood was shot, you can hear on the
2   video -- and I think you've seen this part, because
3   you testified earlier you had -- you say something to
4   the effect of, I'm going to tell these people to get
5   out of here.  Do you remember that?
6      A.   Yes.
7      Q.   Why did you say that?
8      A.   So the reason why I said that and then
9   proceeded to go on and tell all the subjects inside and
10  outside of Circle K to leave was because after that
11  incident -- and I know as you continue to probably watch
12  the video, I don't know if it's captured on video -- but
13  I'd become very distraught, and I'm very upset over the
14  situation.  And my mind goes from thinking clearly to
15  not thinking very clearly at all.
16       It was a mistake on my part.  And I do
17  recognize that it was wrong of me to tell people to
18  leave the scene -- to tell witnesses to leave the scene.
19  And I do -- I do acknowledge that that was wrong on my
20  part.  But due to the fact that I felt that it was right
21  that no one came in to where we -- where Mr. Wood was
22  and where the scene was, is why I felt that it was right
23  at the time to tell people to leave.
24       Now, again, looking back on hindsight, again,
25  I recognize that I did make a mistake and that I should

---

Page 173

1   not have told people to leave, but I should have asked
2   witnesses if they were willing to stay, to say and to
3   talk to detectives, but not to force anybody to stay or
4   to leave.  But, again, due to the traumatic incident
5   that had just occurred -- and, again, just being as
6   distraught as I was because of what just -- because of
7   what had occurred, I was not thinking clearly.
8      Q.   Okay.  I appreciate you saying that.
9        When you -- you -- the day after the
10  incident when you were talking to the detectives, you
11  talk about -- and you've talked a little bit here
12  today -- the thoughts that were going through your
13  mind before you shot Mr. Wood.  One of the thoughts
14  was, you know, the media -- what the media is going to
15  do with this; am I going to get fired because I don't
16  have my lapel camera on.  Were you thinking -- were
17  you also thinking about the fact that there were
18  witnesses watching?  Were you thinking about anybody
19  at the scene or anything?  No?
20     A.   No, ma'am.
21     Q.   Okay.
22     A.   Just more their safety before, but not -- at
23  that moment, no, I was not.
24     Q.   Were you also -- were you -- and I feel like
25  you alluded to it in the statement somewhere, but I've

---

44 (Pages 170 to 173)

Trattel Court Reporting & Videography
505-830-0600

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 35 of 43

Hope Irvin, et al.  v. Katherine Wright, et al.                December 10, 2015
Jeffrey Bludworth                                              15cv00550 SCY-KBM

Page 182

1      Q.   So did David Munoz ever come to the call?
2      A.   Yes, he did.
3      Q.   Okay.  And was he supposed to be primary on
4   the call?
5      A.   No.
6      Q.   Okay.  So why does it say Prime Unit F422?
7          MS. GRIFFIN:  Objection.  Form and foundation.
8      A.   The reason why it says Primary Unit Frank 422
9   is because the officers that were primary -- myself and
10  Kat -- were both involved in the use of force, and so
11  someone else needed to take the initial report.  And so
12  that's why Frank 422 was logged on as the primary
13  officer.  They can switch at that point.
14     Q.   Okay.  I'm a little bit confused.  Sorry.
15  So dispatch has him as the primary because you guys
16  are the primary?  I'm sorry.  I got confused there.
17     A.   So myself and Kat Wright -- if you look at
18  19:39:04, and it says "DSP," we both dispatched.
19  And then right underneath, it says "PRIU," so primary
20  unit.  And that was me, Ida 434.  Due to the fact that
21  we were both involved in a shooting, that means that we
22  can no -- that we were no longer going to be doing the
23  report on this call.
24         So they changed the primary unit from me to
25  Frank 422, so that way he could then essentially brief

Page 183

1   the detectives on why -- what call we were on, why we
2   were there and what happened, in very small detail,
3   which has not much, because the detectives are still
4   going to have to do their investigation and everything.
5   But he became the primary officer at that point.
6      Q.   So when this -- so this CAD has been changed
7   since this -- this isn't -- this is not what it
8   appeared at its first inception.  This is what
9   happened after the shooting.  It got entered that way.
10         MS. GRIFFIN:  Objection.  Form and foundation.
11     A.   I don't know when he got placed as primary
12  unit, but I know it's going to be after the shooting.
13  Because, again, like it says -- at 19:39:04, it says
14  that I am primary, Ida 434.
15     Q.   Okay.  Okay.  Have you ever looked at the
16  CAD before?
17     A.   Yes, I have.
18     Q.   Okay.  Do you see where at the very top --
19  the very first entry, 19:34:41, "CREATE," it says
20  "Priority: 2, Response: 20"?
21     A.   Yes.
22     Q.   What does that mean?
23     A.   It's a Priority 2 response.  I don't know what
24  the 20 means.
25     Q.   You don't know what the "Response: 20"

Page 184

1   means?
2      A.   (No audible response.)
3      Q.   What does Priority 2 mean?
4      A.   It's a Priority 2 call.
5      Q.   What is a Priority 2 call?
6      A.   It's one that is urgent but doesn't meet the
7   criteria of like running lights and sirens or anything
8   like that.
9      Q.   Okay.  Do you see below that, three minutes
10  -- less than three minutes later, 19:37:14 has
11  "ENTRY," "Priority: 2," and then it has a dot and an
12  arrow to "1," and then it says "Comment."  What does
13  that mean?
14     A.   It means that it was upgraded from a
15  Priority 2 to a Priority 1.
16     Q.   Okay.  All right.  Do you see that about
17  10 seconds later it says "Comment: Caller advised
18  subject has 40 history"?
19     A.   Yes.
20     Q.   Okay.  That means that he has a mental
21  health history?
22     A.   Yes.
23     Q.   Next, below that, it says "Comment, negative
24  18/57."  Does that mean that he's not suspected of
25  drugs and alcohol?

Page 185

1      A.   Alcohol and drugs; but, yes.
2      Q.   Okay.  Did you -- were you able to see all
3   of this on your KDT?
4      A.   Yes.
5      Q.   Okay.  Next line down.  "Subject is known to
6   be violent."  Do you see that?
7      A.   Yes.
8      Q.   Okay.  So you had all this information that
9   we talked about before you responded to the call?
10     A.   Yes.
11     Q.   Okay.  Thank you.
12         The next line down, it says "Select."  What
13  does that mean?
14     A.   I don't know.
15     Q.   Okay.
16     A.   It's probably a dispatch thing.
17     Q.   Okay.  Thank you.
18         So then I see where you guys are dispatched
19  roughly four to five minutes after the call -- five
20  minutes after the call is initially made.
21         And then below that, it says "I434."  Do you
22  see that, at 19:39:04?
23     A.   Yes, ma'am.
24     Q.   What does that mean?
25     A.   Dispatch, Ida 434.  That's myself.

47 (Pages 182 to 185)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 36 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                        7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.                    December 10, 2015
Jeffrey Bludworth                                                  15cv00550 SCY-KBM

---

Page 186

1  **Q.  So you were calling dispatch?**
2  A.  No.  Dispatch called me.
3  **Q.  What does the "PRIU" mean?**
4  A.  That I was the primary unit.
5  **Q.  Okay.  So dispatch picked you to be the**
6  **primary unit?**
7  A.  Yes.  And, again, that's what I was stating
8  earlier.
9  **Q.  Okay.  Thank you.  Are there any**
10 **restrictions that you know of or -- this is my word,**
11 **"restrictions," but you can use whatever word you want**
12 **that's synonymous with that.  Prohibit -- any SOP or**
13 **training that states a P1/2 should not be a primary on**
14 **a Priority 1 call?**
15 A.  P1/2?
16 **Q.  I'm sorry.  A P2/C should not be primary to**
17 **a Priority 1 call of this nature?**
18 A.  No.  Because once you're an officer, you're an
19 officer and you take calls.
20 **Q.  Regardless of if you're a P2/C or a P1/C?**
21 A.  Correct.
22 **Q.  Okay.  Again, just reiterating, there was**
23 **nothing mandating you -- that you wait for backup?**
24 A.  Correct.
25 **Q.  Okay.  Next thing we see here is "en route**

---

Page 187

1  **423."  Is that Katherine saying that she's en route?**
2  A.  Yeah, that's probably her pushing the button.
3  **Q.  And then next thing we see here is**
4  **"BACKER" -- "BACKER, BK46."  Do you see that?**
5  A.  Yes.
6  **Q.  What does that mean?**
7  A.  Bike 46 is getting dispatched, as well, for
8  backup.
9  **Q.  Did you hear your supervisor, Altman --**
10 **Sergeant Altman call and state, "We need a CIT**
11 **officer"?**
12 A.  He didn't call and state, "We need a CIT
13 officer."  He asked if a CIT officer was en route.
14 **Q.  Okay.  Thank you.  And did you hear that?**
15 A.  Yes.
16 **Q.  Okay.  And what did you think about when you**
17 **heard that?**
18 A.  That any -- nothing really.
19 **Q.  Okay.**
20 A.  It's just standard procedure, I guess.
21 **Q.  Why is it standard?  It is standard**
22 **procedure on all calls?**
23 A.  No.  It is just that if -- if a subject
24 possibly have mental illness issues, and -- you're going
25 to hope that a CIT officer can go.  But it's not

---

Page 188

1  required, and it's not -- you know, it's not a law that
2  a CIT officer has to go.
3  **Q.  Okay.  So going -- looking at this CAD,**
4  **Jeffrey, going down, were you able to read and see**
5  **everything that's reflected on this first page when**
6  **you were en route?**
7  A.  I was able to see it.  I guess I just don't --
8  I remember looking at the top part, but nothing really
9  else.
10 **Q.  Okay.  Do you see where it says "19:41, on**
11 **scene, BK46"?  Do you see that?**
12 A.  Yeah.  Bike 46.
13 **Q.  So what does that mean?**
14 A.  He's on the scene.
15 **Q.  Okay.  Do you see the next line below that,**
16 **it says "INFO, Contact: No."  "Weapons: KNIVES."**
17 **Drugs."  What is that?**
18 A.  So it says "Contact: No."  Meaning -- I'm
19 guessing that the security guard didn't want contact at
20 that point, which is kind of wrong.  "Weapons: KNIVES."
21 "Drugs: U" for unknown.  "Alcohol: Unknown."  "Comment:
22 Unknown if still armed.  Subject in Circle K parking
23 lot."
24 **Q.  Who conveyed that information?**
25 A.  I don't know.  Usually it will -- it's an

---

Page 189

1  officer, it will say.  If not, then I do not know.
2  **Q.  Okay.  So you're saying that the security**
3  **guard was saying that he didn't want you guys or**
4  **dispatch to have contact with him?**
5  MS. GRIFFIN:  Objection.  Form and foundation.
6  A.  I don't know if that was him or if it was a
7  different caller.  So I don't know.
8  **Q.  Why were you saying that -- so that's wrong?**
9  **What do you mean by that?**
10 A.  Because I believe that he wanted contact.
11 Yeah.  Because at the top, it says -- so at the entry
12 19:37:14, it says "Caller requesting 34s make 25 at
13 above 20."  So caller is requesting officers make
14 contact at above 20, which would be the 40- -- it wasn't
15 4601 San Mateo, but it was the bus stop at San Mateo.
16 **Q.  Okay.  Do you know who the dispatcher is?**
17 **Is there a way to identify the dispatcher on this**
18 **call?**
19 A.  Not that I know of.
20 **Q.  Okay.  Do you know who the dispatcher was?**
21 A.  No.
22 **Q.  Okay.**
23 A.  I don't even know our dispatchers now.
24 **Q.  Okay.  Do you see on the next page, it says**
25 **-- at 19:42:12 it says "on scene, F423"?  Is that when**

---

48 (Pages 186 to 189)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 37 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.                          December 10, 2015
Jeffrey Bludworth                                                        15cv00550 SCY-KBM

---

Page 198

1   and symptoms that may signal mental illness exists."
2   Do you see at the bottom of A it says "may be
3   aggressive without apparent provocation"?  Do you see
4   that?
5       A.  Yes.
6       Q.  Do you agree or disagree with that?
7       A.  I guess I agree, yeah.
8       Q.  Okay.  The next one, B, it says
9   "Appropriateness of Behavior - a person who acts
10  extremely inappropriate for a given situation may be
11  mentally ill."  Do you agree or disagree with that?
12      A.  I agree with it to a point.  I think sometimes
13  people are just dumb and don't act appropriate.  Doesn't
14  mean they're necessarily mentally ill.
15      Q.  Okay.  The next one.  "Extreme Rigidity or
16  Inflexibility - Mentally ill persons may be easily
17  frustrated in new or unforeseen circumstances and may
18  exhibit inappropriate or aggressive behavior."  Do you
19  agree or disagree with that?
20      A.  Agree.
21      Q.  Okay.  Did you believe that Mr. Wood was
22  dangerous before you arrived on the scene?
23      A.  Can you rephrase that?  Because I know -- I
24  don't want to say yes.  I don't want to say no.  Because
25  I -- there's a lot that plays into it.

---

Page 199

1       Q.  Well, as you were approaching the scene,
2   were you thinking in your mind this guy is -- this guy
3   is going to be dangerous?  He's going to potentially
4   be violent, he's a dangerous person?  Were you
5   thinking in your mind before you encountered him?
6       A.  I think about him with everybody.  I think
7   anyone can be dangerous.
8       Q.  Okay.  So the answer is yes?
9       A.  Yes.
10      Q.  Okay.  Thank you.
11          Now, let's go to "Handling the Mentally
12  Ill/Suspected Mentally Ill."  The very first thing it
13  says is that "If the officer determines that a subject
14  may be mentally ill, the officer will attempt to
15  respond in the following manner:"  Do you see that?
16      A.  Yes.
17      Q.  Okay.  "Ensure that backup officers are
18  present before taking any action."  Let's break that
19  down a little bit.
20          You agree with me that you thought that
21  Mr. Wood, the subject, may be mentally ill; correct?
22      A.  Correct.
23      Q.  And yet you did not ensure that backup
24  officers were present before you took any action with
25  Mr. Wood; correct?

---

Page 200

1           MS. GRIFFIN:  Objection to the form.
2       A.  Before, it says "If the officer determines
3   that a subject may be mentally ill, the officer will
4   attempt to respond in the following manner:  both
5   officers will" -- Officer O'Guin had stated that he was
6   56, meaning he had arrived at scene, and to -- and it's
7   an attempt; it's not you must.
8       Q.  Okay.  So you believed when you made initial
9   contact with Mr. Wood that O'Guin was, your backup,
10  said officer was present?
11      A.  Yes.
12      Q.  Okay.
13      A.  I'll admit, if he was not present right when I
14  saw him -- because when I pulled in, I clearly saw he
15  wasn't there, but that he would be there within seconds.
16      Q.  So why not just wait for him, since he had
17  specialized training on how to deal with people who
18  suffer from mental health and -- let me finish --
19  given your knowledge of how Mr. Wood is, as you've
20  testified to, that he is hard to understand, that he
21  is agitated easily, he doesn't -- as you -- as you
22  testified to earlier.  But given just what I've just
23  told you, why not wait for O'Guin to have initial
24  contact?
25      A.  Well, I was trying to determine essentially

---

Page 201

1   the danger of the situation, and so -- and I didn't want
2   to have him continue to elude and escape where officers
3   where trying to find him.  It's easier to contain him in
4   one spot than to continue to try to follow him and watch
5   him and figure out where he's going next.
6       Q.  Okay.  Do you see the next thing, it says,
7   "If possible, try to obtain any information on the
8   subject from family or friends."  The next thing,
9   "Calm the situation."  "Cease emergency lights and
10  sirens."  You didn't do that, did you?
11      A.  My siren was off; but, no, my lights were not.
12      Q.  And, in fact, your lights were still going
13  the entire time, all the way up until the point when
14  you were shooting at Mr. Wood; correct?
15      A.  Correct.
16      Q.  Did you ever think that those lights were
17  causing him to become agitated and disturbed?
18      A.  No.
19      Q.  Okay.  Now, you had testified in your
20  statement that you were sure that he saw you -- you're
21  sure that he saw you -- or saw your lights, because he
22  turned, and you had alluded that you think that that's
23  why he -- that's what got his attention were your
24  lights; correct?
25      A.  My like little "whoop-whoop" of my siren, yes.

---

51 (Pages 198 to 201)

Trattel Court Reporting & Videography
505-830-0600

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 38 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                    7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

Page 202

1    Q.   Okay.  Weren't you trained in CIT that that
2  is something that you should absolutely not do because
3  people who suffer from mental health disorders become
4  agitated, and also that can be a major triggering
5  event for them is the sirens and the lights?
6         MS. GRIFFIN:  Object to form and foundation.
7    A.   Per other SOPs, I'm to respond with lights and
8  sirens to Priority 1 calls.  And so I was following
9  another SOP.
10   Q.   So are you saying that this SOP conflicts
11 with other SOPs?
12   A.   Yes.  Because -- well, this says cease
13 emergency lights and equipment -- or, well, lights and
14 siren.  So you can still arrive to scenes with lights
15 and sirens.  And my siren was off.  I just didn't get my
16 lights off.
17   Q.   Okay.  And I'm so sorry, Jeffrey, but I just
18 -- I got to make sure for the record that I get clear
19 answers, and so I've got to keep repeating it, because
20 instead of answering the question that I'm posing,
21 you're just telling me other things.  So like me
22 saying, Was the car red?  You said, Well, it was a
23 Toyota Corolla.  So I just need to go back.
24        MS. CARPENTER:  So can you read the question
25 again.

Page 203

1        (The record was read by the reporter as
2  follows:
3        "So are you saying that this SOP conflicts
4  with other SOPs?")
5    Q.   So do you think that it conflicts with the
6  other SOP that says you have to have your emergency
7  lights and sirens?
8    A.   I say no, because this says cease emergency
9  lights and sirens.  It doesn't say don't respond with
10 emergency lights and sirens.
11   Q.   But you didn't cease your emergency lights,
12 did you?
13   A.   No, I did not.
14   Q.   All right.  "Assume a quiet, nonthreatening
15 manner when approaching the subject."  Did you do
16 that?
17   A.   Yes.
18   Q.   Okay.  "Avoid physical contact, if possible,
19 while assessing the situation."  Do you see that?
20   A.   Do I see it?
21   Q.   Yes.
22   A.   Yes, I see it.
23   Q.   Okay.  Isn't that contradictory to what you
24 said your ultimate goal was, which was to get him to
25 come to you whereby you could make physical contact

Page 204

1  with him?
2    A.   Right.  But this -- I -- this isn't an "if
3  possible," because I needed to have physical contact
4  with him to place him in the handcuffs, in case he was
5  still armed with the knives, to assess the situation,
6  for officer safety as well for the public's safety.
7    Q.   Okay.  Let's go down.  "Communicating with
8  the subject."  Did you ever tell Mr. Wood that -- that
9  you were there to help and that you weren't there to
10 hurt him?
11   A.   No.
12   Q.   Okay.  Okay.  Let's go to page 5 of this
13 standard operating procedure.  All right.  Do you see
14 where it says "Deployment of the Field Crisis
15 Intervention Team"?
16   A.   Yes.
17   Q.   Okay.  It says the "Crisis Intervention Team
18 is composed of Field Services patrol officers that
19 function within the patrol team as specialists in
20 handling calls involving the mentally ill and other
21 calls of crisis not related to mental illness."  Do
22 you see that?
23   A.   Yes.
24   Q.   Were you told that when you were at the
25 academy, that that was their function?

Page 205

1    A.   Yes.
2    Q.   Okay.  And that they are specialists in
3  handling calls involving the mentally ill?
4    A.   I don't know if I'd call them specialists, but
5  they have the training to, yes.
6    Q.   Okay.  And don't you agree with me that this
7  call involved someone who was mentally ill?
8    A.   Yes.
9    Q.   Okay.  Next thing, Section A, it says "When
10 available, Field Crisis Intervention Team Officers
11 will respond as primary officers to calls that meet
12 the following criteria:
13        "Any incident when a mental illness or
14 crisis precipitated a response by APD."  Do you see
15 that?
16   A.   Yes.
17   Q.   Do you agree or disagree with that?
18   A.   I agree.
19   Q.   Okay.  Number 2.  "Any incident where
20 subject poses a risk to themselves or others."  Do you
21 see that?
22   A.   Yes.  And it continues "threatened or
23 attempted suicide."
24   Q.   Yes.  That's the same line.
25   A.   Yes.

52 (Pages 202 to 205)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 39 of 43

Electronically signed by Mary Fulton (001-060-973-7022)

7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

Page 238

1  because the reactive control model indicates that you
2  can use deadly force against a subject who is using --
3  who is confronting you with a deadly object.
4      Q.   Correct.
5      Q.   Okay.  On page 30--
6          MS. CARPENTER:  I'm on page 36 of his
7  statement, Stephanie.
8      Q.   -- line 13, you say that, "So after I cuffed
9  him -- well, after other officers had cuffed him" --
10  you're sure you didn't cuff him; right?
11      A.   Yes.
12      Q.   Okay.  "One clear thing I heard him say was
13  'You shot me.'"  You heard him say, "You shot me"?
14      A.   Yes.
15      Q.   Okay.  Did you say anything back to him?
16      A.   No.  At that point, that's when my emotions
17  kind of got the best of me.
18      Q.   Okay.  I heard -- I heard on your video
19  someone say, "Hey, where you been shot, Bud?" or even
20  "Where you hit?" or something like that.  Was that you
21  or was that O'Guin saying that?
22      A.   That's probably O'Guin.
23      Q.   You don't recall saying anything?
24      A.   I did not say anything.
25      Q.   Did you ever say anything to Vincent?

Page 239

1      A.   No, ma'am.  Other than my commands, but
2  nothing else, no.
3      Q.   When did you learn that he had died?
4      A.   I think the next day someone had told me, one
5  of the detectives had told me.
6      Q.   Okay.
7      A.   Or it might have even been on the news that
8  night.  I don't remember.  It was very shortly after.
9  Like I wasn't on the scene anymore.  That's for sure.
10      Q.   Okay.  A lot of these we've already talked
11  about.
12      A.   All right.
13      Q.   Okay.  On page 44 of your statement, you say
14  that you opened your door for -- let me just use
15  your -- read what you said.  You said, "I kind of --
16  I'm making it angled, so that way I have my door for
17  cover."  Do you see where you said that?  Or, I'm
18  sorry, is that -- let me ask the question again.
19  Strike that.  I apologize.  I'm getting tired.
20          Were you -- did you open your door and stand
21  behind your door because you wanted to use it as
22  cover?
23      A.   Yes.
24      Q.   Thank you.  Okay.
25          Why did you feel like it was important to do

Page 240

1  that?
2      A.   Just so that way, again, as I was having him
3  come towards me, I think -- I'm sorry, I keep referring
4  back to Exhibit 26, but it's just the best way to do it.
5      Q.   Sure.
6      A.   And as he would start to come towards me and
7  my door was open, I would then have something -- a
8  barrier in between us while I'm talking to him, and then
9  I would again explain to him, Okay, hey, Mr. Wood --
10  well, sir, I need you to turn around at this point.  So
11  it was just -- more of just protection just in case he
12  decided to come just running at me or anything like
13  that.
14      Q.   Okay.  My understanding is that he moves
15  around your police unit, eventually making it to where
16  he's on the driver's side of your unit -- the driver's
17  side of the unit.  And that's the place where he was
18  shot.
19      A.   Yes.  But like in -- let's see.
20      Q.   Yeah, any exhibits you see that would help.
21      A.   So Exhibit 31, as he starts to come around as
22  I'm backing up this way, that's when he starts to come
23  like right here.  That's where my position would be --
24  would be in front of my rear quarter panel area.
25      Q.   Jeffrey, I'm glad you pulled this exhibit

Page 241

1  out.  So if -- if -- when he was on this side of your
2  police unit --
3      A.   Yes.
4      Q.   Was he right up against the police unit or
5  was he --
6      A.   No.  He was a little bit back.
7      Q.   Okay.
8      A.   So as he comes from here, he starts to go this
9  way.  And he's kind of back.
10      Q.   Okay.
11      A.   And then, as I'm mirroring him -- so I shut my
12  door in case he starts to run.  I don't want my car to
13  be left unsecured.  So I shut my door, and then I start
14  to mirror him.  And then as I'm mirroring him, I start
15  to go back a little bit, because I start -- I get that
16  feeling like, okay, something bad is about to happen.
17  And then that's when we go -- I go back this way, and
18  then he presents his knives here and starts walking.
19      Q.   Why not walk around your unit so that you
20  can maintain something -- I mean, you're in an open
21  parking lot here; right?
22      A.   Correct.
23      Q.   Why not use your unit to keep a position of
24  cover from him if you were worried about his actions?
25      A.   At that time, it wasn't the best option, in my

61 (Pages 238 to 241)

Trattel Court Reporting & Videography
505-830-0600

Electronically signed by Mary Fulton (001-060-973-7022)

7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

Page 258

1    Q.   Did you have a city-issued cell phone?
2    A.   No.
3    Q.   Did you ever talk about this on social
4  media?
5    A.   No.
6    Q.   Did you ever call anyone or text anyone
7  about this using your own personal phone?
8    A.   No.
9    MS. CARPENTER:  I know you have follow-up,
10  Stephanie.  I'm going to wrap it up -- I'm just wrapping
11  it up here.
12    Q.   Do you have any reason to believe, as you
13  sit here today, that Mr. Wood was not able to comply
14  with your commands, based -- and due in part because
15  of his mental illness?
16    A.   I'm sorry.  Say that one more time.
17    Q.   Sure.  As you sit here today, do you have
18  reason to believe that Mr. Wood was not able to comply
19  with your commands, based in part because of his
20  mental illness?
21    A.   No.
22    Q.   Why not?
23    A.   Because I think everyone can understand that
24  an officer pointing a gun at you and telling you to stop
25  your actions, whether you're in your own rule or not,

Page 259

1  can make you stop.
2    Q.   Okay.  Were you trained that at the academy?
3    A.   That's just on my personal belief.
4    Q.   Okay.  How were you trained in regards to
5  that at the academy?
6    A.   I don't remember specifics.
7    Q.   Okay.  Did you ever see Officer Wright walk
8  back to her car after the incident?
9    A.   Not to my recollection, no.
10    Q.   Okay.  If you -- if she had done so, would
11  it behoove you -- would you have told her, Hey, you
12  can't do that?
13    MS. GRIFFIN:  Object to form and foundation.
14  I don't know why she wouldn't be allowed to go back to
15  her car.
16    Q.   Okay.  So after a shooting like this --
17  whenever you're involved in a police shooting and
18  you're actually the shooter -- what are you supposed
19  to do?  What are you told by the force that you're
20  supposed to do?
21    MS. GRIFFIN:  Objection to form and
22  foundation.
23    A.   After rendering the scene safe, then to go and
24  not necessarily seclude yourself, but go and find
25  somewhere to go to sit and wait to get -- to get your buddy

Page 260

1  officer and wait until criminalistics comes out.
2    Q.   So you're not supposed to talk to any other
3  officers about what occurred; correct?
4    A.   Correct.
5    Q.   Were you ever trained at the academy that if
6  you see -- it's basically the rule of intervention,
7  that if you see another officer doing something that
8  you believe to be wrong or in violation of the
9  constitution that you are to intervene and tell that
10  officer to stop?  Were you ever told that at the
11  academy?
12    A.   Yes.
13    Q.   Okay.  Have you ever done that?
14    A.   I've never had any issues with any other
15  officers that I worked with.
16    Q.   Okay.  Were you trained at the academy about
17  concealment, cover and communication?  Have you ever
18  heard that?
19    A.   Yes.
20    Q.   Okay.  And when are you supposed to seek a
21  position of concealment, cover, and to use
22  communication?
23    A.   Whenever possible for all three.
24    Q.   Okay.  So up until the point that Mr. Wood
25  retrieved the knives from his backpack, for all

Page 261

1  practical purposes he was obeying your commands to
2  come over to you; correct?
3    A.   I wouldn't say he was obeying, because he
4  wasn't coming to me.  He was going away from me.
5    Q.   Okay.  Did you say, "Come to me"?  Because I
6  thought you said, "Hey, come over here."
7    A.   Well, over here would be to me, not around to
8  the other side of my car.
9    Q.   Did you tell him that?
10    A.   I believe any reasonable person would
11  understand that.
12    Q.   But you never made that clear to him?
13    A.   No, I never stated --
14    Q.   "Come to me."
15    A.   -- "Come to me."  I just stated, "Come talk to
16  me."
17    Q.   Okay.
18    A.   Which, to me, again, if I say, "Come talk to
19  me," you wouldn't go away from me.
20    Q.   Okay.  So I didn't know that you said, "Come
21  talk to me."  I thought you said, "Come over here.  I
22  want to talk to you."
23    A.   "Come talk to me."
24    Q.   Okay.  So let me just be really clear,
25  because we need to be clear.  Tell me exactly what you

66 (Pages 258 to 261)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 41 of 43

Electronically signed by Mary Fulton (001-060-973-7022)

7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.                    December 10, 2015
Jeffrey Bludworth                                                  15cv00550 SCY-KBM

---

Page 262

1  said to Vincent.
2      A.  I stated, "Sir, come here.  I need you to talk
3  to me."
4      Q.  Okay.  Before you arrived on scene, you
5  heard Kat say over the air, "I think his name is
6  Vincent"; right?
7      A.  Correct.
8      Q.  Why didn't you ever use his name?
9      A.  I just call everybody by sir or ma'am when I'm
10 at work unless they specify or tell me otherwise.
11     Q.  Did you learn in CIT training that -- and
12 when at all possible, to use the person's name because
13 it de-escalates the situation?
14     A.  I learned that.  But, again, sir and ma'am
15 usually do the same thing as well.
16     Q.  Okay.  You're still a P1/C now?
17     A.  Correct.
18     Q.  Okay.  Are you -- is there any possibility
19 that you're going to be promoted in the next year?
20     A.  In the next year, no.
21     Q.  Okay.  Are you planning on staying with the
22 force, with the police department?
23     A.  Yes, ma'am.
24     Q.  Okay.  Did you ever talk to your sergeant,
25 Sergeant Altman, about this incident?

---

Page 263

1      A.  Other than just like sergeant to officer, and
2  just saying that, hey, I was involved and I shot, I
3  shot, not that I know of, no.
4      Q.  Okay.  So you didn't tell him this is what
5  happened when I first got on scene, this is what he
6  did, this is why I shot?  You never explained any of
7  that to Steve?
8      A.  Not that I remember, no.  I just remember
9  saying, "I shot.  I shot.  What do I do?  What do I do?"
10     Q.  It's Steve Altman, isn't it?
11     A.  Yes, ma'am.
12     Q.  Okay.  What did he say in response to you
13 telling him that?
14     A.  I don't think he heard me the first couple of
15 times, so I had to repeat it.
16     Q.  Okay.
17     A.  And then he kind of patted me on my shoulder
18 and walked me over to his car.  And by patting me on the
19 shoulder, it wasn't like, oh, good boy.  It was like a,
20 you're going to be all right; like I'll take care of
21 you, let's go.
22     Q.  And he walked me over to his unit?
23     A.  Yes.
24     Q.  How did you know that Mr. Wood didn't have
25 any hearing disabilities?

---

Page 264

1      A.  Just assumed.
2      Q.  You never asked Mr. Wood, "Can you hear me?"
3      A.  No.
4      Q.  You never asked Mr. Wood, "Do you understand
5  what I'm saying to you?"
6      A.  No.
7      Q.  Okay.  Were you a part of or aware of any
8  citywide briefing in regards to policies being enacted
9  regarding how to deal with the mentally ill -- how
10 field service officers are to deal with mentally ill
11 people?
12     A.  Not that I know of, no.
13     Q.  Okay.  Is it illegal to show someone your
14 knives?
15     A.  No.
16     Q.  Okay.  Do you think that Vincent's reaction
17 at -- his reaction to -- that you saw at the incident
18 -- in regards to this incident, was one that a normal
19 -- you've used the word "normal" during the course of
20 this testimony.  Do you think it was one of a normal
21 person?
22     A.  His actions?
23     Q.  Yeah, his reactions to you.  Do you think
24 they were one of a normal person?
25     A.  No.

---

Page 265

1      Q.  Do you think it's -- they were one of
2  someone who is mentally disturbed?
3      A.  Not of sound mind, yes.
4      Q.  Okay.  Do you feel like the risk of danger
5  that Vincent posed to you was obvious when you got
6  there?
7      A.  When I got -- when I first arrived on scene?
8      Q.  Yeah.
9      A.  No.  I don't believe his risk was posed until
10 he started walking away from me.
11     Q.  Have you ever had the opportunity to refer
12 any case that you've been a part of to the CIT
13 division?
14     A.  I've sent reports to them.
15     Q.  How do you do that?
16     A.  I just e-mail them.
17     Q.  You e-mail it to the CIT.  I mean do you
18 make any recommendation, like, Hey, I interacted with
19 this guy.  He's 10-40.  Can you guys follow up, or
20 what was it like?
21     A.  I just e-mail my report, and that's it.
22     Q.  Why did you -- can you just give me an
23 example of one of those situations and why you felt
24 the need to refer it to CIT division?
25     A.  That was just a suicide call, where someone

---

67 (Pages 262 to 265)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 42 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                7c224078-c96b-44fb-90ce-43f1c1a125d2

Hope Irvin, et al.  v. Katherine Wright, et al.
Jeffrey Bludworth

December 10, 2015
15cv00550 SCY-KBM

---

Page 294

1    and you're not complying, force is going to be used
2    against you.
3       Q.   So you just assume that the individuals that
4    you interact with are going to just know that without
5    you giving them a warning?
6          MS. GRIFFIN:  Object to from.
7       A.   I believe that any person would acknowledge
8    that.
9       Q.   Were you trained at the academy that you
10   don't have to give a warning because if you point your
11   gun at somebody, they'll just know that you're going
12   to shoot them?
13      A.   I was given direction that you don't always
14   have to present them with a warning, because it doesn't
15   always present itself to be given a warning.
16      Q.   Okay.  Now, last question.  You said that
17   you couldn't use your Taser because you didn't have
18   lethal coverage; correct?
19      A.   Correct.
20      Q.   Okay.  Doesn't a car constitute lethal
21   coverage?
22      A.   I was not inside my car.
23      Q.   No.  Wouldn't using your car as a barrier
24   between you and a subject constitute lethal coverage?
25      A.   If I was outside of my car, no.

---

Page 295

1       Q.   Okay.  So you weren't trained at the academy
2    that you can use your car as lethal coverage?
3       A.   I'm not understanding that question.  I'm
4    sorry, I don't -- I don't get it.
5       Q.   Sure.  Were you ever told at the academy
6    that you could use your police unit as a form of
7    coverage if you were being fired on or use of force is
8    being used against you in some way?
9       A.   As a use of coverage?
10      Q.   Yes.
11      A.   Yes.  But it's not lethal coverage.  Coverage
12   isn't lethal.
13      Q.   What were you told is lethal coverage?
14      A.   Like having someone else have a lethal weapon
15   out and ready to use.
16      Q.   Anything other than that?
17      A.   That's it.
18      Q.   Okay.  All right.
19          MS. CARPENTER:  No other questions.
20          FURTHER EXAMINATION
21   BY MS. GRIFFIN:
22      Q.   Let me just ask this.  How fast -- or how
23   much time, if you know, passed between the time you
24   first saw him with the knives, going towards you, to
25   the point that you shot?

---

Page 296

1       A.   I'd say 15 seconds at the most.
2          MS. GRIFFIN:  Anything else?
3          MS. CARPENTER:  Not that I know of.
4          MS. GRIFFIN:  I think we're done.  We'll read
5    and sign.
6          THE VIDEOGRAPHER:  This concludes the
7    videotaped deposition of Officer Jeffrey Bludworth.
8    Today's date is 10 December 2015.  The time is 1655.
9    The master recording of today's testimony will remain in
10   the custody of Trattel Court Reporting & Videography.
11   We're off the record.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 297

1    Hope Irvin v. Katherine Wright, et al.
2    WITNESS SIGNATURE/CORRECTION PAGE
3       If there are any typographical errors to
4    your Deposition, indicate them below:
5    PAGE  LINE
6    _____  Change to _____
7    _____  Change to _____
8    _____  Change to _____
9    _____  Change to _____
10      Any other changes to your Deposition are to be listed
11   below with a statement as to the reason for such change:
12   PAGE LINE  CORRECTION           REASON FOR CHANGE
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19          I, OFFICER JEFFREY BLUDWORTH, do hereby certify
20   that
     I have read the foregoing pages of my testimony as
21   transcribed and that the same is a true and correct
     transcript of the testimony given by me in this
22   deposition on December 10, 2015, except for the changes
     made.
23
24
25   _____  _____

75 (Pages 294 to 297)

Plaintiff's Motion for Summary Judgment
Exhibit 3, Page 43 of 43

Electronically signed by Mary Fulton (001-060-973-7022)                                    7c224078-c96b-44fb-90ce-43f1c1a125d2