Case 1:15-cv-00550-SCY-KBM   Document 60-4   Filed 05/06/16   Page 1 of 9

Hope Irvin, et al.  v. Katherine Wright, et al.                                            December 3, 2015
Katherine Wright                                                                            15cv00550 SCY-KBM

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

No. 15cv00550 SCY-KBM

HOPE IRVIN, as Personal Representative
of the ESTATE OF VINCENT WOOD, Deceased,
      Plaintiff,
  vs.
KATHERINE WRIGHT, individually and in her
Official capacity as an Albuquerque Police Officer
JEFFREY BLUDWORTH, individually and in his
Official capacity as an Albuquerque Police Officer,
and CITY OF ALBUQUERQUE,
      Defendants.

VIDEO DEPOSITION OF KATHERINE WRIGHT
December 3, 2015
9:15 a.m.
Trattel Court Reporting & Videography
609 12th Street, NW
Albuquerque, New Mexico 87102

PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE THIS DEPOSITION WAS:

TAKEN BY:   MS. FRANCES C. CARPENTER
      ATTORNEY FOR THE PLAINTIFF

REPORTED BY: Penny E. McAlister, CCR, NM CCR #250
      TRATTEL COURT REPORTING & VIDEOGRAPHY
      P.O. Box 36297
      Albuquerque, New Mexico  87176-6297

Hope Irvin, et al.  v. Katherine Wright, et al.
Katherine Wright

December 3, 2015
15cv00550 SCY-KBM

### Page 26

1  A. Yes.
2  Q. Okay. So when you got this call, you -- it
3  popped up on your computer screen; correct?
4  A. A few minutes after I was dispatched to the call.
5  Q. Okay. And whenever someone -- whenever dispatch
6  makes an entry, that pops up on that screen; right?
7  MS. GRIFFIN: Object to form and foundation.
8  A. At that time, it doesn't directly pop up. You
9  have to refresh the call. All the things don't pop up at
10 one time.
11 Q. Okay. Okay. Did you ever refresh the call?
12 A. No.
13 Q. Okay. My understanding, Katherine, is that you
14 had had prior interactions with Vincent Wood before July
15 the 5th of 2013; is that correct?
16 A. Yes.
17 Q. I want you to talk to me about those and tell me
18 about those, when they were, and I'll let you just talk to
19 me about them, and then we'll sort of break it down. So
20 tell me, if you can recall, the last time you had an
21 interaction with Vincent -- I'm going to refer to him as
22 Vincent -- before July the 5th of 2013.
23 A. I had only had one interaction with -- with him
24 prior.
25 Q. Okay. I appreciate that. And when -- when was

### Page 27

1  that, roughly?
2  A. Several weeks prior to this call.
3  Q. Okay. Several being more than a month or less
4  than a month, would you say?
5  A. Probably right around a month or so.
6  Q. Okay. Tell me about that.
7  A. In that instance, me and another unit were at
8  lunch in the area of San Mateo and Montgomery.
9  Q. Okay.
10 A. When -- I don't recall, one or two other units
11 were in the area of the Walgreens and wanted us to look for
12 who we then just had a description of, that turned out to
13 be Vincent Wood.
14 Q. What -- what was the description that they gave,
15 if you can recall?
16 A. An older black male with a black jacket and black
17 jeans, I think.
18 Q. Okay. All right. And then what happened?
19 A. The other units on the call were out with a male
20 individual who had several lacerations to his face and
21 stated that the -- the other male that we were looking for,
22 which ended up being Vincent, had hit him in the face with
23 a glass bottle.
24 Q. Okay. And that was all through -- that all came
25 through dispatch; correct?

### Page 28

1  A. No. We -- we were in the same parking lot, so I
2  went over there and briefly talked to them.
3  Q. Them being the officers? I'm just trying to make
4  sure the record is complete.
5  A. Yes, them being the officers, and then they gave
6  us the description of who ended up being Vincent, and we
7  went to look for him.
8  Q. Okay. Did you find him?
9  A. Yes.
10 Q. Okay. Did -- before you went to look for him,
11 did anyone tell you that he was 10-40, meaning that he had
12 mental health issues?
13 A. No.
14 Q. Okay. Did you suspect that he may have mental
15 health issues?
16 A. Not at that time.
17 Q. Okay. Did the -- did you ever -- did you speak
18 to the man who had been allegedly assaulted?
19 A. No, I did not.
20 Q. Okay. Do you know if that man had told the other
21 officers that Vincent was mentally ill?
22 A. No, I do not.
23 Q. Okay. But the officers, when they -- when you
24 met them in the parking lot, and they conveyed information
25 to you, they never mentioned, hey, this guy may have mental

### Page 29

1  health issues or anything like that; correct?
2  A. No, not that I recall.
3  Q. Okay. So then you went to look for Vincent;
4  correct?
5  A. Yes.
6  Q. You and your other officer?
7  A. Yes.
8  Q. And who was this other officer that was with you?
9  A. Officer David Munoz.
10 Q. David Munoz? Okay. Do you know if he's still an
11 officer?
12 A. Yes.
13 Q. And do you know -- is he still a field services
14 officer?
15 A. Yes.
16 Q. Okay. And he was in the same unit as you, or did
17 he have his own unit?
18 A. He had his own unit.
19 Q. He had his own unit. Okay. And did you guys --
20 did he follow you to go look for Mr. Wood or --
21 A. I don't recall if he was in front of me or behind
22 me.
23 Q. Okay. Fair enough. So both you went to go look
24 for Mr. Wood, and you eventually found him?
25 A. Yes.

8 (Pages 26 to 29)

Case 1:15-cv-00550-SCY-KBM   Document 60-4   Filed 05/06/16   Page 3 of 9

Hope Irvin, et al.   v. Katherine Wright, et al.                                December 3, 2015
Katherine Wright                                                                  15cv00550 SCY-KBM

### Page 30

1   Q. Where did you find him?
2   A. Just outside the parking lot around San Mateo and
3   Montgomery.
4   Q. The parking lot of Walgreens, you mean?
5   A. Yes.
6   Q. Okay. What was he doing when you found him?
7   A. He was walking on the sidewalk.
8   Q. Okay. Did he have a backpack?
9   A. I don't recall if he had one or not.
10  Q. Okay. And tell me about your interaction with
11  him.
12  A. We stopped and talked to him.
13  Q. Did you have your lights engaged?
14  A. I don't recall.
15  Q. Did you have your sirens engaged?
16  A. More than likely, no.
17  Q. Okay. Why not?
18  A. It wasn't a priority call.
19  Q. Okay. All right. So you -- I'm sorry, I keep
20  interrupting you, and I apologize. So you -- you saw him
21  walking on the sidewalk. Did you pull your unit over and
22  get out and engage him at that point?
23  A. Yes.
24  Q. What did you say to him, Katherine, when you
25  first encountered him?

### Page 31

1   A. I don't recall our whole conversation.
2   Q. Do you get out of the car and say -- do you sort
3   of have a dialogue that you -- that you use always, like,
4   Hi, my name is Officer Katherine Wright?
5   A. Somewhat. I probably said something to the
6   effect, you know, of "hi" and asked him if he was in the --
7   in the Walgreens and if he got in a fight with anybody.
8   Q. Okay. Would you say, Katherine, that your
9   demeanor when you -- when you talked to Vincent was one of
10  calmness and -- and respect and not hostile?
11  A. More than likely.
12  Q. Okay. And -- versus -- let me give you an
13  example, or did you pull up next to him, get out of your
14  car and say, "Hey you, come over here. I need to talk to
15  you"? Did you -- did you yell at him in any way, or did
16  you --
17  A. More than likely not. The situation at that
18  point wouldn't have called for that.
19  Q. Okay. Tell me what you mean by the situation
20  wouldn't have called for you to do that.
21  A. That he wasn't a threat to anybody at that -- at
22  that time.
23  Q. Okay.
24  A. We would have just walked up to him, started a
25  dialogue with him and probably looked in his jacket, at his

### Page 32

1   waistband and stuff, just to make sure he didn't have any
2   weapons on him.
3   Q. Okay. And so when you approached Mr. Wood and
4   spoked to him in that non-hostile way, what was his
5   response to you?
6   A. He was slightly agitated and angry.
7   Q. Okay.
8   A. But he answered what questions we asked him.
9   Q. Do you remember what questions you had asked him?
10  A. If I recall, I asked him if he was in an argument
11  or a fight with somebody. He said he was. He said he was
12  mad, and then he started talking about wanting money.
13  Q. From his person or just in general?
14  A. Just in general.
15  Q. Did -- did it -- did it seem relevant to the
16  conversation you were having with him?
17  A. No.
18  Q. Okay. Did he have nystagmus?
19  A. I didn't check.
20  Q. Okay. You couldn't -- you couldn't see just from
21  speaking to him whether or not his eyes were -- were moving
22  erratically at all?
23  A. No.
24  Q. Did you suspect that he was on drugs or alcohol
25  or -- or whether he had a mental health issue?

### Page 33

1   A. He appeared that he could have been slightly
2   intoxicated.
3   Q. Okay. Did you think he had a mental health
4   problem?
5   A. I wasn't real sure.
6   Q. Okay. So he told you he was sad and started
7   talking about money. What -- what -- what was your
8   response?
9   A. No. He said he was mad.
10  Q. He was mad. And then did he talk about wanting
11  money or --
12  A. Yeah.
13  Q. After that?
14  A. Yes.
15  Q. Okay. And what was your -- what was your
16  response?
17  A. I asked him why. He said that the City owed him
18  money.
19  Q. Okay.
20  A. And then he didn't want to -- and then he -- I
21  think he mentioned he didn't want to talk, at which point,
22  the other officers said that we didn't need to detain or --
23  and the male didn't want to press charges. So Mr. Woods
24  was left -- allowed to go on his way.
25  Q. Okay. Did you -- did you sit him down? Did you

9 (Pages 30 to 33)

Trattel Court Reporting & Videography
505-830-0600

Plaintiff's Motion for Summary Judgment
Exhibit 4, Page 3 of 9

Electronically signed by Penny McAlister (301-012-776-0544)                      4976eea8-8948-4471-83e0-b859a5797757

Case 1:15-cv-00550-SCY-KBM   Document 60-4   Filed 05/06/16   Page 4 of 9

Hope Irvin, et al.  v. Katherine Wright, et al.                                    December 3, 2015
Katherine Wright                                                                   15cv00550 SCY-KBM

Page 34

1   ask him to sit down at any point?
2       A. Yeah.  I think I asked him to sit down, and he
3   briefly sat down.
4       Q. Is that when you first approached him?  You said
5   do you mind sitting down?
6       A. I think it was after I made sure he didn't have
7   any weapons in his waistband.
8       Q. Okay.  All right.  Did you learn in -- did you --
9   did you take CIT training classes when you were at the
10  academy?
11      A. Yes.
12      Q. What do you recall learning about interactions
13  with persons who have mental health issues and how you
14  should interact with them?
15          MS. GRIFFIN:  Object to form and foundation.
16      A. What specifically?
17      Q. Well, just in general.  I mean, if you -- what
18  did -- what do you recall learning at the academy about,
19  hey, you know, if you're -- if you suspect that someone may
20  have mental health issues, here is how you should approach
21  them, and here is a dialogue, and here is how you should
22  deal with them?  What do you recall your training telling
23  you about that?
24          MS. GRIFFIN:  Objection; foundation.
25      A. It depends on the situation.

Page 35

1       Q. Okay.  Okay.  Do you -- you can give me a couple
2   of examples if you'd like.
3       A. Well, in general, if there is no immediate
4   threat, and that person is not trying to harm anybody or
5   harm us and the situation allows, we will talk to them in a
6   calm, clear manner, be respectful, actively listen to them.
7       Q. Were you -- were you trained that having someone
8   sit down also helps de-escalate things?
9       A. Again, it depends on the situation.
10      Q. Okay.
11      A. With some people, that will work.
12      Q. Okay.  Were you -- did you learn about the signs
13  and symptoms or how to recognize someone who suffers from
14  schizophrenia?
15      A. Yes.
16      Q. Okay.  And what were -- what are those signs and
17  symptoms?
18      A. A few of them are they will sometimes hear --
19  have hallucinations, whether it's visual or hearing.
20  Sometimes they won't follow conversations very well.
21      Q. Okay.  Did your training tell you that they're --
22  oftentimes they're not able to comply with commands?
23      A. Depending on -- on what -- depending on the
24  situation --
25      Q. Yeah.

Page 36

1       A. -- and how far in crisis they are.  Sometimes
2   they have a hard time with that.
3       Q. Okay. Okay. Were you trained that you should
4   ask an individual that you suspect has mental health
5   issues -- that you should ask them, hey, you know, are you
6   on any medications?  Are you okay?  Do you have any mental
7   health issues that we should know about, to ask them about
8   those things?
9       A. If the situation allows.
10      Q. Okay.  And again, I want to make sure that I'm
11  understanding what you're saying when you say the situation
12  allows.  You're saying -- and tell me if I'm incorrect,
13  please, that if the subject is -- if you approach the
14  subject, and the subject, Number 1, is not currently armed,
15  for example -- in other words, you walk up to the subject,
16  he's not pointing a gun, he doesn't have a gun in his hand
17  or a knife or a taser or some other weapon; Number 2, if
18  he's not actively harming himself or others, would -- would
19  that be a situation in which you would -- would allow you
20  to have that kind of a dialogue with someone?
21      A. Yes, if they're not actively -- or there is no
22  immediate threat --
23      Q. Yeah.
24      A. -- to ourselves or anybody else in the area.
25      Q. Okay.

Page 37

1       A. But it's not something we ask right away.  We try
2   to have a normal dialogue with the person, so that we have
3   some mutual respect --
4       Q. Yeah.
5       A. -- and they trust us enough to tell us.
6       Q. That's right.  Okay.  What would be an example of
7   a normal dialogue, like just telling it to a lay -- someone
8   who is a lay person?
9       A. You would tell them -- usually I don't use my
10  first name very much on calls.  I would tell them, you
11  know, I'm Officer Wright.  Sometimes we tell them why we're
12  there --
13      Q. Okay.
14      A. -- and just ask them how they're feeling and
15  things like that before we just say, hey, you know, what's
16  your mental health issue?
17      Q. Yeah. Okay.  I appreciate that.  So just one
18  interaction with Mr. Wood.  Did you tell Mr. Wood, hey,
19  you're free to go, or what -- how did it end up going with
20  Mr. Wood?  So he said that he -- the City owed him money
21  and then -- did you have your belt tape running during that
22  time?
23      A. Yes.
24      Q. You did?  Is there a -- was a police report
25  generated in -- in response to this call?

10 (Pages 34 to 37)

Case 1:15-cv-00550-SCY-KBM   Document 60-4   Filed 05/06/16   Page 5 of 9

Hope Irvin, et al.  v. Katherine Wright, et al.                                        December 3, 2015
Katherine Wright                                                                       15cv00550 SCY-KBM

Page 42

1  were saying.
2      Q. Good. Did he -- did he seem like he had any
3  difficulty complying with your commands?
4      A. No.
5      Q. And were you able to understand everything he
6  said?
7      A. For the most part. He spoke with a kind of gruff
8  voice, like if you have a sore throat, but we could
9  understand what he said.
10     Q. Okay. All right. So did you tell him he was
11 free to leave, or how did the -- how did the encounter with
12 Mr. Wood end?
13     A. More than likely, we told him "Thank you. You're
14 free to go." He said, "Okay," and he walked off.
15     Q. Okay. All right. And so I've listened to the
16 realtime audio and then the other audio that's involved in
17 this case, and you can hear your voice, and you tell
18 dispatch in regards to this call July the 15th -- you say
19 that you think you know him. I'm not trying to put words
20 in your mouth, but basically, that he -- this guy's name is
21 Vincent. I think this is Vincent. He's definitely 10-40
22 and difficult to understand, I think is what you say, those
23 three things, roughly. Do you recall hearing that on the
24 dispatch?
25          MS. GRIFFIN: Object to form and foundation.

Page 43

1      A. I remember saying that I've been out with him and
2  that he was difficult to understand.
3      Q. Okay. Do you recall saying his name?
4      A. I think I called him -- I think I said his name
5  might be Vincent.
6      Q. All right. Okay. All right. And when you
7  conveyed this to -- to dispatch, how did you convey it to
8  them, over the radio or --
9      A. Yes.
10     Q. Okay. And is that open air? In other words,
11 other officers can hear you saying that to dispatch?
12     A. Yes.
13     Q. Okay. Let's talk about your lapel camera that --
14 for -- for this particular case. My understanding is that
15 there is no lapel footage from your camera in regards to
16 this incident; right?
17          MS. GRIFFIN: Object to form and foundation.
18     Q. Do you know if you captured any of the events
19 with your lapel camera?
20     A. I think it captures everything right after the --
21 the incident.
22     Q. Okay. Why is that?
23     A. It didn't turn on.
24     Q. Okay. Tell me about the camera that you had.
25 What lapel camera were you using on the date of the

Page 44

1  incident?
2      A. At that time, it was the small Scorpions.
3      Q. Small Scorpions. Is that what they were called,
4  the small Scorpion, or is it -- was there a big one and a
5  little one, and you're just using the little one?
6      A. I just used the word "small." They're just
7  called Scorpion cameras.
8      Q. Okay. And how did you -- how did you -- were you
9  trained on this camera?
10     A. We were given a brief overview several years
11 prior on how to use it.
12     Q. So on the date of the incident, how long had you
13 had the Scorpion camera?
14     A. Two, three years.
15     Q. Okay. All right. And were you given -- when you
16 say that they gave you an overview, who is they?
17     A. I think at that time, it was my chain of command.
18     Q. Okay. Did you guys have a class, like sit in a
19 classroom and talk about things, about the cameras, or did
20 they just give you here is the owner's manual, go forth and
21 learn how to use this?
22     A. If I recall, it was in briefing. We were given
23 the cameras. We were told that there is an owner --
24 owner's manual, and we were just told briefly on how to
25 turn them on.

Page 45

1      Q. Okay. Did you feel like you understood how to
2  use the camera?
3      A. Yes.
4      Q. Okay. Did you feel like you needed to -- to get
5  more training on how to use the camera?
6      A. No.
7      Q. Okay. So why didn't you have your camera running
8  when you went to this call?
9      A. When I went to this call, I attempted to turn it
10 on. Sometimes they don't turn on when they're supposed to.
11     Q. When did you try to turn it on?
12     A. As I exited my vehicle.
13     Q. Okay. And how did you attempt to turn it on?
14     A. There is a very small gray button on the top of
15 the camera. Usually you have to hit the button twice for
16 the camera to turn on. There has been instances where they
17 won't turn on even if you hit it twice. You have to hit in
18 a couple times, three or four times to get it to -- to
19 activate.
20     Q. How do you know that it's activated?
21     A. There is a small light about probably the size of
22 the head of a pin, and that light blinks green when it's
23 on.
24     Q. Okay. Now, I under- -- I understand that there
25 is -- there is the blinking green light. So you're

12 (Pages 42 to 45)

Case 1:15-cv-00550-SCY-KBM   Document 60-4   Filed 05/06/16   Page 6 of 9

Hope Irvin, et al.   v. Katherine Wright, et al.                                    December 3, 2015
Katherine Wright                                                                    15cv00550 SCY-KBM

Page 58

1   A. Yes.
2   Q. Okay. And you admitted to drug use; correct?
3   A. No.
4   Q. No? Okay. So in your application, you never
5   admitted to any type of drug use?
6   A. As far as?
7   Q. Anything.
8   A. No. I didn't use drugs.
9   Q. Okay. Let me show you -- so, Katherine, what
10  this is, this is a binder. What we've done in these
11  depositions is that we've done all the exhibits as
12  continuing exhibits. So in the binder, there are these
13  tabs here. I'm going to have you flip to certain tabs,
14  because I have a copy -- the same copy here.
15      So what I want you to take a look at is --
16      MS. CARPENTER: The ones from yesterday are
17  already in here; right? Okay. Great. Thank you.
18  Q. There we go. Maybe flip to what's been marked as
19  Exhibit 11. I will get my copy. Let me have you flip to
20  the section that's 2-13-07, Katherine. Do you see that?
21  A. Yes.
22  Q. Okay. Take -- take a little bit of time to -- to
23  read that section, and let me know when you're -- when
24  you're ready.
25  A. Okay.

Page 59

1   Q. Okay. Do you see where it's -- so have you --
2   are you familiar with this Standard Operating Procedure?
3   A. Yes.
4   Q. Okay. Do you use the Crisis Intervention Team or
5   this SOP sometimes when you're dealing with your
6   specialized area that you talked about earlier, Care?
7   A. Not a lot, no.
8   Q. Okay. Do you recall this particular portion of
9   this SOP?
10  A. Now that I read it.
11  Q. Okay. When do you recall prior to today this
12  SOP? Was it something from the academy, do you recall,
13  or --
14  A. As far as what, remembering that we have it or --
15  Q. Or just remembering the contents of this, what
16  it's saying.
17  A. From every -- from every day from the academy.
18  Q. Okay. Makes sense. So do you agree or disagree
19  with what it says here?
20  A. I agree.
21  Q. Okay. Number 2 -- so we've got 2-13-07, and do
22  you see where Section 8 says, "When available, Field Crisis
23  Intervention Team officers will respond as primary officers
24  to call that meet the following criteria: Any incident
25  when a mental illness or a crisis precipitated a response

Page 60

1   by APD. Number 2, any incident where the subject poses a
2   risk to themselves or others"? And then they give an
3   example to that. Do you see that?
4   A. Yes.
5   Q. Okay. Do you believe in this situation with
6   Mr. Wood and having reviewed everything that you reviewed
7   that this was an incident in which a mental illness was
8   involved?
9       MS. GRIFFIN: Object to form.
10  A. I don't know that -- I've never been told at the
11  time of this incident. I did not know if he was mentally
12  ill or not.
13  Q. Okay. Why did you say over the air that he was
14  10-40?
15      MS. GRIFFIN: Object to form.
16  A. There is some actions that we've told amongst
17  each other that it was a possibility, but it was never
18  confirmed in any way that he was mentally ill.
19  Q. Can you elaborate on what you just said? You
20  said that you've talked amongst each other. What do you --
21  who -- who -- who are you talking about?
22  A. During the -- we had gotten several calls over
23  several months that he would yell at cars, stand on the
24  street corner and yell at cars.
25  Q. Okay.

Page 61

1   A. But we never knew if it was -- we were never told
2   if it was due to a mental illness or being intoxicated.
3   Q. Okay. Did you ever respond to any of those
4   calls?
5   A. No.
6   Q. Okay. So my understanding -- and tell me if I'm
7   incorrect -- is that your substation was getting a lot of
8   calls -- the units in your substation were getting a lot of
9   calls involving Vincent Wood and involving instances such
10  as him yelling at cars?
11  A. Yes.
12  Q. Okay. So you guys suspected that he was mentally
13  ill, but you just didn't have any confirmation?
14  A. Correct.
15  Q. How do you get confirmation?
16  A. Sometimes it's talking to them. Sometimes it's
17  from the CIT detectives.
18  Q. Okay. Have you ever spoken to a CIT detective?
19  A. Yes.
20  Q. Tell me about that.
21  A. In what instance?
22  Q. So you've had situations in which you've met with
23  a CIT detective and talked about a particular individual?
24  A. Yes.
25  Q. Okay. Can you give me an example of one of --

16 (Pages 58 to 61)

Case 1:15-cv-00550-SCY-KBM   Document 60-4   Filed 05/06/16   Page 7 of 9

Hope Irvin, et al.  v. Katherine Wright, et al.                    December 3, 2015
Katherine Wright                                                   15cv00550 SCY-KBM

Page 102

1    A. If that is possible. In this situation, he was
2 an immediate threat. We needed to get to the area, and
3 that wasn't something that we could do at this point in
4 time.
5    Q. Okay. Were you aware that Jon O'Guin did not
6 have his sirens engaged?
7    A. No, I was not.
8    Q. Okay. Did you ever see Officer O'Guin at the
9 scene?
10    A. After the situation -- after the shooting had
11 already transpired, yes.
12    Q. You don't recall seeing him before the shooting
13 had transpired?
14    A. He was not there at that time.
15    Q. Okay. When did Officer O'Guin arrive to the
16 scene?
17    A. Officer O'Guin arrived to the scene after the
18 shooting transpired, and I was walking up to handcuff
19 Mr. Woods.
20    Q. Okay. All right. I want to go back to you being
21 able to get information on Mr. Wood. If you -- just with
22 the descriptors that you knew of Mr. Wood, Vincent -- did
23 you ever know his last name? Like earlier, you said that
24 inside your department substation that there was banter
25 about, you know, him talking to cars and things like that.

Page 103

1 Did you ever pick up his last name?
2    A. No.
3    Q. Okay. Given the descriptors that you knew of him
4 from dispatch and then you saying I think his name may be
5 Vincent, would you have been able to -- given the resources
6 that you had at that time, not now, been able to look up
7 any information on him?
8    A. No, not that I know of.
9    Q. Do you know if dispatch could have?
10    A. I do not know.
11    Q. Okay. Did you call or ask dispatch to see if
12 they could pull any calls for him or any -- get any
13 information about him?
14    A. No.
15    Q. Okay. Why not?
16    A. At that time, we -- I was -- we were dealing with
17 the -- this situation that was very fluid and ongoing, and
18 a lot of times, dispatch would do that for us, but it's not
19 like it is now.
20    Q. When you -- before you arrived on scene, you had
21 already gotten information that he was violent, that he had
22 a history of violence; is that right?
23    A. That's on the call, and I have prior knowledge of
24 that.
25    Q. Okay. All right. Okay. Katherine, we're on

Page 104

1 video here, and the reason we're on video is that I want
2 you to -- to show us what Mr. Wood looked like when you
3 first got on scene. When you first arrived on scene, what
4 was Mr. Wood doing? So you can move your chair, and if you
5 can describe for us what he looked like.
6    A. It looked like as far as --
7    Q. Was he standing?
8    A. -- his description, or what he was doing?
9    Q. What he was doing. When you first saw him, what
10 was he doing?
11    A. When I first saw Mr. Woods in the parking lot of
12 the Circle K, he had a backpack in one hand, and he was
13 digging in his --
14    Q. I need you to -- if you don't mind, if you could
15 just stand up and show the camera what he was doing.
16    A. When I first arrived to where I could see the
17 Circle K, he was just standing with a backpack in one hand,
18 and he was looking down, digging in his backpack.
19    Q. Okay. And where were you when you first saw
20 that?
21    A. I was still on San Mateo.
22    Q. Okay.
23    A. Approaching McLeod.
24    Q. Okay. And where was Officer Bludworth? Could
25 you see him?

Page 105

1    A. He was on the other side of his -- somewhere on
2 the other side of his car.
3    Q. Okay. So his car was separating -- so his car
4 was in between Mr. Wood and him, Jeff?
5    A. I think he was towards the front of his car. He
6 wasn't like behind his car.
7    Q. Was Mr. Wood behind his car?
8    A. No. He was kind of across from him.
9    Q. Okay. All right. And what was -- did Jeff have
10 his gun pointed at him? What was Jeff doing?
11    A. When I first arrived, I think Jeff was just --
12 was -- at that -- at that brief second, Jeff was just
13 talking -- was talking to him, but I couldn't tell what he
14 was saying.
15    Q. How do you know he was talking to him?
16    A. My window was slightly down, and I recognized
17 Jeff's voice.
18    Q. Okay. So you're -- you're on -- are you on
19 McLeod? I apologize.
20    A. Well, I am like right at the intersection.
21    Q. You're right at the intersection. Your window is
22 a little bit cracked. You can hear Jeff's voice.
23    A. Uh-huh.
24    Q. And what you see is Mr. Wood rifling through his
25 backpack with one hand, and then -- and I apologize. What

27 (Pages 102 to 105)

Case 1:15-cv-00550-SCY-KBM   Document 60-4   Filed 05/06/16   Page 8 of 9

Hope Irvin, et al.  v. Katherine Wright, et al.                     December 3, 2015
Katherine Wright                                                    15cv00550 SCY-KBM

Page 126

1   Q. Okay. Okay. What would you say the distance was
2   separating Mr. Wood and Jeffrey? And I'm going to look
3   at -- let's show the camera here. What would you say the
4   distance between Jeffrey and -- Jeffrey Bludworth and
5   Mr. Wood was at the green J and W, as you've indicated?
6       A. They were moving -- they were moving the whole
7   time.
8       Q. Okay.
9       A. But the distance between both of them was 3 to 4
10  yards.
11      Q. Okay. All right. And where did you -- so when
12  you -- when you arrived on scene, did you seek a position
13  of cover or concealment?
14      A. No.
15      Q. Okay.
16      A. With the way that the situation was unfolding, I
17  didn't have time, or the situation didn't allow for that.
18      Q. Why didn't the situation allow for that?
19      A. Because Mr. Woods was actively taking action to
20  harm Officer Bludworth.
21      Q. How far was your unit from Mr. Wood at that
22  point?
23      A. At this point -- this diagram is kind of odd, but
24  at this -- at this point, it was probably 5 or 6 yards.
25      Q. Okay. Is there some reason that you couldn't

Page 127

1   have used your unit for cover?
2       A. As I stated, he was actively trying to harm
3   Officer Bludworth.
4       Q. Okay.
5       A. So me staying back here way back on my unit,
6   which I took a couple of steps, wasn't feasible at that
7   point in time.
8       Q. Okay. Would you say you actively engaged
9   Mr. Wood at that point?
10          MS. GRIFFIN: Objection; form.
11      A. As far as engaged how?
12      Q. Did you -- did you engage him? Did you
13  physically engage him walking toward -- were you walking
14  towards him, or were you seeking a position of cover?
15          MS. GRIFFIN: Object to form.
16      A. No. As I said a minute ago, he -- staying back
17  and seeking cover wasn't an option. He was trying to stab
18  Officer Bludworth. So I moved -- I took a couple steps and
19  moved in a direction so that my backdrop was not the gas
20  pumps and the -- the front door, which was about right
21  here, and I engaged him in verbal commands of "Drop the
22  knives, drop the knives."
23      Q. Okay. Were you walking towards him when you were
24  saying these things?
25      A. I took a few steps to change my backdrop.

Page 128

1   Q. Were you walking towards him?
2       A. No. He was walking westbound towards Officer
3   Bludworth, and I walked kind of in a northwestern
4   direction.
5       Q. Okay. Were you intentionally trying to stay away
6   from Mr. Wood, or were you intentionally trying to close
7   distance on him?
8           MS. GRIFFIN: Object to form.
9       A. I wasn't intentionally closing distance. I was
10  changing what was behind Mr. Wood.
11      Q. Okay. And why were you doing that?
12      A. Because he was an immediate threat and trying to
13  hurt Jeff Bludworth. So if it came to the situation where
14  I had to use my firearm, I have to know what's between me
15  and Mr. Wood and what is also behind Mr. Wood.
16      Q. Okay. Did you -- when did you draw your firearm?
17      A. I drew my firearm as I exited my vehicle,
18  probably when I was around the tire to bumper area.
19      Q. Of your vehicle?
20      A. Yes.
21      Q. Okay. All right. So you exit your vehicle where
22  you've drawn on the diagram the green J and W; is that
23  correct?
24      A. Yes.
25      Q. Okay. And where was the -- if you could draw

Page 129

1   with a different color the next place that Jeff and
2   Mr. Wood moved that you recall.
3       A. So during that whole situation, they were
4   actively moving in a west direction.
5       Q. Do you want to just do that with dots, maybe some
6   pink dots?
7       A. So they were actively moving in this direct- --
8   in kind of a western -- western direction.
9       Q. Okay. And where -- where was the -- where did
10  they stop moving when you shot Mr. Wood?
11      A. He had -- had not stopped. Me firing my weapon
12  stopped him, and he was approximately right here.
13      Q. So the -- the pink W is where he was when you
14  fired your weapon at him?
15      A. Yes.
16      Q. Okay. And where was Jeffrey Bludworth?
17      A. I don't know.
18      Q. You don't know. Okay. Why don't you know?
19      A. Once I engaged, you know, started yelling at
20  Mr. Woods to "Drop the knives, drop the knives," I never
21  took my focus off of him, because he was a threat to
22  Officer Bludworth. He was our immediate threat.
23      Q. Okay. But you don't know where Jeff was when you
24  fired your weapon?
25      A. No. He was closely over here.

33 (Pages 126 to 129)

Case 1:15-cv-00550-SCY-KBM   Document 60-4   Filed 05/06/16   Page 9 of 9

Hope Irvin, et al.  v. Katherine Wright, et al.                                December 3, 2015
Katherine Wright                                                               15cv00550 SCY-KBM

Page 130

1    Q. And you've -- you've indicated that with a --
2    A. Circle.
3    Q. -- pink circle. Okay. All right. Do you know
4    where Jon O'Guin was at this time?
5    A. No. He wasn't on scene at all at this point.
6    Q. How do you know that?
7    A. Because I could see the area.
8    Q. Okay. All right. Okay. Did you fire first?
9    A. Yes, I did.
10   Q. Okay. How do you know that you fired first?
11   A. Because Officer Bludworth fired shots after I
12   started firing.
13   Q. Okay. I'm going to have you sign and date that
14   exhibit. You can use my pen if you want or the court
15   reporter's. It doesn't matter where you do it. Okay.
16   Katherine, do you know how many shots you fired, how many
17   rounds?
18   A. Four or five.
19   Q. Four or five? Okay. And do you know where they
20   struck Mr. Wood?
21   A. I don't know exactly where all of them hit
22   Mr. Wood, no.
23   Q. Did you ever hit Mr. Wood in the -- shoot him in
24   the -- in -- while he -- his -- strike that. Did you ever
25   shoot Mr. Wood while his back was to you?

Page 131

1    A. My first couple of rounds, when I shot my first
2    couple standard defense rounds, as I remember, one of the
3    rounds hit him -- he was at an angle from me, so one of the
4    round hit him in his arm.
5    Q. And was that maybe your first round? You're not
6    sure?
7    A. I don't know. It was one of the first couple.
8    Q. Okay. Did he drop the knife?
9    A. No, he did not.
10   Q. Okay. When he -- so when you're -- when you shot
11   him in -- in the arm, you're saying -- is that when he spun
12   around.
13   A. Yes. Within the first couple rounds that struck
14   Mr. Wood, I looked over my sights. His body spun around,
15   and he was now facing me holding -- still holding the
16   knives.
17   Q. Okay. So, Katherine -- and I know this is
18   difficult, and hopefully, this will be the last time I'm
19   going to have you stand up, but I'm -- I'm trying to
20   understand, because we, unfortunately, don't have a visual
21   of Mr. Wood's account or his version of the account.
22      So what I need for you to explain is what he
23   was -- when you fired at him, how he moved in response to
24   that. So you fire your first round at him, and you've
25   indicated his position in the pink W. What was he doing

Page 132

1    when you first shot at him?
2    A. He was still actively -- he was still in the same
3    exact position, blankly staring at Officer Bludworth and
4    still moving towards Officer Bludworth.
5    Q. Okay. Was he -- were you face to -- were you
6    face to face with him when you fired at him?
7    A. No. I was kind at a back angle over here.
8    Q. Got it. Okay. So when you -- when you fired at
9    him, do you know where your first round -- where you were
10   aiming, where your first round struck?
11   A. I was aiming towards the center of mass of his
12   body. I don't know which -- which round it was. I know
13   one of them hit him in this area of his -- of his body, and
14   that forced him -- it forced his body around.
15   Q. So then at that point, was he face to face with
16   you?
17   A. Yes. At that point, he was face to face with me,
18   still holding the knives.
19   Q. Okay. And then you continued to shoot?
20   A. And then I shot two or three more times.
21   Q. Do you know where you shot him?
22   A. Center mass.
23   Q. Okay. Was Bludworth also firing at this time?
24   A. Yes.
25   Q. You can sit down, Katherine. Thank you. You

Page 133

1    said yes; right?
2    A. Yes. After my first couple shots, Officer
3    Bludworth then started firing shots.
4    Q. Okay. And could you -- could you -- did you make
5    visual of him while he was firing?
6    A. No.
7    Q. Okay. Did you ever see him firing?
8    A. No.
9    Q. Okay. Do you know where his rounds struck
10   Mr. Wood?
11   A. No. I don't know where anybody's --
12   Q. Okay.
13   A. -- rounds hit him.
14   Q. Okay. Do you know how many rounds Mr. Bludworth
15   fired?
16   A. I would say two or three.
17   Q. Okay. All right. Did you -- why did you stop
18   firing?
19   A. Because after my second couple of rounds,
20   Mr. Woods stopped his action. He was no longer trying to
21   harm me. He was no longer trying to harm Jeff. He fell,
22   and the knives fell out of his hands.
23   Q. Okay. Now, I've watched Officer Bludworth's
24   video, and so have you, my understanding. You're firing
25   these rounds off pretty quickly. Are you -- is that -- is

34 (Pages 130 to 133)