Case 1:15-cv-00550-SCY-KBM   Document 60-5   Filed 05/06/16   Page 1 of 8

Hope Irvin, et al.  v. Katherine Wright, et al.                    December 2, 2015
Jon O'Guin                                                         15cv00550 SCY-KBM

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

No. 15cv00550 SCY-KBM

HOPE IRVIN, as Personal Representative
of the ESTATE OF VINCENT WOOD, Deceased,
       Plaintiff,
  vs.
KATHERINE WRIGHT, individually and in her
Official capacity as an Albuquerque Police Officer
JEFFREY BLUDWORTH, individually and in his
Official capacity as an Albuquerque Police Officer,
and CITY OF ALBUQUERQUE,
       Defendants.


DEPOSITION OF JON O'GUIN
December 2, 2015
1:25 p.m.
Trattel Court Reporting & Videography
609 12th Street, NW
Albuquerque, New Mexico 87102


PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE THIS DEPOSITION WAS:

TAKEN BY:   MS. FRANCES C. CARPENTER
       ATTORNEY FOR THE PLAINTIFF


REPORTED BY: Penny E. McAlister, CCR, NM CCR #250
       TRATTEL COURT REPORTING & VIDEOGRAPHY
       P.O. Box 36297
       Albuquerque, New Mexico  87176-6297

Hope Irvin, et al.  v. Katherine Wright, et al.  
Jon O'Guin

December 2, 2015  
15cv00550 SCY-KBM

Page 14

1    Q.  Because you have a special certification, if a
2    call comes over the air in which 10-40 is mentioned, are
3    you supposed to be the one to respond to that call?
4        A.  Not always.  We may respond to assist if there is
5    units available or if we're available, too, yes.
6        Q.  So let me break that down.  You may be called to
7    assist.  You may be called my whom?
8        A.  The other officers dispatched to it.
9        Q.  So because you're a CIT officer, you're not
10   assigned priority on that particular call?
11       A.  No.  I may or may not take it.  It's based on,
12   you know, discussion of the officers on scene, who wants to
13   handle it, how to handle it.  I mean, ultimately, it would
14   still be their call.  I could take it over for them, or I
15   could just assist them with it, with de-escalating if they
16   don't know how to or whatever.
17       Q.  So based on what you've told me, it's not a
18   requirement that you be first on scene?
19       A.  No.
20       Q.  Looking at Exhibit 1, what I would like for you
21   to do is to run through that exhibit and tell me -- first
22   of all, can you tell me your -- on the date of the
23   incident, what was your man number and your call number?
24       A.  My man number is 5268.  That never changes, but
25   our call sign does change a lot, or it can, and mine on

Page 15

1    that date of incident was BK46.
2        Q.  BK46?
3        A.  Yes.  I was a bike unit at that time.
4        Q.  I understand that you had a ride-along during
5    this time, as well?
6        A.  Yes, I did.
7        Q.  And who was that?
8        A.  Cleo Salas.
9        Q.  How did you know Cleo Salas at the time?
10       A.  She was a friend of mine before I was a police
11   officer.  She's also a dispatcher.
12       Q.  She is an APD dispatcher?
13       A.  Yes.
14       Q.  How was it that she came to be a ride-along with
15   you that day?
16       A.  It was a request.
17       Q.  She requested to ride along with you?
18       A.  Yes.
19       Q.  Do you have to put that request in formally
20   somewhere?
21       A.  I believe you do now.  You do fill out a
22   ride-along request form.  It's like a waiver.  It's like a
23   waiver for -- a liability waiver, so to speak.
24       Q.  When you say that she was your friend, were you
25   guys intimate?

Page 16

1        A.  No.
2        Q.  So she was just a friend, friend?
3        A.  Yeah.  Acquaintance would be probably more
4    appropriate.
5        Q.  At the time, she was currently -- she was
6    employed with APD as a dispatcher?
7        A.  Yes.
8        Q.  Is she still working for APD?
9        A.  Yes.
10       Q.  And what does she do for APD?
11       A.  Same thing.  She's still a dispatcher.
12       Q.  She is.  Okay.  Have you guys spoken about this
13   incident?
14       A.  Not that I can recall, no.
15       Q.  So after the incident, you guys didn't talk about
16   it at all?
17       A.  Not that I recall, no.
18       Q.  Do you have any issues with memory?  And I'm not
19   trying to be rude.  I'm just curious.
20       A.  No.
21       Q.  No?  Okay.  Do you take any medications that
22   would cause you to have any memory lapse or any issues of
23   memory?
24       A.  No.
25       Q.  So what I want you to do is look at Exhibit 1,

Page 17

1    and I want you to tell me -- and what we'll do is instead
2    of marking on the exhibit, if you can tell me where you
3    appear by indicating the timestamp next to it.
4        A.  Each time or --
5        Q.  Yes, each time.
6        A.  Okay.  Let's see.  19:39 and 20 seconds, 19:41
7    and 48 seconds.
8        Q.  Okay.
9        A.  19:43 and 05 seconds.
10       Q.  Okay.
11       A.  19:43 and 27 seconds.
12       Q.  Okay.
13       A.  19:48 and 18 seconds.  Oh, good lord.  It
14   references my call sign a lot because that's what the
15   dispatcher is using to log other units on the call.
16       Q.  What do you mean by that?
17       A.  She's just logging other units with me.  So I
18   actually appear a lot.
19       Q.  Can you give me an example of that?
20       A.  19:58 and 12 seconds.
21       Q.  So I see where there is Unit ID BK46?
22       A.  Yes.
23       Q.  So what does that BACKER mean?
24       A.  BACKER is backup unit.  It says BACKER and then
25   asterisk and BACKUP, and it means the same thing when

5 (Pages 14 to 17)

Case 1:15-cv-00550-SCY-KBM   Document 60-5   Filed 05/06/16   Page 3 of 8

Hope Irvin, et al.  v. Katherine Wright, et al.                                    December 2, 2015
Jon O'Guin                                                                          15cv00550 SCY-KBM

Page 18

1  they're logging like that.
2      Q.  So BACKER and BACKOS means backup?
3      A.  BACKER and BACKUP, backup, asterisk backup, I
4  should say.  I'm not sure what the difference between the
5  two means and the asterisks, but they are one in the same
6  on units logging with me.  It does it again at 20:02 and 18
7  seconds.
8      Q.  20:02 and 18 seconds?
9      A.  Yup.
10     Q.  See, I don't have a 20:0- -- never mind.
11     A.  And then again at 20:04:43 seconds, and then a
12 duplicate of that -- or an additional one to that at the
13 same time right underneath it, and at 20:05 and 28
14 seconds -- do you see all the ones I'm talking about?
15     Q.  Yes.
16     A.  And then 20:06 and 04 seconds, 20:13:42 seconds.
17     Q.  Okay.
18     A.  20:25:46 seconds.
19     Q.  20:25:50?  What was the seconds on that?
20     A.  40 seconds -- 46 seconds.  I'm sorry.  20:27:56
21 seconds, 21:00:51 seconds, 21:05:58 seconds, 21:32:43
22 seconds.
23     Q.  Give me that one more time.
24     A.  21:32:43 seconds.
25     Q.  Got it.

Page 19

1      A.  22:33:48 seconds, 23:34:07 seconds.
2      Q.  23:40?
3      A.  34.
4      Q.  34.
5      A.  And 07 seconds.  And then 23:59:54 seconds.
6      Q.  Is that when you clear the scene?
7      A.  Yes.  I'm looking to make sure there is no more.
8  There shouldn't be, because I'm not logged on anymore.  I'm
9  not seeing myself referenced on there from that point on.
10     Q.  All right.  So going back to the beginning of the
11 CADS, the first time you state that you see that you appear
12 is 19:39:20.  It says -- it shows BACKER.  Does that mean
13 that you're the primary backup unit?
14     A.  It just means I'm backing them up.  I don't know
15 if it means -- if dispatch logs me as their backup officer,
16 if that's what that means, or I can self log it, as well.
17 I'm not sure if that has a difference how it's coded, but
18 at that point, I am logged with them as a backup unit.
19         It shows Officer Bludworth would be primary,
20 because underneath his call sign, it says PRIU, primary
21 unit, at 19:39 and 04 seconds, and then Officer Wright is
22 dispatched second, which she'd be -- she would be his
23 backup officer, and anybody after that would be tertiary.
24     Q.  What about the fact that Steve Altman is
25 dispatched?

Page 20

1      A.  He's a supervisor.  I think -- I'm not sure at
2  what time supervisors had to go to high priority calls.
3      Q.  Do you see where Katherine Wright as F43 -- as
4  F423 --
5      A.  Yes.
6      Q.  -- states en route?
7      A.  Yes.
8      Q.  Do you see that?  Okay.  And then it shows
9  Officer Bludworth is en route logged in after that, that
10 he's en route?
11     A.  Yes.
12     Q.  Does it show when you log in that you're en
13 route?
14     A.  No, it doesn't.
15     Q.  Did you indicate that you were en route?
16     A.  Yes, via radio.
17     Q.  Do you know why that wouldn't have been logged
18 in?
19     A.  Because I didn't push the en route button and
20 dispatch didn't push the en route button for me.
21     Q.  Did the officers have any other way of knowing
22 that you were en route?
23     A.  Other than radio, no, and I mean, looking at the
24 call obviously.
25     Q.  Is there a way to know whether or not you told

Page 21

1  them that you were on your way?
2      A.  Yes, over the radio.
3      Q.  And you recall specifically doing that?
4      A.  Yes.
5      Q.  When do you recall telling them that you were on
6  your way?
7      A.  Right after I heard the call coming out.  So they
8  were dispatched, and then maybe like a minute later, if
9  that.
10     Q.  Who was your supervisor at the time?
11     A.  Stu Vigil, Sergeant Vigil.
12     Q.  Was he just a regular patrol officer supervisor,
13 or did he have some sort of special CIT?
14     A.  He was a -- I think he was a field investigator
15 sergeant before that.  He was a field investigator before
16 that.  I don't know in what capacity, if he was a
17 supervisor or just a regular field investigator, but that
18 was the only specializations I know he has.
19     Q.  You were a certified CIT officer.  At the time of
20 this incident, how many certified CIT officers were there
21 in the field?
22     A.  I have no idea what numbers those would be.
23     Q.  Did you guys have any sort of special meetings or
24 anything dealing with your division, the CIT Division?
25     A.  Meetings, no.

6 (Pages 18 to 21)

Case 1:15-cv-00550-SCY-KBM   Document 60-5   Filed 05/06/16   Page 4 of 8

Hope Irvin, et al.   v. Katherine Wright, et al.                                December 2, 2015
Jon O'Guin                                                                      15cv00550 SCY-KBM

Page 22

1    Q.  Anything related to talking about updated
2  trainings or encounters with citizens?
3    A.  They send out bulletins, but that's to every
4  officer.  Basically, like a CIT bulletin, be aware of this
5  person.  They are -- for whatever reason, they need to be
6  entered in there from the CIT database.
7    Q.  What is the CIT database that you're talking
8  about?
9    A.  Whenever the CIT Unit gets, say, a field officer
10 report, they report to them, thinking that it may be
11 something they need to know about.  That unit will look
12 through the report and then send out a bullo, so to
13 speak -- not a bullo, but like information.
14   Q.  And you've seen one of these before?
15   A.  Yes.
16   Q.  And what does it look like?  A, how do you get
17 it?
18   A.  It's either they do it in morning briefings, they
19 will pass it around, or you can give them your e-mails, and
20 it usually has a picture of the person via driver's license
21 photo, booking photo, their name, information, identifiers,
22 where they live, description, and then what incident kind
23 of is the reason they're on that, why it was sent out
24 basically, like we were called to his house.  He's
25 schizophrenic, threatening to shoot police, use caution

Page 23

1  when dealing with him type of thing.
2    Q.  If you got a bulletin about a particular
3  individual who has a mental health disorder, is it
4  incumbent at that point for field officers to make sure a
5  CIT officer is first on scene; do you know?
6    A.  No.
7    Q.  Does it change anything with respect to dealing
8  with that particular subject?  And I don't mean -- I don't
9  want your subjective understanding, but objectively, is
10 there a protocol that says, hey, if you get a CIT bulletin,
11 this is how you need to -- you need to handle this person
12 this way?
13   A.  No.
14   Q.  Do you ever recall or remember getting any type
15 of e-mail or information about Mr. Wood?
16   A.  No.  I don't remember seeing an e-mail in
17 reference to him.  I think I had had a contact with him a
18 couple times before, because he frequented the area that I
19 usually worked.  He was never -- for whatever reason, I
20 never needed to either detain him or identify him.  It was
21 just more of a he was obstructing some place, and I said,
22 "Hey, move along," and he complied with it.
23       So I never had any reason to identify him or
24 anything like that.  He just seemed like another homeless
25 guy.

Page 24

1    Q.  In those times that you would encounter him, did
2  it seem like he understood what you were saying, and could
3  you understand what he was saying back to you?
4    A.  I couldn't really -- he was hard to understand,
5  but he did comply when I would say like, "Hey, you've got
6  to leave the property," which was usually at the -- if I
7  recall, it's the Walgreens, 5001 Montgomery area.  The
8  security officers over there patrol a lot and try and chase
9  off the homeless people that are there.
10   Q.  When you would engage with Mr. Wood, did you know
11 him to -- or did you suspect that he had mental health
12 issues?
13   A.  I had no idea what his story was.
14   Q.  Were you CIT certified in those times that you
15 were dealing with Mr. Wood?
16   A.  I'm not sure.
17   Q.  Let's step back.  When did you graduate from the
18 academy?
19   A.  2008, August 2008.
20   Q.  What class were you in?
21   A.  The 100th.
22   Q.  And after you graduated from APD, did you
23 immediately get CIT certified, or when did you become CIT
24 certified?
25   A.  It was shortly thereafter.  I don't know shortly.

Page 25

1  A couple years after.  I think it was 2010 or 2011.
2    Q.  Why did you choose to become CIT certified?
3    A.  I already deal with people that have mental
4  illnesses.  It would just be kind of nice to have a little
5  bit more knowledge of the process, what to look for, how to
6  de-escalate them and stuff like that.
7    Q.  Did you feel like you learned that in that
8  additional training that you received to be certified?
9    A.  Yeah.
10   Q.  When you got the CIT certification training, did
11 they also dovetail into that anything about the American
12 With Disabilities Act?
13   A.  I can't recall.
14   Q.  Sure.  Do you recall getting any training on the
15 American With Disabilities Act?
16   A.  I can't recall.
17   Q.  Do you know what the American With Disabilities
18 Act is?
19   A.  Specifically, no, I don't.
20   Q.  Do you know what, if anything, APD does or the
21 City of Albuquerque does in order to accommodate persons
22 with mental health disorders?
23   A.  Specifically, no, I don't.
24   Q.  In nonspecific terms, do you?
25   A.  Nothing that I -- I wouldn't even feel

7 (Pages 22 to 25)

Trattel Court Reporting & Videography
505-830-0600

Plaintiff's Motion for Summary Judgment
Exhibit 5, Page 4 of 8

Electronically signed by Penny McAlister (301-012-776-0544)                                b0c3ce1d-820b-499e-b715-901a114f3b5b

Case 1:15-cv-00550-SCY-KBM   Document 60-5   Filed 05/06/16   Page 5 of 8

Hope Irvin, et al.  v. Katherine Wright, et al.   December 2, 2015
Jon O'Guin                                         15cv00550 SCY-KBM

Page 42

1  Q. Is that what motivated you to use your camera
2  every single time?
3  A. Yes. And it covers -- I mean, it covers me, too,
4  also. People complain. It could exonerate. It usually
5  does 90 percent of the time. Somebody complains, and then
6  there is a video of it. So it helps.
7  Q. That's right. Now you have a lapel camera on
8  today in this deposition. You're wearing your uniform, and
9  you have a lapel camera. Is that the TASER camera that
10 you're wearing today?
11 A. Yes, the TASER AXON camera.
12 Q. And you had -- with TASER, you went to a class;
13 correct?
14 A. Yes. There was a class for operation of it.
15 Q. You did not have a class with the Scorpion
16 camera; correct?
17 A. No.
18 Q. You were given a user's manual; correct?
19 A. Yes. And by class, I mean it was a basic
20 rundown, quick and dirty rundown of how to operate it.
21 Q. Where were you when you were given this rundown?
22 A. I don't recall.
23 Q. Were you in some big class with a bunch of other
24 officers, or were you just sort in your sergeant's --
25 A. It might have came out as a video at that time.

Page 43

1  Q. A video?
2  A. Operation of it. It might have been a class. If
3  I recall, I think I recall seeing a video, but I received a
4  lot of training, and that's changed a lot between now and
5  then. So it's kind of hard to pin down when I got the
6  training.
7  Q. Fair enough. When did you stop using the
8  Scorpion camera?
9  A. 2013.
10 Q. 2013. That's when --
11 A. Basically, yes.
12 Q. That's when this incident happened. So was it
13 the end of 2013 or --
14 A. Yes. I believe it was cold out. It was either
15 in December, or it was in January.
16 Q. Of 2014?
17 A. Yes.
18 Q. I'm just going to --
19 A. 2013 or 2014.
20 Q. I'm just going to have you speak up a little bit
21 more. I can see that she's straining to hear.
22 A. Sorry.
23 Q. That's okay. You're soft spoken, but that's
24 fine.
25 A. I need a microphone clipped to me.

Page 44

1  Q. Yes. Okay. So let's go to this incident. Tell
2  me everything that you remember, and I'm going to write it
3  all down, and I'll fill in some gaps, but I don't want to
4  interrupt you. I will let you just go.
5  A. I remember asking to be sent there, telling them
6  I'm going to be en route.
7  Q. Who asked that you be sent there?
8  A. I think I was already on my way. I just couldn't
9  get on the radio, and then Sergeant Altman, now Lieutenant
10 Altman, asked if there was a CIT unit available, and I
11 was -- I advised that I was CIT certified and that I would
12 be en route.
13 Q. Where is that indicated in the record of Exhibit
14 1?
15 A. That they asked for a CIT officer?
16 Q. Yes, where he asked for one and that you
17 responded.
18 A. It's not notated on the CAD, but it was on the
19 radio. I remember hearing that. I remember arriving on
20 the scene, and when I called -- when I say I'm on the
21 scene, or when I hit I'm on scene, 98 percent of the time,
22 it's shortly before I get there.
23 I don't want to give them where I'm at and be
24 messing with the computer trying to log on scene when I
25 need to quickly get out of my car, or I need to paying

Page 45

1  attention to what's going on around me. So usually within
2  10 seconds of getting there, or about 10 seconds, I will
3  hit on scene or advise that I'm on scene.
4  Q. Before we go too far, I've got these diagrams of
5  the incident that were done by Kleinfeld. I'm going to
6  mark that as Exhibit 14.
7  A. Okay.
8      (Exhibit 14 was marked for
9      identification.)
10 Q. This is Exhibit 14. We had a similar exhibit
11 already in evidence, but I'm going to have you write on
12 this one, so I want it to be different. I'm going to have
13 you use different colors.
14 A. Okay.
15 Q. These are dry erase markers. They will probably
16 take on the paper.
17 A. There is a Sharpie there if you want to use that.
18 Q. Yes, let's do that. We've an orange and then a
19 purple highlighter maybe we can use.
20 A. That's a purple Sharpie, too, I think.
21 Q. Is that purple? Okay.
22 A. Or dark blue.
23 Q. So what I'm going to have you do, as you're
24 talking to me about when you arrived on scene is if you can
25 show me where you first -- when you first saw Mr. Wood,

12 (Pages 42 to 45)

Trattel Court Reporting & Videography
505-830-0600

Plaintiff's Motion for Summary Judgment
Exhibit 5, Page 5 of 8

Electronically signed by Penny McAlister (301-012-776-0544)                     b0c3ce1d-820b-499e-b715-901a114f3b5b

Case 1:15-cv-00550-SCY-KBM   Document 60-5   Filed 05/06/16   Page 6 of 8

Hope Irvin, et al.  v. Katherine Wright, et al.                                December 2, 2015
Jon O'Guin                                                                     15cv00550 SCY-KBM

Page 94

1  that more into the classes.  I'm fairly positive on that.
2      Q.  Looking at this, you can see here the dates are
3  2009 to 2013.  When did you graduate from the academy?
4      A.  2008.
5      Q.  2008.  So prior to this?
6      A.  Yes.
7      Q.  You can see here it says basic CIT class 40
8  hours?
9      A.  Yes.
10     Q.  Is that what you recall receiving, as well?
11     A.  Yes.  That was the additional training that I
12 received.  This sounds to be the additional training I
13 received.
14     Q.  Well, let's go to the second page of this
15 exhibit.  And do you see where it says "Elements of
16 Abnormal Behavior" on that first page?
17     A.  Yes, I do.
18     Q.  What I'd like for you to do is just to take a
19 little bit of time to sort of go through and scan and take
20 a look at these slides, really focusing on -- on the issues
21 regarding mental health, and I'm wondering if it's similar
22 or the same as the same kind of training that you recall
23 receiving, and then I will ask you some more specific
24 questions.
25     A.  It appears to be the same, but I know training

Page 95

1  changes, so I don't know if this is the same one I was
2  given.  It looks like a copy of the Power Points.  I'm not
3  sure if this is the same Power Points that were used when I
4  went through it.
5      Q.  So there were Power Points used when you went
6  through it?
7      A.  Yes.
8      Q.  Oh, good.  At least these are -- if you go to the
9  page where -- if you look at -- it's hard to identify,
10 because, again, these aren't Bate stamped, and I apologize.
11 It starts by saying "Medications for the mentally ill."
12 That's the first slide that you would see in the top
13 left-hand corner.
14     A.  Is it psychotic disorders with psychotropic meds?
15     Q.  It looks like it's Page 8 of the exhibit, if you
16 count eight pages in.
17     A.  Oh, eight pages.
18     Q.  Maybe it's the page before the antipsychotic
19 medications that you were looking at.
20         MS. CARPENTER:  I'm so sorry, Stephanie,
21 that --
22         MS. GRIFFIN:  It's going to be the
23 right-hand corner.
24     A.  What's that?  Medications for the mentally ill.
25 Okay.  Here it is.  Okay.

Page 96

1      Q.  Is that something that you were trained with at
2  the academy -- trained about at the academy, to ask are you
3  taking any medications?  Why are you taking them?
4      A.  Yes.
5      Q.  What are they for?
6      A.  Yes.
7      Q.  And going to the second side here, it says
8  "Symptoms of mania.  Medications for bipolar."  Do you see
9  that?
10     A.  Is it on the same page?
11     Q.  Yes.  It's on the far right-hand side.
12     A.  Medications for depression, symptoms for mania,
13 medication.  Yes.  Okay.
14     Q.  So looking at that, and then turning the page to
15 the second page in, it talks about communicating in crisis.
16 Did you learn about the different types of disorders, such
17 as schizophrenia, bipolar and people who are manic?
18     A.  Yes.
19     Q.  And what to look for in assessing whether or not
20 they present symptoms and signs of these disorders?
21     A.  Yes.
22     Q.  Was that at the academy, or was that specialized
23 training?
24     A.  I don't recall if it was the academy.  I just
25 recall the CIT class, learning it in there.

Page 97

1      Q.  Is it important in de-escalating a situation to
2  allow the subject to do the majority of the speaking?
3      A.  Maybe a case-by-case basis.
4      Q.  Is that your answer to probably most of my
5  questions, I'm wondering, in regards to what you can do
6  when you first encounter a subject who may be mentally ill?
7  In other words, are you able to answer my questions that
8  this is absolutely what you should do always, or is it
9  always a case-by-case basis?
10     A.  Case-by-case basis.  Like I would say letting
11 somebody talk may give you an indicator of what's going on,
12 so maybe you can get an angle or a hook to talk to them.
13     ==Q.  Whenever a subject has been deemed 10-40, and the==
14 ==call goes out, is it always best practice to -- when you==
15 ==first encounter the subject to give them your name?  My==
16 ==name is Jon?==
17     ==A.  It's taught as it can help.==
18     ==Q.  It can help?==
19     ==A.  Yes.==
20     ==Q.  Can you tell me some other things that can help?==
21     ==A.  Like just listening to them.  Sometimes they just==
22 ==want to vent.  They want their side.  It just to let you==
23 ==get an indicator on what's going on with them.  If they==
24 ==start, you know, talking about there is people chasing==
25 ==them, bugging them.  There is -- they implanted stuff in==

25 (Pages 94 to 97)

Case 1:15-cv-00550-SCY-KBM   Document 60-5   Filed 05/06/16   Page 7 of 8

Hope Irvin, et al.  v. Katherine Wright, et al.                    December 2, 2015
Jon O'Guin                                                         15cv00550 SCY-KBM

Page 98

1  their head, and that's an indicator that they might be
2  schizophrenic.  So it's just letting them talk.
3          If we do the majority of the talking, then you're
4  probably not going to figure out anything on this, I would
5  say, because you're not getting any of the clues.
6      Q.  What were you trained in CIT to do with a subject
7  who, when you're asking him to do things, such as, hey, I
8  want to talk to you, I need to talk to you about something,
9  and they don't respond verbally, and they don't seem to
10 respond physically either?  What are you trained is the
11 next step?
12          MS. GRIFFIN:  Object to form and foundation.
13     A.  I don't recall the training.  I don't recall.  I
14 may do things that I wasn't trained in to try and get their
15 attention, but I don't remember being trained in it.  I
16 mean, let's say if he's walking away from me, and he's
17 deaf, I may try flashing a light, getting in front of him,
18 so he can visually see you.
19     Q.  Are you trained to take your finger and point it
20 to your ear and point it to the person and say, hey, are
21 you deaf?
22     A.  If they're facing me?  Oh, no.
23     Q.  Can you hear me?
24     A.  I think any deaf person I ever contacted
25 indicated -- when I try talking to them, they'll usually

Page 99

1  indicate I can't hear you, or they'll try and start signing
2  at me or something like that.  So that would be an
3  indicator that they don't -- they're not able to
4  communicate with me.
5          They might be able to read lips, but for the most
6  part, they communicate in sign language.  I mean,
7  certainly, it's an option, but every deaf person I've
8  encountered, when I try talking to them, you can either
9  catch it in their speech, or they'll start signing, or
10 they'll tell you they're deaf.
11     Q.  Jon, you had indicated earlier in your deposition
12 that you've been -- not directly involved necessarily, but
13 you've been on the scene for a few of these police shooting
14 cases.  Is that true?
15     A.  Yes.  I believe there was just one before this in
16 2009.
17     Q.  Which one?
18     A.  It was in 2009 around Thanksgiving at the Warren
19 Coronado Apartments, 6220 Indian School.
20     Q.  But you don't recall the subject's name?
21     A.  No.  No.
22     Q.  Did they die?
23     A.  He ultimately died like a year later in the
24 hospital, yes.  He had an knife wound infection.
25     Q.  Have you had the opportunity to be a part of --

Page 100

1  directly, I mean, primarily a part of a situation in which
2  there was a subject who was armed, and he was mentally --
3  he or she was mentally ill?
4      A.  Have I ever been involved in a situation like
5  that?
6      Q.  Yes.
7      A.  Yes.
8      Q.  How many?
9      A.  I can't recall.
10     Q.  Is it more than five?
11     A.  I would like to say yes, but I couldn't put a
12 number on it.
13     Q.  Sure.
14     A.  I would think it's more than five, yes, but I
15 don't --
16     Q.  I apologize to interrupt you.  Is that because
17 you were a certified CIT officer?
18     A.  I don't keep a tally of them.  So I just -- I
19 mean, it's part of my daily work, so I don't keep a tally.
20     Q.  Let me ask it this way.  Have you ever been
21 requested to a scene to take over the scene or the
22 interaction with the subject because of your CIT
23 certification?
24     A.  Yes.
25     Q.  How many times has that happened?

Page 101

1      A.  That, I couldn't recall.
2      Q.  A lot?  Would you say a lot?
3      A.  Yeah.  It's happened fairly frequently, yes.
4          MS. CARPENTER:  Can we take a short break?
5          THE WITNESS:  Sure.
6          (A recess was taken from 3:34 p.m.
7          to 3:36 p.m.)
8      Q.  So can you give me a -- sorry, I forgot where we
9  left off there.
10         (The previous question and answer
11         were read.)
12     A.  How many times I've been requested to take over a
13 scene?
14     Q.  Yes.
15     A.  Usually for like a suicidal person call.  We get
16 called to that a lot.
17     Q.  And are you asked to be the primary person
18 dealing with that subject?
19     A.  Yeah.  Most of the time, they'll make us primary
20 on the call, or we will go and help out the officer, or we
21 will be dispatched as a backup officer and usually end up
22 taking it anyway, not always, but --
23     Q.  In any of those situations, have the subjects
24 been armed?
25     A.  I can recall one, yes.

26 (Pages 98 to 101)

Case 1:15-cv-00550-SCY-KBM   Document 60-5   Filed 05/06/16   Page 8 of 8

Hope Irvin, et al.  v. Katherine Wright, et al.                December 2, 2015
Jon O'Guin                                                      15cv00550 SCY-KBM

Page 118

1    A. Yes. That's the one I reviewed.
2    Q. So was it nine, ten hours at the FAC?
3    A. Yes.
4    Q. And it says here Detective J. Frederickson, and
5  down here, we see investigating officer Detective Manary.
6  Are those the two people you recall being present at that
7  interview?
8    A. I remember Detective Manary being there. I just
9  don't remember the other guy's name.
10   Q. Take a look and look at that. Is that accurate?
11 Is that accurate, or do you believe that there is anything
12 in there that's inaccurate, and if it is, please let me
13 know what that is.
14         MS. GRIFFIN: I want to make sure that
15 you're reading the same thing that she is.
16         MS. CARPENTER: Yes. Yes.
17         MS. GRIFFIN: What is it at the bottom?
18         MS. CARPENTER: It's Page 21.
19         MS. GRIFFIN: 21. You're looking at 14.
20         THE WITNESS: Okay.
21         MS. CARPENTER: Thanks, Stephanie.
22         MS. GRIFFIN: I just want to make sure.
23         MS. CARPENTER: Yes.
24   Q. Let me know when you're done, and I have some
25 follow-up questions on that statement.

Page 119

1    A. Do you want me to go to the next page and
2  continue reading or --
3    Q. No. Let's just focus on this page first. Do you
4  disagree with anything, first?
5    A. No.
6    Q. So the first paragraph in the highlighted
7  brackets here on this Page 21, you could hear what the
8  dispatcher was conveying about the subject; correct?
9    A. Yes, I could.
10   Q. So what we have gone through on Exhibit 1, which
11 is the CAD, and it said -- you know, we talked about the
12 drugs and alcohol and where his location was. You could
13 hear all of that?
14   A. Whatever was voiced, I remember hearing. I don't
15 remember if I heard everything in its entirety, but I do
16 remember hearing descriptions of him and so on.
17   Q. You could hear what the caller had informed
18 dispatch?
19   A. Yes.
20   Q. Could you hear the actual caller, or was it just
21 conveyed by dispatch?
22   A. It was just conveyed through dispatch.
23   Q. Then the same on the first paragraph. It says
24 that you went to the scene for two reasons. One, you were
25 in the area; right?

Page 120

1    A. Yes.
2    Q. And two, because of your specialized training,
3  you felt that you could assist if the subject was suffering
4  from a mental illness; right?
5    A. Yes.
6    Q. And third, you shut off your lights because you
7  didn't want to possibly upset the subject or set the
8  subject off; correct?
9    A. Yes, that's one of the reasons.
10   Q. Did you ever convey to Officer Bludworth or
11 Wright that maybe they should do that too?
12   A. No.
13   Q. And just to be clear, you never communicated
14 anything with Officer Wright or Bludworth prior to meeting
15 them around the police car after the shooting had occurred?
16   A. Beforehand, you mean?
17   Q. Before the shooting, did you ever communicate
18 anything to Officer Bludworth or Wright?
19   A. No.
20   Q. Did you communicate to dispatch anything other
21 than what's reflected in the radio transmissions?
22   A. No.
23   Q. The next paragraph says you advised radio you
24 were in the area, and you asked if there were any updates.
25 What updates were you given?

Page 121

1    A. His location.
2    Q. How did dispatch know his location?
3    A. Probably the call-taker had added it on the call.
4    Q. And you heard over the radio that Bludworth was
5  on scene. He had a visual of the subject?
6    A. Yes. We're moving to Page 22 now; right?
7    Q. I'm still on Page 21, the second paragraph.
8  Third paragraph, it says when you were pulling in the
9  parking lot, you noticed that Bludworth was about 15 feet
10 away from the subject, and you thought that he had been --
11 Wood had been tased due to him moving erratically?
12   A. Yes.
13   Q. Can you describe for the record how he was moving
14 erratically? What does that mean? I mean, I've seen
15 someone get tased.
16   A. His movements were weird. He looked like he was
17 jerky, like -- I don't know, like he had palsy, the best
18 way to describe it.
19   Q. Sure. I know what you mean.
20   A. He wasn't moving fluidly, and there was just
21 something off about it.
22   Q. What did it make you think when you saw him,
23 other than maybe he'd been tased?
24   A. That there might be something wrong with him. He
25 might be hurt. Like he may have palsy. That could be

31 (Pages 118 to 121)