Case 1:15-cv-00550-SCY-KBM   Document 60-6   Filed 05/06/16   Page 1 of 4

Hope Irvin, et al. v. Katherine Wright, et al.　　　　　　November 24, 2015
Richard Hilger　　　　　　　　　　　　　　　　　　　　15cv00550 SCY-KBM

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

No. 15cv00550 SCY-KBM

HOPE IRVIN, as Personal Representative
of the ESTATE OF VINCENT WOOD, Deceased,
　　　　Plaintiff,
　vs.
KATHERINE WRIGHT, individually and in her
Official capacity as an Albuquerque Police Officer
JEFFREY BLUDWORTH, individually and in his
Official capacity as an Albuquerque Police Officer,
and CITY OF ALBUQUERQUE,
　　　　Defendants.

DEPOSITION OF RICHARD HILGER
November 24, 2015
12:55 p.m.
Trattel Court Reporting & Videography
609 12th Street, NW
Albuquerque, New Mexico 87102

　　PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE THIS DEPOSITION WAS:

TAKEN BY:　MS. FRANCES C. CARPENTER
　　　　ATTORNEY FOR THE PLAINTIFF

REPORTED BY: Penny E. McAlister, CCR, NM CCR #250
　　　TRATTEL COURT REPORTING & VIDEOGRAPHY
　　　P.O. Box 36297
　　　Albuquerque, New Mexico  87176-6297

Case 1:15-cv-00550-SCY-KBM   Document 60-6   Filed 05/06/16   Page 2 of 4

Hope Irvin, et al. v. Katherine Wright, et al.                                    November 24, 2015
Richard Hilger                                                                     15cv00550 SCY-KBM

Page 30

1  sign language. If we don't have that, we can also write
2  things -- write things down.
3       So you can do things like that, or various ways
4  that you can go ahead and -- go ahead and do your job the
5  best of your ability, or if someone else has a specialty
6  that can assist with it, yes.
7       Q. So what about people who are suspected of having
8  a mental health disorder?
9       A. We attempt to get a CIT officer, but that's not
10 always possible.
11      Q. Why is it not always possible?
12      A. That CIT officer -- not everyone was CIT trained
13 at that time, and that person -- the CIT officers may be on
14 a separate call where they're not available to respond.
15      Q. If a CIT officer is able to respond, then what
16 happens?
17      A. Usually they'll go and attempt to assist with the
18 situation by whatever they believe is necessary, talking to
19 them. That's how they generally will go from there.
20      **Q. Isn't it true that they -- the CIT officer who is**
21 **dispatched should ideally be the first officer and the**
22 **primary officer on scene?**
23      **A. Ideally, it should, where the second and third**
24 **officer, their job would be basically his safety, or the**
25 **CIT officer's job is to make sure they stay safe.**

Page 31

1       Q. So you've reviewed these CADS; correct?
2       A. Yes.
3       Q. They've been marked as Exhibit 1 to this
4  deposition. Do you see where a CIT officer was called out
5  on this in regards to this particular incident?
6       A. I don't see -- right now, just looking briefly
7  real quick -- I looked at it, but I don't remember
8  everything, but I don't see where one was actually called
9  at that point in time, and I don't know if Katherine Wright
10 or Jon O'Guin or any of the other officers or even Sergeant
11 Altman are CIT officers.
12      Q. And at the time, just to confirm, you were not
13 CIT trained -- or you were trained, but you weren't
14 certified?
15      A. That is correct, yes.
16      Q. Got it. So going back to my question on persons
17 with mental health disabilities, you said you had not heard
18 what I said verbatim like that before; right?
19      A. That is correct, yes.
20      Q. Had you heard some amalgamation of that, some
21 variation or version of that?
22      A. Definitely with the deaf and the blind, maybe
23 some slight variation. You know, I haven't looked into the
24 exact laws and everything with persons with mental
25 disabilities, that exact version.

Page 32

1       Q. As of 2013, what was your understanding of how
2  you were supposed to engage with someone who is suspected
3  of a mental health disorder?
4       A. With everything else, officer safety is always
5  first, no matter what, and you usually try to remain calm
6  with them and talk to them. The best thing, you know, we
7  try to talk to them. That's the same with most people on
8  the street, is I prefer to talk to someone if possible, and
9  then I go on their actions as I react to their actions.
10      That's most -- most calls on the street is the
11 exact same way. You try to talk to -- I always try to talk
12 to them first. If I can get compliance by my voice, I'm
13 happy, and that's what I try to do with everyone. The same
14 with someone with mental disabilities. You try to talk to
15 them. You may try to just talk to them best -- the best
16 you can, but still remain safe at the same time.
17      Q. Do you engage your sirens and lights when you go
18 to a call that involves a mentally health person -- someone
19 with mental illness?
20      A. At times, you do. At times, you do. At times,
21 you don't.
22      Q. When do you, and when don't you?
23      A. Each -- we use -- our emergency equipment is
24 situational. I can't tell you we're only going to use it
25 on this, we're only going to use it on that. It depends on

Page 33

1  a lot of different factors, traffic, time of day, how much
2  traffic there is.
3       Generally, I like to turn off my lights and
4  sirens as I'm getting closer to the call, but
5  unfortunately, that could, you know, slow down -- people
6  don't know I'm running lights and sirens anymore, but
7  neither does the traffic. So it could interfere with that.
8  It all depends on each type of call.
9       So I can't sit there and say we only do it on
10 this, we only do it on that, because it's -- as with most
11 of my job, it's completely situational.
12      Q. What did you learn that the purpose of CIT is?
13 What's the purpose of crisis intervention training or team?
14         MS. GRIFFIN: Objection; form and
15 foundation.
16      A. The purpose is to help us interact with people
17 with disabilities with the least amount of, I guess,
18 violence, or cooperation between the Police Department and
19 them, basically, in a nutshell.
20      Q. Did you know Mr. Torres had mental health issues
21 before you encountered him?
22      A. No, I did not.
23      Q. What was the call that you were going out to?
24      A. On which?
25      Q. Mr. Torres, yes.

9 (Pages 30 to 33)

Case 1:15-cv-00550-SCY-KBM   Document 60-6   Filed 05/06/16   Page 3 of 4

Hope Irvin, et al. v. Katherine Wright, et al.  
Richard Hilger

November 24, 2015  
15cv00550 SCY-KBM

Page 38

1  call that says there is a 40?
2      MS. GRIFFIN: Objection; form and
3  foundation.
4      A. Okay. The same thing is if a CIT or if a CIT
5  officer is going. Those are factors.
6      Q. Do you call dispatch back and say, hey, can you
7  confirm if a CIT officer is going to be there? You just
8  said this person is 40. Let's ensure that that happens.
9  Do you do that?
10     MS. GRIFFIN: Objection; form and
11  foundation.
12     A. It could be that. It could be knowing at that
13  time -- I know which officers of mine are CIT trained or
14  not. Since this is in the past, I can't recall if Officer
15  Wright was or is CIT trained.
16     Q. I'm still on a hypothetical.
17     A. Oh, it's a hypothetical?
18     Q. I'm still with the two -- the same call. One is
19  a 40, one is not a 40, but it's the same call.
20     A. Okay. Generally, I know if my guys are CIT
21  trained or not that are actually working for me right now.
22  So that, yes, involves -- involves that.
23     Q. So you get dispatched to the call, and it's for a
24  40. You can hear who else is dispatched and know whether
25  they're CIT or not?

Page 39

1      A. Generally, the answer is yes. That is correct.
2      Q. And hearing that, and you're on the way to the
3  call, you don't hear any dispatch for CIT or any officers
4  that you know to be CIT, do you then take affirmative
5  action to make sure CIT is there?
6      A. It's situational, yes. If it sounds violent in
7  nature, definitely, 100 percent, we're doing that.
8      Q. We're doing what?
9      A. Attempt to see if there is a CIT.
10     Q. Now, it's my understanding from APD SOPs that
11  whenever a suspect is even -- whenever someone, a suspect
12  or otherwise, is suspected of being a 40, that CIT is
13  always -- it's not a may, maybe we will. It's a must. CIT
14  must be called to the scene. Am I wrong in that?
15     MS. GRIFFIN: Object to form and foundation.
16     A. I would actually have to 100 percent review it.
17  Right now, I can't say yes or no 100 percent right now.
18     Q. Were you 100 percent sure of that answer in 2013?
19     MS. GRIFFIN: Objection; form and
20  foundation.
21     A. About the same. Right now, we always want, if
22  possible, a CIT.
23     Q. So in your training, in your experience as being
24  an officer for as long as you've been an officer, how would
25  you explain how APD accommodates people with mental

Page 40

1  disabilities?
2      A. We do the best that officers can at the time do.
3  We try -- right now, we do have CIT training for -- it's
4  supposed to be mandated for everyone that's working in the
5  field. Eventually, it's going to be mandated for the whole
6  department to go through it, and then we do our best to
7  accommodate that, as long as we remain safe for ourselves
8  and the public will remain safe.
9      Q. So you accommodate them by making sure the public
10  is safe? I'm just going to write down your answer.
11     A. Okay. Safety is first for the public and us and
12  attempt to make -- make it safe for them. At that point in
13  time, if everything is safe, we attempt to accommodate
14  them, usually by talking to them as long as possible to
15  resolve the situation with as little -- hopefully, no force
16  at all.
17     Q. Were you trained how to recognize certain mental
18  disorders such as schizophrenia?
19     A. Yes.
20     Q. Were you trained to recognize certain mental
21  disorders such as bipolar?
22     A. Yes.
23     Q. What are some of the symptoms of someone who
24  presents with -- someone who has schizophrenia?
25     A. Generally, they're usually more afraid of

Page 41

1  different situations, could be afraid of officers. They're
2  thinking that people are out to get them generally, type --
3  very generalization like that.
4      Q. Were you trained that people who had
5  schizophrenia and other mental health disorders -- certain
6  other mental health disorders have a hypersensitivity to
7  light and sounds?
8      A. At times, certain ones do, yes.
9      Q. Were you also trained that you are not to yell
10  commands at people who have schizophrenia or certain mental
11  health disorders?
12     MS. GRIFFIN: Objection; form.
13     A. You were to avoid it if possible.
14     Q. And if fact, you're supposed to speak in -- speak
15  as calmly as possible to them; correct?
16     A. Yes.
17     Q. You're to tell them that you're not there to hurt
18  them or harm them in any way; correct?
19     A. Yes. You try to do that. That's -- you know,
20  with most people with mental illness, that's generally the
21  best possible way is calm and relaxed. If everything
22  allows that to happen, yes.
23     Q. Now, were you trained this just in the regular
24  CIT training, or was this some kind of special training
25  that you received in order to get a certificate?

11 (Pages 38 to 41)

Case 1:15-cv-00550-SCY-KBM   Document 60-6   Filed 05/06/16   Page 4 of 4

Hope Irvin, et al. v. Katherine Wright, et al.                                November 24, 2015
Richard Hilger                                                                15cv00550 SCY-KBM

Page 42

1     A.  Well, we also -- you learn that in the academy.
2  Then you also learn it again through the certificate
3  course.
4           MS. GRIFFIN:  Is that urgent?
5           MS. CARPENTER:  Let's go off the record.
6           (A discussion was held off the record.)
7     Q.  It's my understanding that Katherine had a prior
8  interaction with Mr. Wood roughly about a week or two
9  before this incident.  Are you aware of that?
10    A.  I can't say a hundred percent yes or no.
11    Q.  Do you recall a call in which Ms. Wright went
12 out, and it was alleged that Mr. Wood -- and I'm just going
13 off the top of my ahead here.  I don't know if these are
14 the actual facts verbatim, but that Mr. Wood had gotten
15 into some sort of altercation at -- I think it was a
16 Walgreens, or it could have been another convenience store,
17 and I don't recall if he broke a bottle or someone broke a
18 bottle, a beer bottle or something like that, and
19 Ms. Wright had interactions with him in that regards?
20    A.  I can't say, because that sounds like a lot of
21 the calls in the Northeast that we get.  It really does.
22 We have a lot of interactions with people at Walgreens
23 causing fights, breaking things.  I can't say yes or no.
24    Q.  Were you ever called out to any type of
25 interaction with Mr. Wood?  Had you ever had any

Page 43

1  interactions with Mr. Wood prior to this?
2     A.  Yes, I have.
3     Q.  Tell me about that.
4     A.  It was a -- basically, a disturbance on the
5  corner of San Mateo and Montgomery.  I went ahead -- I was
6  nearby.  It was a call holding.  I told them that -- you
7  know, basic, I advised -- which means I would take the call
8  by myself and see what the disturbance was.
9     Q.  Did the call come out as a 40, that he was
10 possible 40?
11    A.  I think it just came out as a disturbance.  It
12 could have been he possibly was, because he was doing
13 something on the corner.  I don't recall what it was.  I
14 arrived on scene.  I parked in the street.  I had to
15 have -- my lights were on, but my sirens were not on,
16 because I was blocking traffic.  I didn't want my vehicle
17 to get hit.
18        He was in front of me a little ways, and I
19 contacted him -- attempted to contact him.  Basically, he
20 wanted nothing to do with me at all, didn't want to talk to
21 me.  If I recall, he gave me vulgar words and continued
22 walking northbound, and I let him leave because he stopped
23 what he was doing.
24        I had no reason to go further or anything with
25 him.  He didn't look like he was in danger to himself or

Page 44

1  anyone else.  So I just wanted to make sure he stayed out
2  of traffic.  I stayed for a little bit, watched him leave,
3  and that was it.
4     Q.  So you let him go because the incident that had
5  given rise to the disturbance had ended?
6     A.  Yes.  And I didn't -- at that time, I did not
7  have a crime.  So there is no reason for me to detain him
8  or anything like that.  If I recall, it was just a
9  disturbance, some guy doing something around the bus stop
10 or something, but it wasn't enough for me to charge him or
11 anything like that.  I did not witness any crime when I
12 arrived.
13    Q.  How long was this before July of 2013?
14    A.  Possibly maybe a week to three weeks.  I didn't
15 even know it was the same person until -- I think they
16 showed a photograph one time of it, and I go, oh, I did
17 have an interaction with him.  That's the only time I knew.
18 I didn't know who he was at that point in time when I
19 initially contacted him.
20    Q.  When you first arrived on scene, Richard, did you
21 see Mr. Wood lying on the ground?
22    A.  No.  I believe the ambulance might have already
23 been there working on him.  I just stayed -- I let them go
24 ahead and -- if they were, I let them go ahead and continue
25 with their job.

Page 45

1     Q.  So you didn't realize that it was Mr. Wood until
2  later when you saw a picture of him?
3     A.  That is correct.
4     Q.  Who showed you a picture of Mr. Wood?
5     A.  It might have been on the news or somewhere or a
6  picture somewhere.  I don't recall exactly where.
7     Q.  Did you have any other occasions to interact with
8  Mr. Wood?
9     A.  Not that I recall.
10    Q.  What about any of your other officers that you
11 know of?
12    A.  That I know of?  I'm not 100 percent positive
13 that any of my other guys did.  I believe they did,
14 because, as I recall, he was -- stayed around that area, so
15 people would have to contact him, but I can't say 100
16 percent who or how many or anything like that.
17    Q.  Let's go back to the incident in which you -- did
18 you write a report in regards to that incident?
19    A.  No.
20    Q.  No record?
21    A.  No, I did not write a report, but I added
22 comments on the dispatch.
23    Q.  What were the comments that you added?
24    A.  Something about he left -- he left on foot or
25 something like that.  If I remember -- if I recall.  This

12 (Pages 42 to 45)