Case 1:15-cv-00550-SCY-KBM  Document 60-7  Filed 05/06/16  Page 1 of 14

Hope Irvin, et al.  v. Katherine Wright, et al.  November 24, 2015
Steve Altman                                      15cv00550 SCY-KBM

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

No. 15cv00550 SCY-KBM

HOPE IRVIN, as Personal Representative
of the ESTATE OF VINCENT WOOD, Deceased,
      Plaintiff,
  vs.
KATHERINE WRIGHT, individually and in her
Official capacity as an Albuquerque Police Officer
JEFFREY BLUDWORTH, individually and in his
Official capacity as an Albuquerque Police Officer,
and CITY OF ALBUQUERQUE,
      Defendants.

DEPOSITION OF STEVE ALTMAN
November 24, 2015
9:00 a.m.
Trattel Court Reporting & Videography
609 12th Street, NW
Albuquerque, New Mexico 87102

PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE THIS DEPOSITION WAS:

TAKEN BY:   MS. FRANCES C. CARPENTER
    ATTORNEY FOR THE PLAINTIFF

REPORTED BY: Penny E. McAlister, CCR, NM CCR #250
    TRATTEL COURT REPORTING & VIDEOGRAPHY
    P.O. Box 36297
    Albuquerque, New Mexico  87176-6297

Case 1:15-cv-00550-SCY-KBM   Document 60-7   Filed 05/06/16   Page 2 of 14

Hope Irvin, et al.  v. Katherine Wright, et al.                     November 24, 2015
Steve Altman                                                        15cv00550 SCY-KBM

Page 6

1   right?
2   A. It's been a long time. One time, yes.
3   Q. One time prior to this?
4   A. Correct.
5   Q. Oh, wow. Okay. Do you know how long ago that
6   was?
7   A. I would say ten years ago.
8   Q. So you started APD Academy in 2001. Do you have
9   a master's? Have you gotten your master's?
10  A. I have not, no.
11  Q. You have not. Are you working towards your
12  master's?
13  A. I was thinking about going back to school, but --
14  Q. I don't know why I thought that.
15  A. No, I do not have a master's, no. I plan --
16  actually plan to.
17  Q. Good.
18  A. But it's just time, and I also have children, and
19  it's a lot.
20  Q. Yes. I understand that. 2001 academy. When did
21  you graduate from the academy?
22  A. December 2001.
23  Q. What class were you?
24  A. 84th.
25  Q. Have you been with APD ever since 2001?

Page 7

1   A. Correct.
2   Q. And you're a lieutenant now?
3   A. Correct.
4   Q. Tell me about your -- how you -- how and when
5   you've moved up the ranks.
6   A. Okay. I was a patrolman from 2001 to March of
7   2009. I then transferred to the DWI squad, and I was there
8   from March until December of that year, 2009. I was
9   promoted to sergeant December of 2009.
10  Q. What were you the sergeant of?
11  A. Patrol field. All my time as a sergeant was a
12  patrol sergeant, field sergeant.
13  Q. Patrol sergeant for a particular area?
14  A. Correct, area, particular shift and a particular
15  squad officer.
16  Q. And what about after that?
17  A. After 2009, I was in -- to 2014, to July of 2014,
18  I was then promoted to lieutenant, and from then, I have --
19  I did basically another year on patrol as a lieutenant, and
20  about August of this year, I transferred to operations
21  review up at the chief's floor.
22  Q. What does that mean to be operations?
23  A. Basically, I'm in charge of chaplains units,
24  reserve units, the vehicle fleets. I'm in charge of the
25  Emergency Response Team, all the day-to-day operations,

Page 8

1   things that come into the chief's office, scheduling.
2   Basically, it's just like a ton of things really. They
3   just all -- people have questions, they come to me.
4   Q. When you say Emergency Response Team, what does
5   that mean?
6   A. Emergency Response Team is also a team I've been
7   a part of for about five years. That's the team that
8   basically deals with riots, civil unrest, disturbances,
9   declared emergencies, natural disasters, things like that.
10  Q. Big deal kind of stuff?
11  A. Yeah.
12  Q. Do you guys work with Homeland Security in
13  regards to your Emergency Response Team?
14  A. Some. Some.
15  Q. Yes. Okay. The date of the incident in this
16  case is July of 2013. Can you tell me, what was your
17  employment at that time?
18  A. At that time, I was a field sergeant in the
19  Northeast Heights. It would have been team -- we've kind
20  of changed the teams up. So it would have been Team 9 at
21  the time, which was a -- basically a split between swing
22  and graveyard. It was a time of -- start time of 6:00 p.m.
23  and end time of 4:00 a.m.
24  Q. So officers would come in at 6:00 a.m. in the
25  morning --

Page 9

1   A. No. I'm sorry, did I say 6:00 a.m.? 6:00 p.m.,
2   6:00 p.m. to 4:00 a.m.
3   Q. So they come in at 6:00 p.m., and then they would
4   work until 4:00 a.m.?
5   A. Correct.
6   Q. Was Officer Bludworth a part of Team 9?
7   A. Correct.
8   Q. How long had he been a member of Team 9?
9   A. Since the beginning of the bid, usually in about
10  June. Every year, we have a field services bid, and he bid
11  for that squad, so -- I'm sorry, the date you said was
12  July?
13  Q. The date of the incident.
14  A. So maybe two months, I'm thinking.
15  Q. My understanding is at the time of the -- and
16  during the course of this deposition, I'm going to say time
17  of incident or date of incident, and that, I'm making
18  reference to July of 2013.
19  A. Okay.
20  Q. But if there is any confusion -- if you're
21  confused by any of my questions, just let me know that.
22  A. Okay.
23  Q. I don't want you to guess at any of your --
24  your answers either.
25  A. Okay.

3 (Pages 6 to 9)

Case 1:15-cv-00550-SCY-KBM   Document 60-7   Filed 05/06/16   Page 3 of 14

Hope Irvin, et al.  v. Katherine Wright, et al.                                November 24, 2015
Steve Altman                                                                    15cv00550 SCY-KBM

Page 10

1  Q. So my understanding is that Bludworth at the time
2  was still on probation, and that officers, when they
3  graduated from the academy, they have to do a certain
4  amount of time with another officer, like a ride -- they
5  have to ride along or something with the other officer.
6      That's kind of going to be my next course of
7  questioning for you, is, what happens when an officer
8  graduates from the academy? How are they supervised? What
9  kind of training are they given? And then when they're
10 moving into a probationary status, if you can kind of
11 explain your understanding of that to me. Thank you.
12 A. Again, the -- so they do usually, give or take, a
13 six-month of Police Academy. They then -- we've
14 actually -- and I was a part of that also. I re- -- I
15 guess redid the Field Training Program.
16 Q. Oh, great.
17 A. So it's now extended even longer, but at this
18 time, it would have been three months long. So he would
19 have done the academy six months, three months additional
20 training, and on-the-job training basically with a
21 certified field training officer. He would have had three
22 of those.
23     Each month, he would have rotated. Who those
24 were, I have no idea. So there is -- there were standards
25 within those three months, and he had to pass each phase,

Page 11

1  and once he passed those three months, he was then placed
2  on probationary status, but as a solo beat officer.
3  Q. So after three months, you're then put on a solo
4  beat officer, but still under probation?
5  A. Correct.
6  Q. Now, my understanding is that when you're on
7  probation, that means that APD doesn't really have to
8  justify any reasons for termination. That's one of the
9  many elements of you being on probation. Can you tell me
10 some of the other elements of -- the difference between
11 being a solo officer on beat as a P1C, for example, or a
12 solo officer on beat as an officer who's still on
13 probation?
14 A. Correct. There is no difference. A P2C or a
15 P1C, there is no difference, other than they are on
16 probation and ultimately could be terminated by the City
17 for any reason.
18 Q. Are they given any heightened -- I don't know.
19 Are they given any heightened supervision?
20 A. Not really.
21 Q. Not really.
22 A. I mean, I've had multiple patrolmen that graduate
23 and come to me that were on probation, and basically, the
24 only thing you would do is you would kind of monitor their
25 reports a little more, you know, listen to the radio more,

Page 12

1  meet with them once a month towards the end of the month
2  and fill out a probationary employee report.
3  Q. I've got some of those, Stephanie sent me last
4  night for Bludworth --
5  A. Correct.
6  Q. -- that you had given to her; right?
7  A. Correct.
8  Q. You said listen to the radio more. I'm
9  fascinated by that. Are you constantly listening to --
10 when you're the supervisor, are you constantly listening to
11 all the calls that have to do with your team?
12 A. Correct. Well, the whole area command.
13 Q. The whole area.
14 A. Yes.
15 Q. So you hear every call that comes through?
16 A. Yes.
17 Q. When you say you listen to the radio more, do you
18 just sort of trigger -- is it a trigger in your mind, okay,
19 this is Bludworth, and he's responding to this call, and
20 he's on probation, or how does that work?
21 A. No. No. It would just -- you're just trying to
22 hear the calls, and is this something I should go to? Is
23 this something I should go to rapidly? Is this something
24 that I don't need to worry about? Is this something
25 additional resources should go to? It's just a million

Page 13

1  things are going through your mind really, because it's
2  kind of -- well, it's your responsibility as a field
3  sergeant.
4  Q. If you hear a call come over the radio, and you
5  think this is going to be a call that I'm going to need
6  some additional resources for, what do you mean by that?
7  Tell me -- give me an --
8  A. Well, like for this call, example, sending a CIT
9  officer.
10 Q. Did you send the CIT officer directly?
11 A. I did on the radio, yes.
12 Q. You did?
13 A. Correct.
14 Q. And we're going to get into the incident here in
15 a second. I'll follow up on that question. It was O'Guin;
16 right? Do you remember that?
17 A. Correct, O'Guin.
18 Q. O'Guin. Tell me what you have reviewed, and I
19 don't want you to tell me about your conversations with
20 your attorney, but tell me what you reviewed for your
21 deposition.
22 A. I briefly saw parts of my video yesterday.
23 Q. Parts of your video?
24 A. Correct. Yeah. I also reviewed like just the
25 CAD reports.

4 (Pages 10 to 13)

Trattel Court Reporting & Videography
505-830-0600

Plaintiff's Motion for Summary Judgment
Exhibit 8, Page 3 of 14

Electronically signed by Penny McAlister (301-012-776-0544)                    f6c9704a-d307-435a-92aa-200cf73ce8a5

Case 1:15-cv-00550-SCY-KBM   Document 60-7   Filed 05/06/16   Page 4 of 14

Hope Irvin, et al.  v. Katherine Wright, et al.                    November 24, 2015
Steve Altman                                                       15cv00550 SCY-KBM

Page 14

1  Q. Did you review the incident report or anything
2  like a police report --
3  A. No.
4  Q. -- for this? No?
5  A. No.
6  Q. So the video and then the CADS. Anything else?
7  A. I think there was a sheet of probationary
8  release, which I didn't fill out, which was from human
9  resources or something.
10 Q. For Bludworth?
11 A. Yes.
12 Q. Anything else?
13 A. You know, I did see a small segment of
14 Bludworth's video after the incident had occurred.
15 Q. Do you know about House Bill 93?
16 A. I do.
17 Q. Some people call it the heightened -- or the
18 requirement for more CIT training?
19 A. Yes.
20 Q. We're on the same page?
21 A. Correct.
22 Q. Tell me when you first became aware of House Bill
23 93.
24 A. I can't even -- I'm not sure on that. I went
25 through the CIT training class probably in -- if I had to

Page 15

1  guess, 2003 maybe. I was a CIT officer as a patrolman.
2  When I was promoted to sergeant, I remained with the CIT
3  program. I was a Crisis Intervention Team coordinator,
4  which would have been for the whole area command. I did
5  that for two years, and then that was the extent of my CIT
6  involvement.
7      We've had different trainings throughout the
8  year. Recently, just had -- on our PSU programs, we had to
9  do House Bill 93 tests and videos and stuff, so --
10 Q. Is that the most recent CIT training you've
11 received?
12 A. Correct.
13 Q. Is that the first training you've received in
14 regards to House Bill 93?
15 A. Yes, I believe so.
16 Q. And when was that?
17 A. Well, I'm not sure when that house bill -- the
18 PSU course was just like last week actually.
19 Q. Who was the person that spoke at that training?
20 A. It would have been Detective Matt Tinney and
21 Detec- -- or Dr. -- I think Rosenbaum is his name,
22 Rosenbaum.
23 Q. When you were sitting in this course, Steve, did
24 you learn anything new, something different that you didn't
25 already know?

Page 16

1  A. No.
2  Q. You were trained -- back in 2003, you said you
3  were a CIT officer, and you were trained. How many calls
4  would you say that you have responded to as a CIT officer
5  in regards to someone who has a mental disability?
6  A. Hundreds.
7  Q. Hundreds. Wow. Okay. Have you ever had the
8  opportunity to hear a call come out from dispatch and say,
9  okay, this person is 40, or has a mental health disorder?
10 A. Hundreds.
11 Q. Hundreds. Okay. And what do you do when you
12 arrive on scene?
13 A. As a sergeant, as a lieutenant, as an officer?
14 I'm not sure of the question.
15 Q. Just as a human, as a person wearing the badge,
16 whether you're a low level officer or a high level officer,
17 is there a difference in the way that you would interact
18 with that person?
19 A. I don't -- I don't think so necessarily, no.
20 Q. So just as you Steve would interact?
21 A. Just, you know, a heightened sense of safety, I
22 would say. You know, you might in the back of your mind
23 know if someone has a mental disability that maybe you
24 should be a little more careful.
25 Q. And how are you trained -- and I'm assuming that

Page 17

1  you implemented your training when you were responding to
2  these calls; correct?
3  A. Yes.
4  ==Q. How were you trained to respond to these types of==
5  ==situations involving people with mental disabilities?==
6  ==    MS. GRIFFIN: Object to form. Go ahead and==
7  ==answer. Go ahead and answer. I'm just objecting for the==
8  ==record.==
9  ==A. You basically just ensure that you have at least==
10 ==a backup officer is the main thing, that you don't take==
11 ==these calls by yourself. If you have an officer who is==
12 ==crisis intervention trained, start them. It's a little==
13 ==different now than it was then because -- well, the==
14 ==majority of the Police Department is now CIT trained.==
15 ==    So you know that now if you took a call -- I'm==
16 ==not sure that you would necessarily request the CIT officer==
17 ==because I think almost everyone now on parole is CIT==
18 ==certified.==
19 ==Q. What about in 2013?==
20 ==A. No. That would be something -- you definitely==
21 ==would try to ensure that you had someone coming, a CIT.==
22 Q. When you heard this -- when you -- well, let me
23 keep talking about this and finish up here. So one of the
24 things that you -- the elements that you've pointed out is
25 that you don't take calls by yourself, and I'm going to

5 (Pages 14 to 17)

Case 1:15-cv-00550-SCY-KBM   Document 60-7   Filed 05/06/16   Page 5 of 14

Hope Irvin, et al.  v. Katherine Wright, et al.  November 24, 2015
Steve Altman                                   15cv00550 SCY-KBM

Page 26

1  Q. No. I think that's fine after that. And then
2  let's -- I think we -- let me ask you a question, Steve.
3  Do you see here, it says officer -- you show Bludworth, and
4  then you have Katherine here. It says "Operator," these
5  two entries here.
6  A. Yes. Operator just is their like employee
7  number.
8  Q. Now, is that -- that's just when they were
9  dispatched?
10  A. Correct.
11  Q. Does it indicate --
12  A. Yeah. That's when dispatch gets the call, and
13  then her system logs in as like on the call.
14  Q. So do these officers have to then -- when they
15  hear the call, do Bludworth and Katherine Wright have to
16  say we'll take that call, and then that's what triggers
17  this entry at 19:39:04?
18  A. Sometimes, and sometimes dispatch automatically
19  just assigns them as the people who are going to go handle
20  that call.
21  Q. Is the dispatch able to do that because they can
22  see when officers are in service and out of service?
23  A. Correct.
24  Q. So they will say, okay, well, these officers are
25  in the area. This is their area of command. They're in

Page 27

1  service. So I pick you and you. Go.
2  A. They can do that sometimes, or I think there is
3  also kind of an automatic generating of their -- their
4  system they have will automatically recommend officers
5  sometimes, I think.
6  Q. That makes sense.
7  A. So it could also be that.
8  Q. Does it show when they arrived on scene on this
9  first page? When I say they, for the record, I mean
10  Bludworth and Wright.
11  A. When they arrived on scene. It shows Bike 46 on
12  scene at 19:41, and I believe that that would have been the
13  same time Bludworth would have been on scene. I could be
14  mistaken. So you still don't even have him logged on scene
15  yet, according to these CADS.
16      Frank 423, that's Katherine Wright, I believe.
17  Yes. It shows her on scene at 19:42, on scene 19:42 for
18  Bludworth.
19  Q. This CAD shows that O'Guin actually got on scene
20  first?
21  A. Yes, four minutes -- three minutes. So there is
22  discrepancies in these CADS. It can only be entered --
23  logged as quick as possible, you know.
24  Q. Would there be a more accurate record?
25  A. I would say probably just the audio tapes and

Page 28

1  times.
2  Q. Just the audio tapes and times?
3  A. Correct, like the radio dispatch audio tapes.
4  Because, like I said, it's showing me on scene by the log
5  CADS at 19:55, and I've done all these other things prior
6  to being there. So it's not an accurate time that I was on
7  scene.
8  Q. All right. When are officers trained on the
9  Albuquerque Police Department SOPs, Standard Operating
10  Procedures?
11  A. Well, they're not necessarily trained on every
12  single one.
13  Q. Yes.
14  A. I mean, you basically have your -- we go through
15  stuff at the academy, and they're basically responsible for
16  those written orders as soon as they hit the streets
17  really.
18  Q. When you say they're responsible for them, what
19  does that mean?
20  A. Meaning those are, you know, procedures that
21  we're supposed to follow from day one.
22  Q. If you don't follow them, what happens?
23  A. It depends on --
24      MS. GRIFFIN: Object to form.
25  A. It depends on what -- what SOP, what -- you know,

Page 29

1  I guess they have them broken down into basically
2  sanctions. So you could get a verbal reprimand, you could
3  get a letter of reprimand. It goes all the way to
4  termination. It just depends. It's Sanctions 1 to 7.
5  Q. At the time of this incident, you were Officer
6  Bludworth's supervisor; correct?
7  A. Correct.
8      MS. GRIFFIN: Can you wait until she
9  finishes her question? You're kind of talking over one
10  another.
11  Q. Sorry. I'm probably doing it too. You were his
12  supervisor at the time of the incident; right?
13  A. Yes.
14  Q. Does that mean that you review -- you reviewed
15  this incident to see if there were any violations that he
16  may have committed?
17  A. I did not.
18  Q. You did not?
19  A. You mean after this?
20  Q. That's right.
21  A. No, I did not.
22  Q. Why not?
23  A. Well, because this is a major incident, and
24  that's going to be up to Internal Affairs for that, or the
25  detectives to review. I have not watched his video. I

8 (Pages 26 to 29)

Case 1:15-cv-00550-SCY-KBM   Document 60-7   Filed 05/06/16   Page 6 of 14

Hope Irvin, et al.  v. Katherine Wright, et al.                           November 24, 2015
Steve Altman                                                              15cv00550 SCY-KBM

Page 30

1   have not spoken to him about it, about the details on this,
2   just because I knew -- well, it usually goes litigation,
3   so --
4       Q.  But are you supposed to?  I mean, as his
5   supervisor, are you supposed to say, hey, you did this
6   right, and you did this wrong when it comes to a particular
7   way that an officer responds to a call?
8       A.  I would say no.  I'd say that, one, I don't have
9   free access to this -- to the -- to the videos.  The
10  reports were probably not accessible to me too.  So no, I'm
11  not required to -- to dissect what he did and try to
12  evaluate it.
13          Certainly through the investigation of detectives
14  and the Internal Affairs, if things come to light, there
15  were policy violations, then Internal Affairs would handle
16  that.
17      Q.  So is it just because of the nature of this call
18  that you didn't -- you didn't perform that review of him?
19      A.  No.  I'm not sure on that.  This is an incident
20  that would have gone to Internal Affairs.  So if any
21  violations of policy were seen, they would -- they would
22  initiate the investigation on that.  As a field sergeant, I
23  think the most discipline I can even hand down is a verbal
24  reprimand.
25      Q.  Do you know if there is -- if IA is specifically

Page 31

1   tasked with looking for how an officer may have violated a
2   particular SOP or training protocol?
3       A.  On this?
4       Q.  Yes, sir.
5       A.  On this, yes.  They would be -- they would have
6   to do an investigation also.
7       Q.  Do you know the results of those investigations
8   in this regard?
9       A.  I do not.
10      Q.  Were you ever aware that the DA's Office made the
11  police reports, the investigation, such as even the IA
12  statements given by the officers, as well as the videos --
13  do you know that the DA's Office posts those on their
14  website?
15          MS. GRIFFIN:  Objection; form and
16  foundation.
17      A.  I don't know.  I believe they released
18  information on it, yes.
19      Q.  Yes.
20      A.  But I don't know exactly what.
21      Q.  So officers receive some training on APD SOPs,
22  but not every single one and word for word?
23      A.  Correct, but they're responsible for every one.
24      Q.  They're responsible for every one.  An officer is
25  trained in a particular area -- and let's just narrow it to

Page 32

1   interactions with mentally ill.  So if an officer is
2   trained at the academy that if you suspect that an
3   individual is mentally ill, and you're responding to that
4   call, you have to do X, Y and Z.
5           This is the training in that regard, and that
6   officer gets to the call and deviates from that training or
7   otherwise doesn't follow that training, what -- how is that
8   discovered, A, and B, how is it remedied?
9           MS. GRIFFIN:  Object to form.
10      Q.  Does that question make sense?  It was compound.
11      A.  Yeah.  I'm not -- can you give me the question?
12  I'm not sure.
13      Q.  Let me break it down a little bit.  Absolutely.
14  So an officer goes to the academy, and he receives training
15  on how to interact with persons with mental disabilities.
16  In addition to that training, the officer also has Standard
17  Operating Procedures that they're responsible for in
18  regards to dealing with persons with mental disabilities;
19  correct?
20      A.  Correct.
21      Q.  So if an officer -- now the officer has
22  graduated, say Bludworth.  Let's talk about Bludworth, and
23  he goes to a call involving someone who is suspected of
24  having a mental disability.  He arrives at that call, and
25  the way that he interacts with that subject or responds to

Page 33

1   that call deviates from the way that he was trained.
2           MS. GRIFFIN:  Object to form and foundation.
3       Q.  If that is the case -- and I'm not -- I'm not
4   asking you to say yes, that's the case, but just
5   hypothetically, if that was the case, how is -- how is that
6   learned?  Is it through review of the police report or
7   talking to the officer?  How do you learn that he deviated
8   from the training?
9       A.  Well, you could by review of the report, by lapel
10  videos, by what the officer tells you.  You could learn of
11  those -- if there were mistakes or violations.
12      Q.  Now, if there were mistakes or violations or a
13  deviation from the training, what happens next?
14      A.  Well, it would depend on the severity of the
15  sanction.  It could be a matter of documenting a
16  retraining, even if you and the -- you know, as a sergeant
17  and an officer, just retrained on the SOP or scenarios or
18  send him to CIT.  There is a bunch of things, or it could
19  go -- and you could be sanctioned, get a letter of
20  reprimand on whatnot.  I mean, there is a multiple --
21  multiple things could be done.
22      **Q.  Do you know if at the time of this incident,**
23  **Officer Bludworth would have received some CIT training in**
24  **the academy if he was in the academy?**
25      **A.  Yes.  They receive CIT training in the academy,**

9 (Pages 30 to 33)

Case 1:15-cv-00550-SCY-KBM   Document 60-7   Filed 05/06/16   Page 7 of 14

Hope Irvin, et al.  v. Katherine Wright, et al.  
Steve Altman

November 24, 2015  
15cv00550 SCY-KBM

Page 34

1  but I don't believe it is actual certification. They would
2  then have to take the certified CIT class, which, I
3  believe, is the same that they received in the academy.
4  I'm not a hundred percent sure on that.
5      Q. So let's go to this incident. You know about
6  this incident; correct?
7      A. Correct.
8      Q. And you know what generated the call for this
9  incident; correct?
10     A. Yes.
11     Q. Tell me what you believe to be what generated the
12 call for this incident. I just want to make sure we're on
13 the same page on that.
14     A. I believe a security officer saw this subject.
15 It sounded like he had dealt with him many times before,
16 and that he had some sort of blade and was threatening
17 people with it, and then it kind of sounded like lost
18 visual of him and gave a direction of travel, and that was
19 it.
20     Q. Did you review Bludworth's statement of what
21 happened?
22     A. Of this incident?
23     Q. Yes, sir.
24     A. No, I have not.
25     Q. When you arrived on scene, did you get a briefing

Page 35

1  on what had happened?
2      A. Not really, no.
3      Q. You had said earlier that you were a CIT-trained
4  officer?
5      A. Correct.
6      Q. And prior to that, you were still an officer, but
7  you weren't a CIT officer; correct?
8      A. Correct.
9      Q. But you had received training at the academy on
10 CI- -- on interaction with persons with mental
11 disabilities?
12     A. I also took a 40-hour certification class.
13     Q. Did you receive training at the academy in
14 regards to the American With Disabilities Act?
15     A. I don't recall.
16     Q. Do you recall reviewing Standard Operating
17 Procedures on American With Disabilities Act?
18     A. In the academy?
19     Q. In the academy or otherwise out of the academy.
20     A. Yes. I'm not sure when, but I believe we
21 reviewed that sometime. I can't tell you for sure.
22     Q. Steve, I want you to tell me that -- if you were
23 an officer, not who you were, but on the date of the
24 incident, if you were just a P1C officer, and you had heard
25 this call, and you were dispatched to this call, how would

Page 36

1  you have responded to this call?
2          MS. GRIFFIN: Object to form.
3      Q. Knowing what you just told me, what you believe
4  the dispatch -- what generated the call, the facts that
5  generated the call.
6      A. How would I have handled it as a patrolman? Is
7  that your question?
8      Q. Yes.
9      A. I would have proceeded to the call, ensured that
10 I had backup and tried to locate the individual.
11     Q. How would you have ensured that you had backup?
12     A. Just by hearing on the radio where the officers
13 were coming from and them advising over the radio. Are
14 they on scene, or do I see them down the street?
15     Q. Okay. If you located the subject, would you have
16 waited in your car until the backup officers arrived?
17     A. It would depend. It depends on the situation.
18     Q. If the subject that you located was an elderly or
19 above age 60-year-old African American male, such as
20 Vincent Wood, who was standing out -- had just come outside
21 of a convenience store, not carrying any weapons, not
22 threatening or screaming at anyone, would you have waited
23 for backup to arrive?
24         MS. GRIFFIN: Object to form.
25     A. It would -- it would depend. The main thing that

Page 37

1  I would -- that would be my determining factor, I guess,
2  would be that I would approach him if I felt that other
3  people were in danger, or he could run back in the store
4  and hurt people.
5          I mean, that would be -- if they were out in the
6  middle of nowhere in the mesa, probably not; where a
7  convenience store, I might. I might go out there and try
8  to detain him or stop him from getting close to other
9  people if he was, in fact, threatening people with knives.
10     Q. If you pulled up to the convenience store, and he
11 was just coming out of the store and not holding any
12 weapons or threatening anyone, just the normal person
13 standing there, how would you -- how would you have
14 interacted with him?
15     A. If I --
16         MS. GRIFFIN: Object to form.
17     A. You're saying if I pulled up, and he just kind of
18 happened to come right out of the store?
19     Q. Yes. I'm giving you the facts as I know them as
20 they actually occurred.
21     A. Okay.
22     Q. So I'm trying to move away from a hypothetical to
23 the real situation. So let me step back a little bit.
24 Would you have had your emergency equipment engaged, your
25 lights and sirens?

10 (Pages 34 to 37)

Case 1:15-cv-00550-SCY-KBM   Document 60-7   Filed 05/06/16   Page 8 of 14

Hope Irvin, et al.  v. Katherine Wright, et al.                                November 24, 2015
Steve Altman                                                                    15cv00550 SCY-KBM

Page 42

1  tunnel vision.  I think that his basic instinct of to help
2  people, to protect people, to clear people out of the way
3  on calls had kicked in, and he was trying to get people out
4  of there for their safety because of a man with a knife
5  being attacked and gunshots being fired.
6       I think that's why he did that, was to get the
7  people out of the way because he felt -- just his basic
8  instinct of a policeman.  I don't think it was in any way
9  to have witnesses leave.  I don't think that even was going
10 through his mind.
11     Q.  But you agree with me watching the video that
12 Mr. Wood no longer posed a threat at the time --
13     A.  Correct.
14     Q.  -- Officer Bludworth said that; right?
15     A.  Well, I didn't see the video of him.  I don't
16 know where he was.  All I saw was Bludworth kind of
17 going -- it looked like north to whatever subjects would
18 have been, I guess, in the down range of bullets that would
19 have been fired, that he was trying to get them to leave
20 for safety reasons.
21     Q.  But what was the safety concern at that time?
22 Mr. Wood was already shot.
23     A.  I don't think there was a safety concern at that
24 time.  I just think that that's what was going through his
25 mind.

Page 43

1     Q.  Okay.  Fair enough.  All right.  So what do you
2  know about the COAST program?
3     A.  The COAST program, I believe, is civilians that
4  are paid.  They are given excess training in dealing with
5  people in crisis.  They go out to home visits for families
6  that are in crisis of maybe someone who -- a family member
7  is mentally ill, or they just try and help in other ways to
8  reduce calls for service at a residence, also.  Crisis
9  outreach -- I forget exactly what it stands for.  Crisis
10 outreach something team.
11    Q.  Have you ever had the occasion to work with
12 COAST?
13    A.  Not really.  As a patrolman, if I knew that COAST
14 could maybe assist a family in crisis, that I would -- and
15 there was no emergency before I left, I would give them a
16 card and a number of -- you know, contact the COAST unit
17 and maybe they can help you.  That's about the extent of
18 it.
19    Q.  It's like you're reading my mind.  That was going
20 to be my next question.  If you see that an individual --
21 like if you go to a call, and you see that an individual
22 like -- let me give you an example.  Let's say that there
23 is a call saying there is this man who's taken all of his
24 clothes off, and he is walking around the parking lot
25 naked, talking to himself.

Page 44

1      You respond to the scene, and you're like this
2  is -- this person is clearly mentally disabled and having
3  some issues.  I'm going to take them to -- you know, to the
4  hospital.  Do you then refer that case or that person to
5  COAST?
6     A.  Not necessarily.
7     Q.  What do you mean not necessarily?
8     A.  I would usually -- the report would just be
9  forwarded to the Crisis Intervention Team, and then from
10 there, they would make arrangements to either handle it or
11 assign it to COAST.
12    Q.  Now, when the Crisis Intervention Team receives a
13 particular call like you've just said or a report, what do
14 they do with it?
15         MS. GRIFFIN:  Objection; form and
16 foundation.
17    Q.  Do you know any of this from your experience?
18 You said you were a CIT certified officer.
19    A.  Correct.
20    Q.  So I'm just asking you, in your experience and
21 training, what you know.
22    A.  I was also a CIT area sergeant coordinator.  I
23 would basically get the reports from all the patrolmen in
24 my area command and disseminate them to the CIT unit.  From
25 there, I don't know what they did.  They would usually try

Page 45

1  to assign -- like if we had a particular address where a
2  man or a woman was constantly calling police for things
3  that was really absorbing our resources of patrolmen going
4  there, that they would try and do a house visit, because
5  what we wanted was the person to get help and not
6  necessarily be calling police for matters that were not a
7  police matter.
8     Q.  Have you ever had the occasion -- or do you know
9  what it looks like if there has -- if there has been a
10 particular person that is in the system, such as a known
11 person with disabilities, mental health disabilities, and
12 they're in the system, what does that look like?
13    A.  In the system, I do not know.
14    **Q.  Is there a situation in which you can look for --**
15 **you know, you receive a call, and they -- and then you look**
16 **and say, okay, well, this person is on our CIT watch list**
17 **or some sort of -- I mean, I don't know what that's called.**
18    **A.  Correct.**
19    **Q.  Is it called CIT watch list or --**
20    **A.  No.  I'm not sure what it's called, but --**
21    **Q.  You know what I'm talking about?**
22    **A.  -- we would not have had access -- patrolman**
23 **would not have had access to that before going to this**
24 **call.**
25    Q.  How do patrolmen know -- how are they given

12 (Pages 42 to 45)

Case 1:15-cv-00550-SCY-KBM   Document 60-7   Filed 05/06/16   Page 9 of 14

Hope Irvin, et al.  v. Katherine Wright, et al.                                          November 24, 2015
Steve Altman                                                                              15cv00550 SCY-KBM

## Page 46

1 knowledge about a particular person who has a mental health
2 disability, and that that person is on some sort of list?
3     A.  At that time, it would have been only if dispatch
4 advised them that, hey, we have information about him, and
5 somehow they're connecting it to other CADS, things like
6 that.  Now we have the Realtime Crime Center, which is
7 helping, which is relaying information to the officers, and
8 they are creating some sort of database that will be
9 accessible to them, so that then they can broadcast that
10 information to the responding units.
11     Q.  Okay.  All right.
12     A.  But for the officer to stop, pull over, take the
13 time to try and pull up this database and gather
14 information, that may not be the smartest thing if someone
15 is threatening people with knives.  What if he's assaulted
16 people, and you're trying to figure out who he is?
17 Sometimes that may not have been -- you may not have had
18 that luxury in time.
19     Q.  Are you aware that Officer Bludworth actually
20 drove by the particular bus stop where the two individuals
21 who had allegedly been threatened were?
22     A.  No.
23         MS. GRIFFIN:  Objection; form and
24 foundation.
25     A.  I did not know that.

## Page 47

1     Q.  Are you aware that he drove by these two
2 individuals and saw that they were not in -- and using his
3 words, in any apparent distress, so he didn't stop and
4 speak to these people.  He went on to the convenience store
5 to locate Mr. Wood.  Are you aware of that?
6     A.  I am not.
7         MS. GRIFFIN:  Objection to the form and
8 foundation.
9     A.  I'm not sure if he would have had enough time to
10 necessarily determine that, other than just visually
11 quickly looking, but -- I mean, because this all occurred
12 very rapidly.
13     Q.  What were you told is the purpose of CIT?  What's
14 the -- if you could say what the purpose of CIT is, what
15 would you say?
16     A.  The Crisis Intervention Team would just be -- the
17 team or the certified officers or -- I'm not sure what
18 you're asking.
19     Q.  What's the purpose of the -- yes, just the team,
20 Crisis Intervention Team?
21     A.  The team would be to do more than the average
22 patrolman could do.  They would dedicate their entire
23 workweek to people in crisis, whether making house visits
24 or building a network among doctors and getting referrals
25 to people to get help that they need, transporting, putting

## Page 48

1 holds on -- medical holds on people.
2         They're just taking the whole program to another
3 level that an actual patrolman doesn't have time to do.
4 His responsibility is calls for service.  They're also to
5 help train the department in crisis intervention material,
6 things of that nature, trying to reduce calls for service
7 for particular addresses for the patrolmen.
8     Q.  Let's mark as Exhibit 2 -- let's go through some
9 of these exhibits.
10         MS. CARPENTER:  So, Stephanie, here is what
11 I would like to do, is I would like to have one exhibit
12 binder where we just have continuing exhibits.  We can go
13 off the record.  Sorry.
14         (A discussion was held off the record.)
15     Q.  Exhibit 2 will be -- I've made yours single
16 spaced -- the original single spaced, but then Stephanie
17 and I have the double spaced copies.  Exhibit 2.
18         (Exhibit 2 was marked for
19          identification.)
20     Q.  Exhibit 1 is the CADS.  Exhibit 2 will be 2-13.
21 That's the SOP on mentally ill.  When was the last time you
22 recall seeing this SOP?
23     A.  I do not know.
24     Q.  This is Standard Operating Procedure 2-13.  It
25 was effective 1/9 of '13.  I want you to take the time to

## Page 49

1 take a look at this and scan it, because I'm going to be
2 asking you if it's what you recall being trained on.
3     A.  This exact one, no.  Like I said, I was trained
4 through -- it probably would have been 2003.
5     Q.  But as of 2013, like you said, you, as well as
6 any officers on duty, were responsible to know this --
7     A.  Correct.
8     Q.  -- regardless of whether you were directly
9 trained on it; correct?
10     A.  Correct.
11     Q.  Steve, do you agree with me that there is no
12 doubt that Mr. Wood was suspected of being mentally ill at
13 the time of dispatch?
14     A.  That we should have known he was mentally ill; is
15 that what you're asking?
16     Q.  That it was suspected that he was mentally ill.
17     A.  Yes.  I would say suspected.
18     Q.  If you want to use another word, that's fine.  I
19 mean --
20     A.  I believe so, yes.  I think that even the
21 security guard had indicated that he has dealt with him and
22 known him to be -- have a violent history.
23     Q.  And so according to this Standard Operating
24 Procedures -- or Standard Operating Procedure, it seems
25 that you're supposed to -- and this starts -- you start

13 (Pages 46 to 49)

Case 1:15-cv-00550-SCY-KBM   Document 60-7   Filed 05/06/16   Page 10 of 14

Hope Irvin, et al.   v. Katherine Wright, et al.                                   November 24, 2015
Steve Altman                                                                       15cv00550 SCY-KBM

Page 50

1  seeing this on Page 2 or -- yes, Page 2, Number 1.  Let's
2  recognize the abnormal behavior; Number 2, determining the
3  danger; and Number 3, handling the mentally ill, suspected
4  mentally ill.  That starts on Page 3.  Do you see that?
5      A.  No.  Page 3, you're saying --
6      Q.  Page 3, and it's 2-13-03.  It says, "If the
7  officer determines that a subject may be mentally ill, the
8  officer will attempt to respond in the following manner:
9  Ensure that the backup officers are present before taking
10 any action."  Do you see that?
11     A.  So what's your question?
12     Q.  Do you agree with this Standard Operating
13 Procedure that responding officers should ensure that a
14 backup officer is present before taking any action?
15         MS. GRIFFIN:  Object to form.
16     A.  I think there is a lot of circumstances that that
17 would be applicable to.  I think that there is -- there is
18 a lot of variables that go into these.  These are --
19 operating procedures are not exact.  Not everything is how
20 it happens out there.
21         I think the majority of this SOP on how to
22 respond to people in crisis are not necessarily when it's
23 an emergency and people's lives are in danger or -- I think
24 it's more someone is maybe at a bus stop doing this, and no
25 one is around or something, you know, because to take the

Page 51

1  time to gather intel on, you know, contacting family and
2  friends, I mean, you may not have that time.  That's if you
3  have time, and there is no other emergency.
4      Q.  Just to be clear, I'm just talking about this
5  very first section here.  It's 2-13-03, Section A, B and C,
6  just those three elements.  If the subject -- and I'm going
7  to give you -- this is what I believe to be the case.  A
8  subject like Mr. Wood has exited a convenience store, has
9  no weapons in his hand.
10         There is convenience store video footage showing
11 him in the store, coming out of the store calm, not
12 agitated, wearing a backpack, not carrying any weapons in
13 his hands, not verbally threatening or physically
14 threatening anyone when Bludworth arrives on scene with
15 lights and sirens, and when Bludworth arrives on scene with
16 his lights and sirens, and he sees -- identifies the
17 subject as Mr. Wood, who is not threatening anyone, should
18 he have then turned off his lights and his sirens if he
19 says, well, this person is mentally ill, suspected of being
20 mentally ill?  Let me -- he's not -- there is no imminent
21 danger.  Let me turn off my lights and sirens.  Should he
22 have done that?
23         MS. GRIFFIN:  Objection; form and
24 foundation.
25     A.  I would say he could have done that, yes.

Page 52

1      Q.  In speaking to Mr. Wood, again, if Mr. Wood is
2  still in that same situation as I just described -- or
3  before speaking to Mr. Wood, should he have told everyone
4  in there was a crowd around to please step back before even
5  interacting with Mr. Wood?
6          MS. GRIFFIN:  Objection; form and
7  foundation.
8      A.  He could have done that, yes.
9      Q.  When he arrives on scene, and he sees that
10 Mr. Wood is not a threat, like I just said, should he have
11 waited, knowing, according to the CAD, that O'Guin
12 announces that he's on scene, for O'Guin who is the CIT
13 officer that was called as backup, to interact with
14 Mr. Wood?
15     A.  He could have.
16         MS. GRIFFIN:  Objection; form and
17 foundation.
18     Q.  Should he have spoken to Mr. Wood in a quiet,
19 nonthreatening manner?
20     A.  He could have.
21         MS. GRIFFIN:  Objection; form and
22 foundation.
23     Q.  So you're saying he could have.  You're saying he
24 could have because if there was no imminent or immediate
25 threat of danger or harm to anyone, that he certainly could

Page 53

1  have implemented these procedures as set forth in this
2  Standard Operating Procedure?
3          MS. GRIFFIN:  Objection; form and
4  foundation.
5      A.  He could have, but also -- what could have also
6  been going -- or going through Officer Bludworth's mind is
7  that he was a threat to people.  He was assaulting people
8  with knives, so his response could have been more of a
9  quicker response.
10     Q.  Were you told as a CIT officer why it's important
11 to communicate with -- interact and communicate with
12 persons with mental disabilities in the following manner as
13 we've just discussed?
14     A.  Yes, so that, you know, you can try to, you know,
15 avoid violence or unneeded violence or escalate the
16 situation.
17     Q.  How does Albuquerque Police Department reasonably
18 accommodate people who have mental disabilities?
19         MS. GRIFFIN:  Objection; form and
20 foundation.
21     A.  That's kind of a vague question.  You'd have to
22 give me a greater, more detailed situation.
23     Q.  If there is a call that comes out like this that
24 says this person has a mental disability, how does APD
25 accommodate that?

14 (Pages 50 to 53)

Case 1:15-cv-00550-SCY-KBM   Document 60-7   Filed 05/06/16   Page 11 of 14

Hope Irvin, et al.  v. Katherine Wright, et al.                                    November 24, 2015
Steve Altman                                                                        15cv00550 SCY-KBM

Page 54

1         MS. GRIFFIN:  Objection; form and
2     foundation.
3         A.  They would send at minimum two officers to the
4     scene and preferably a CIT officer.  Now we would have a
5     Realtime Crime Center, which would try to gather
6     information as officers were responding to the call to
7     maybe voice more information over the radio.  Sometimes it
8     helps.  Sometimes there is just not time.  Every situation
9     is different.
10        Q.  Do you believe, Steve, that by following the
11    Standard Operating Procedures and specifically the
12    provisions that are set forth therein that I just went over
13    with you -- do you feel like that's another way that APD
14    accommodates persons with mental illness?
15            MS. GRIFFIN:  Objection; form and
16    foundation.
17        Q.  The way that they interact?  In other words, we
18    have the Standard Operating Procedure that says, hey, here
19    is how you interact with people.  Here is how you handle
20    the mentally ill, suspected mentally ill, when you read
21    this Standard Operating Procedure, you looked at this, is
22    this another way that APD accommodates the mentally ill, so
23    that they can be in compliance with the American With
24    Disabilities Act, which sets forth that law enforcement
25    agencies have to make reasonable accommodations for persons

Page 55

1     who have mental -- who are suspected of having mental
2     illness?
3             MS. GRIFFIN:  Objection; form and
4     foundation.
5         A.  I think this is a guidelines on how to handle
6     people with mental disabilities.  I think that it certainly
7     does not pertain to every situation.  There is a lot of
8     variables to all these situations, and I don't necessarily
9     know that this is proper if -- if immediate life is in
10    danger, if someone is actively doing something to someone.
11        Q.  Tell me more about that.  What would Mr. Wood
12    have had to be doing in order to allow Mr. Bludworth to
13    deviate from this SOP?
14            MS. GRIFFIN:  Objection.
15        Q.  You've used a couple of times in this deposition
16    that phrase, immediate danger, immediate threat to the
17    lives and safety of others.  Can you give me some examples
18    of what that means?  I mean, standing outside of a Circle
19    K, for example, with your backpack on, not verbally or
20    physically threatening anyone, is that -- does that
21    constitute an immediate threat, that Mr. Wood is an
22    immediate threat to the life and safety of others?
23        A.  No.
24            MS. GRIFFIN:  Objection; form and
25    foundation.

Page 56

1         A.  But it could.
2         Q.  Tell me how it could.
3         A.  He could grab the knives and run right back into
4     the grocery store and start assaulting people, and that
5     could happen that fast, so --
6         Q.  But Mr. Bludworth didn't know that; correct?
7         A.  No.
8             MS. GRIFFIN:  Objection; form and
9     foundation.
10        Q.  Mr. Bludworth is judged by an objective
11    reasonable standard, correct, as an officer; correct?
12        A.  Correct.
13            MS. GRIFFIN:  Objection; form and
14    foundation.
15        Q.  He is not judged as a reasonable civilian,
16    correct, under the law?
17        A.  Correct.
18        Q.  So as a reasonable officer handling the situation
19    when he arrives there, if there is no immediate threat to
20    anyone's life or safety, shouldn't he follow this Standard
21    Operating Procedure that requires him to do these things in
22    handling someone who is suspected of being mentally ill?
23            MS. GRIFFIN:  Objection; form and
24    foundation.
25        A.  I can't say what Officer Bludworth would do.  I

Page 57

1     know that maybe he was just trying to locate him, and he
2     happened to, you know, locate him, and he was too close to
3     him.  I don't know.  I mean, there was no guarantee -- if
4     you look at the CADS, it shows that he was at the Azuma --
5     Azuma's -- you know, I forget what that is, but Chinese
6     restaurant.
7         Q.  I think it's a sushi restaurant.  Yes.
8         A.  Yeah, Sushi restaurant, and maybe he turns in,
9     and he's looking at Azuma's, and, oh, he's right in front
10    of me.  Here he is at the Circle K.  I mean, I don't know.
11    I don't know what Officer Bludworth did.  If practical,
12    yes, you would handle people with mental illness the way
13    that this SOP is stating, but there is variables in life,
14    and it doesn't always apply.
15        Q.  I understand what you're saying, Steve.  I get
16    what you're saying.  I'm just trying to figure out -- I
17    really am trying to understand how APD articulates or --
18    not even articulates Standard Operating Procedures, but how
19    does APD accommodate persons with mental health disorders.
20        Let's say Mr. Wood was deaf, he couldn't hear at
21    all, and Mr. Bludworth didn't know that he was deaf.  He
22    just thought he had mental health disorders, and he gets on
23    scene, and Mr. Wood doesn't seem to be understanding
24    anything he's saying.
25        Hey -- he yells out, Hey, minister.  Hey sir, I

15 (Pages 54 to 57)

Case 1:15-cv-00550-SCY-KBM   Document 60-7   Filed 05/06/16   Page 12 of 14

Hope Irvin, et al.  v. Katherine Wright, et al.                               November 24, 2015
Steve Altman                                                                   15cv00550 SCY-KBM

**Page 58**

1   need to talk to you, and the person ignores him. How are
2   you trained to deal with that at the academy? Are you guys
3   trained, hey, someone doesn't respond to you, they may be
4   deaf?
5           MS. GRIFFIN: Objection; form and
6   foundation.
7        A. That's -- again, there are so many variables in
8   this line of work that -- that it's impossible to write
9   SOPs on exactly how every situation of every incident
10  should -- should play out, and that's one example. Yes.
11  Well, what if he was deaf, you know?
12       Q. Right. Okay. So let me just ask the question
13  again now that we've talked about all this. I know that
14  you answered, one way is -- one way APD accommodates people
15  mentally ill in accordance with the ADA is to dispatch CIT.
16  That's one of the ways that you said.
17          MS. GRIFFIN: Object --
18          MS. CARPENTER: I'm sorry, Stephanie.
19          MS. GRIFFIN: Let me just say objection;
20  form.
21       Q. Are there any other ways that you can think of
22  that you know of how APD reasonably -- provides reasonable
23  accommodation in regards to the mentally ill?
24          MS. GRIFFIN: Objection; form and
25  foundation.

**Page 59**

1        A. No. Just by the -- the guidelines.
2        Q. Is there somebody else that would have more
3   knowledge about that particular question?
4        A. I would say the Crisis Intervention Team would.
5        Q. Anybody on the Crisis -- in particular on the
6   Crisis Intervention Team, Steve, that you can think of that
7   would say, hey, you know what, Frannie, ask -- ask this
8   person. This person is going to know. They wrote the
9   policies. Do you know what I'm saying? Who could I ask?
10  Because I don't want to -- you know, I appreciate all your
11  answers.
12       A. Well, I think any of them could answer those
13  questions.
14       Q. You think any of them?
15       A. Any of them, any of the detectives, the sergeant
16  or the lieutenant probably could.
17       Q. On the CIT?
18       A. Correct.
19       Q. Who is the main head person on the chain of --
20       A. The lieutenant would be Glen St. Onge.
21       Q. Glen St. Onge. Is that O- --
22       A. O-N-G-E. Sergeant John Gonzales.
23       Q. Do you think that -- and I know that I'm asking
24  you to sort of speculate here, but do you think that Glen
25  St. Onge -- would he have enough knowledge based on CIT to

**Page 60**

1   go back to the July 2013?
2           MS. GRIFFIN: Object to form.
3        A. He should.
4        Q. Okay. I appreciate that. Do you recall what
5   kind of instruction was received by you, and if you know,
6   how Bludworth may have been instructed on how to provide
7   reasonable accommodations under the American With
8   Disabilities Act?
9        A. Like what was he trained on?
10       Q. Yes. In other words --
11       A. I don't know.
12       Q. -- here is how you reasonably accommodate a
13  mentally ill person in accordance with the American With
14  Disabilities Act?
15       A. I can't testify or speak of how he was trained.
16       Q. And then what about with you, Steve, how are you
17  trained in regards to that question?
18       A. The ADA question?
19       Q. Yes, sir.
20       A. I believe it was at an MOE, a yearly biannual
21  training. I can't recall exactly what year, but it seems
22  moderately recent, within a couple years at least.
23       Q. And what do you recall in that training? What do
24  you recall learning about in that training?
25       A. I guess that if someone has a disability that you

**Page 61**

1   have to try to make every effort to accommodate that
2   disability.
3        Q. Did they go through the various accommodations
4   that you made? I know that APD has a Standard Operating
5   Procedure for deaf people in particular, just specifically
6   for deaf people and how you accommodate a deaf person. Do
7   they have it for people who are paralyzed --
8        A. No.
9        Q. -- or in wheelchairs or blind or have
10  schizophrenia?
11       A. The only one that I know would be the SOP on
12  dealing with people who are deaf. I do know that one.
13       Q. So you don't have any independent recollection
14  right now on any training that you may have received in
15  regards to providing reasonable accommodations for persons
16  who suffer from a mental health disorder under the ADA?
17       A. Yeah. I believe it was, you know, things of --
18  you know, also more on a civilian note, that if someone,
19  you know, has certain disabilities, and you could
20  accommodate it by, say, you know, you need to -- like
21  building codes, things of that nature. I remember things
22  like that, but I don't have any details.
23       Q. Okay. I appreciate that. Steve, is any legal --
24  let me give you a hypothetical here. I'm saying
25  hypothetical, but I'm saying it's actually what happened in

16 (Pages 58 to 61)

Case 1:15-cv-00550-SCY-KBM   Document 60-7   Filed 05/06/16   Page 13 of 14

Hope Irvin, et al.  v. Katherine Wright, et al.                               November 24, 2015
Steve Altman                                                                  15cv00550 SCY-KBM

Page 70

1    Q. Now, tell me about these monthly performance
2  evaluations. Tell me what you review and what you do to
3  create these evaluations.
4    A. So these are -- I apologize. It said June is
5  when I first got them. That's because recently our bids
6  have been more pushed back to June, but maybe it was in
7  April then. So anywhere from April to June, our bids have
8  occurred.
9       So the first month I would have got Bludworth
10 would have been in April of 2013. This month, I did not
11 really have enough time to accurately evaluate all his
12 categories to make sure he was, you know, performing as a
13 solo beat officer. That's basically the standard, to use a
14 solo beat officer.
15      The next month, I met with him, and I saw no
16 issues. Every month, I would meet with him. I would fill
17 this form out. I would sign it, and he would sign it while
18 sitting there with me. I would then make a copy of it and
19 send it to operations to review and for the file.
20      This form, I don't know -- even know where I got
21 it from. It wasn't necessarily a standardized form, an SOP
22 form that we had to do. We were required to do these, but
23 there was no actual form, and actually, up until right now,
24 there is still not a standardized form that we use. This
25 is just the one I used.

Page 71

1      Now, that is in the process. I believe we're
2  trying to try to standardize that form a little more, but
3  either way, every month, you were required to fill out some
4  sort of performance evaluation sheet on the officer who was
5  on probation, which I did, and meet with them and go over
6  any areas of concern.
7    Q. So how are you able to -- on the very top here,
8  it says, Calls for service, on-site activities, report
9  writing -- you know, all of these things that it says, beat
10 integrity, citizen contact, how are you able to evaluate
11 and make these assessments of satisfactory or below
12 standards, for example?
13   A. I think by listening to the radio, getting to
14 know your officers, reading the reports. Reports is a huge
15 one. You know, are you getting complaints of misconduct
16 from your officer and citizens, other officers complaining
17 about it? Approving criminal complaints, is he, you know,
18 correctly charging the right charges and doing the right
19 protocol? That's basically it.
20      I mean, policing is just a different kind of job
21 where you're not with everyone 24/7. You know, they have
22 their -- they're out, you know, in the field. So it's not
23 like this is an office setting, and you're my employee, and
24 I'm supervising you, and I'm across the desk 40 hours a
25 week. It's just they're not there. So by using all those

Page 72

1  different areas, that's how you would evaluate an
2  employee's performance.
3    Q. If the officer has any comments, you would write
4  them into where it says "Officer Comments"?
5    A. Correct.
6    Q. I notice on none of these evaluations -- there
7  are no officer comments located on any of these.
8    A. Correct.
9    Q. Is that because Bludworth didn't make any
10 comments?
11   A. Correct. And all his categories were
12 satisfactory. Initially, there were no DWI arrests his
13 first month, so I couldn't evaluate that category, but
14 after that, he made arrests. He made DWI arrests. So it
15 continued to be satisfactory in all of his performance
16 evaluations.
17   Q. Let me go back to the April 2013 one. You said
18 that you didn't have enough time to properly evaluate.
19 Then why -- why wasn't that -- why was he given
20 satisfactory on these?
21   A. Because, I guess, mainly the -- all the
22 categories were not checked off is why I put that, because
23 he made no DWI arrests.
24   Q. Did you have enough time to properly evaluate his
25 calls for service?

Page 73

1    A. It was pretty -- in the beginning. I had no
2  issues arise. So I would say yes at the point, he was
3  performance satisfactory, but I also indicated that he was
4  recently assigned to my team. Due to the new bid, I have
5  not had enough time to accurately evaluate his performance
6  as of this date. I will continue to monitor his progress.
7  So I needed a little more time, but what I could evaluate,
8  he was satisfactory.
9    Q. Let's move on to the July evaluation.
10   A. May, June, July.
11   Q. Do you see here where it says -- and these are
12 your comments, I'm assuming, supervisor -- "Officer
13 Bludworth was TDY." Did you write that?
14   A. I did.
15   Q. What does TDY mean?
16   A. Actually, it means temporary duty yonder, is what
17 that means.
18   Q. Temporary duty yonder?
19   A. Correct. No one knows the Y stands for yonder,
20 but me, I guess.
21   Q. I love it. That's great. What does that mean?
22   A. That basically means he was assigned somewhere
23 else due to an incident that occurred at the beginning of
24 the month, which was the shooting. Right? Yeah, July.
25   Q. Yes, that's right.

19 (Pages 70 to 73)

Case 1:15-cv-00550-SCY-KBM   Document 60-7   Filed 05/06/16   Page 14 of 14

Hope Irvin, et al.  v. Katherine Wright, et al.                    November 24, 2015
Steve Altman                                                        15cv00550 SCY-KBM

Page 82

1   Q. Now, tell me, when you first got on scene --
2   well, before you got on the scene, did you -- did you talk
3   to anybody about the incident before you arrived on scene?
4       A. Before I arrived on scene?
5   Q. Yes.
6       A. No. How would I have talked to anyone?
7   Q. Well, I didn't know if you like over the air were
8   talking to somebody, you know, on the way there, like, hey,
9   what's going on?
10      A. No.
11  Q. Here is what's happened?
12      A. No.
13  Q. None of that?
14      A. No.
15  Q. Were you just listening to the radio as you were
16  driving?
17      A. Correct.
18  Q. And I don't mean music.
19      A. No, I wasn't. The radio.
20  Q. When you got on scene, what was -- did you have
21  your lights and sirens activated?
22      A. I did. After they called out shots fired, I
23  believe is when I began to turn lights and sirens on and
24  try and get there in a hurry.
25  Q. Were you already on your way there?

Page 83

1       A. No. I was still in the parking lot of San Pedro
2   and Montgomery.
3   Q. What were you doing before you came to this call?
4       A. Actually, Officer Bludworth and I were eating at
5   Rex's Hamburgers.
6   Q. Oh, really?
7       A. Correct.
8   Q. So you were with him immediately before this?
9       A. Correct.
10  Q. And so were you with him when he left to respond
11  to this call?
12      A. Yes.
13  Q. When you guys were at Rex's Hamburgers, and you
14  got the call, did you guys say anything about the call?
15      A. No.
16  Q. He just said I'm going to respond?
17      A. No. We basically walked out of the restaurant,
18  and he proceeded to get in his car and drive away. I
19  actually don't remember which direction he would have went
20  to the -- to the call. I don't know if he went down
21  Montgomery or if he went back up to San Pedro and around,
22  because there would be two ways he could get here.
23      I mean, he hightailed it faster than I would
24  have, that I was going. He got in his car and left. I
25  stayed on scene and -- or where I was at and began to, you

Page 84

1   know, listen to the radio and monitor it from the -- from
2   the radio, looking at the Ks and their computer call, and
3   he began to immediately drive to respond to the call,
4   because he's -- that's his job.
5   Q. And what do you remember next happening? So
6   you're still at Rex's Hamburgers?
7       A. Correct. Well, I'm in the parking lot. So then
8   the -- I think just over the radio, I heard "I think I
9   located the subject over here," and I think he called out
10  San Mateo and McLeod, and then someone -- I think dispatch
11  said, "Is it Circle K?" And he said, "10-4," and then that
12  was the last transmission, and it was immediately within --
13  I would say probably within a minute, less than a minute
14  that they say, you know, shots fired and secure the air
15  type thing, that officers are okay. So that's how fast it
16  happened.
17  Q. So you arrive on scene.
18      A. So yeah. I went out right onto Montgomery,
19  straight down San Mateo. I also knew I was close to this
20  incident, so it was -- I was there quickly. I know where
21  San Mateo and McLeod is. Proceeded to get there quickly,
22  and that's about the time, I think, my -- when I get there,
23  then my video is activated, and then you can see what I did
24  from there.
25  Q. So I've watched your video and watched

Page 85

1   Bludworth's, as well, a few times, and he's pretty shaken
2   up, it appears through the videos. His hands are shaking.
3   It sounds like he's getting emotional or already emotional
4   about it.
5       Did you do anything to -- was he -- in the video,
6   you see him say, "Hey, Serge," and I'm assuming he's
7   talking to you.
8       A. Yes.
9   Q. I hear you talking to him about whether or not he
10  has his video running, and you instruct him to continue to
11  keep his video running?
12      A. Correct.
13  Q. Are you the one that takes him to -- it looks
14  like he's put in the back of a unit. Is that your unit?
15      A. Correct. You're talking -- you're referring to
16  my video?
17  Q. Well, it's on his video, and his video he's got
18  running, and then also your video.
19      A. So that does -- that does sound like my video.
20  Like I said, I have not seen Bludworth's, other than the
21  aftermath of going to the parking lot to the people. Other
22  than before, after I have not seen any of that. So I
23  assume you're referring to my video, which I have reviewed.
24  Q. Right. Right.
25      A. Yes. I -- so what's your question? Is that my

22 (Pages 82 to 85)