Page 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

No. 15cv00550 SCY-KBM

HOPE IRVIN, as Personal Representative
of the ESTATE OF VINCENT WOOD, Deceased,
            Plaintiff,
        vs.
KATHERINE WRIGHT, individually and in her
Official capacity as an Albuquerque Police Officer
JEFFREY BLUDWORTH, individually and in his
Official capacity as an Albuquerque Police Officer,
and CITY OF ALBUQUERQUE,
            Defendants.


DEPOSITION OF DONOVAN RAY OLVERA
December 2, 2015
9:00 a.m.
Trattel Court Reporting & Videography
609 12th Street, NW
Albuquerque, New Mexico 87102


PURSUANT TO THE NEW MEXICO RULES OF CIVIL
PROCEDURE THIS DEPOSITION WAS:

TAKEN BY:   MS. FRANCES C. CARPENTER
            ATTORNEY FOR THE PLAINTIFF


REPORTED BY: Penny E. McAlister, CCR, NM CCR #250
            TRATTEL COURT REPORTING & VIDEOGRAPHY
            P.O. Box 36297
            Albuquerque, New Mexico  87176-6297

Plaintiff's Motion for Summary Judgment
Exhibit 11, Page 1 of 5

Electronically signed by Penny McAlister (301-012-776-0544)          e7102101-02d0-4d73-a06e-77ea09275beb

Hope Irvin, et al.  v. Katherine Wright, et al.
Donovan Ray Olvera

December 2, 2015
15cv00550 SCY-KBM

Page 6

1    know, because I want to be clear.
2         A. Yes, ma'am.
3         Q. Your counsel will be making objections. You can
4    still answer unless she directs you not to answer. The
5    last thing is, what did you prepare -- what did you do to
6    prepare for your deposition today?
7         A. I had an e-mail advising me of the meeting, and I
8    met up with -- with Stephanie yesterday.
9         Q. You don't need to tell me what you guys talked
10   about. What did you review in preparation for your
11   deposition today?
12        A. The SOP 2-13, which is the mental illness.
13        Q. Okay. Well, we'll jump in, and we'll talk about
14   that first then, if that's all right. Did you review
15   anything else, other than this SOP?
16        A. No, ma'am.
17        Q. Did you have an opportunity to look at any of the
18   video, lapel videos for the shooting?
19        A. No, ma'am.
20        Q. Any of the police reports or statements that were
21   given?
22        A. No, ma'am.
23        Q. Do you recall this incident?
24        A. Vaguely. I was a newly promoted lieutenant at
25   the time, so I vaguely remember it.

Page 7

1         Q. Let's talk about that before we -- before we get
2    into this SOP actually. The date of incident in this case
3    is July of 2013. In what capacity --
4              MS. CARPENTER: Am I right about that date,
5    Stephanie?
6              MS. GRIFFIN: July 5, 2013.
7              MS. CARPENTER: Thank you, Stephanie.
8         Q. What was your job title with APD at that time?
9         A. At that time, I was the lieutenant for the Crisis
10   Intervention Team.
11        Q. And what does that mean, being a lieutenant for
12   the Crisis Intervention Team?
13        A. I oversaw the team and the COAST Unit.
14        Q. What were your responsibilities and duties?
15        A. Just to make sure that their operations and their
16   needs are met in order to maintain the proper function of
17   the unit.
18        Q. And did you often go to calls?
19        A. No.
20        Q. Is that because you're not supposed to, or you
21   just didn't?
22        A. I have a sergeant that responds. So there is a
23   chain of command, and that's his responsibility, and his
24   responsibility is to report to me anything that needs to be
25   brought up to my attention.

Page 8

1         Q. Let me ask you about that a little bit. So in
2    some of the depositions -- like, for example, Officer
3    Altman, he was a sergeant during the time of this incident,
4    and he was explaining that because he's a sergeant,
5    sometimes, you know, you're listening to the calls --
6    you're always listening to the calls, and if it involves
7    one of your officers, depending on the nature of the call,
8    he may go out to the call or not.
9         Do you do that, as well? Are you always
10   listening to the calls that are coming through to see if
11   there is one for crisis intervention, if crisis
12   intervention is called?
13        A. No, ma'am. My unit is a follow-up team. So
14   they're not really out there taking calls for service. So
15   their -- the majority of their day is following up on
16   cases.
17        Q. The majority of the day is following up on cases?
18        A. Yes, ma'am.
19        Q. Can you explain to me what that means?
20        A. An officer will take a call involving an
21   individual who they believe may be suffering from some form
22   of mental illness. Once their report is generated, they
23   send it off to the CIT detective. The CIT detective will
24   follow up on that, as well, to either do a house visit and
25   make sure that that individual is okay, offer resources, or

Page 9

1    to see if a certification of evaluation is needed at the
2    time of his or her follow-up visit. So there are various
3    reasons for that.
4         Q. So let me give you an actual real example. In
5    this case, Mr. Wood -- there are several police reports
6    which indicate that Mr. Wood -- Mr. Wood's case -- I don't
7    know a better way of describing it. Let me know if you
8    don't understand what I'm saying, but there was -- for
9    example, there was a call involving Mr. Wood, who is the
10   deceased in this case.
11        He was found outside of a motel, and he was
12   rambling, and an officer responded. After speaking with
13   Mr. Wood, engaging with Mr. Wood, he decided to take
14   Mr. Wood to the VA Hospital, the mental health section of
15   the VA Hospital, and then in the report -- actually in the
16   report, it said forwarded to CIT Unit.
17        Is that what you mean when you say -- and I'm not
18   asking you to opine specifically on that case, but is that
19   typical what you would see -- your CIT Unit would see on a
20   report to follow up on, that it would say recommended or
21   referred to CIT?
22             MS. GRIFFIN: Objection; form and
23   foundation. Answer.
24        A. So it will go to CIT for them to -- for tracking
25   purposes, but not necessarily always a follow-up, because

3 (Pages 6 to 9)

Plaintiff's Motion for Summary Judgment
Exhibit 11, Page 2 of 5

Electronically signed by Penny McAlister (301-012-776-0544)

e7102101-02d0-4d73-a06e-77ea09275beb

Hope Irvin, et al.   v. Katherine Wright, et al.
Donovan Ray Olvera

December 2, 2015
15cv00550 SCY-KBM

---

Page 10

1  it just -- it just really depends on the case.
2      Q.  How does it get to CIT?  So if that officer in
3  that particular call made that referral to CIT, and then
4  CIT -- how would CIT have gotten that from that officer?
5      A.  He would -- or she would have forwarded it either
6  by e-mail.  I think it's by e-mail now, or forwarded a
7  hardcopy, interoffice it to the CIT Unit.
8      Q.  And then when the CIT Unit gets it, what happens
9  then?
10     A.  Again, if your example states that he went to the
11 VA's office, nothing, because there is nothing that the CIT
12 detective can do that the VA Hospital already hasn't.  So
13 the VA Hospital would have already offered the resources,
14 would have offered the psychological help that he or she
15 needed, the behavioral science that he or she needed, but
16 the officers do have knowledge of that individual.
17     Q.  Is Mr. Wood then put in a database, or is there
18 something -- is there some record or log of what CIT did?
19 Like if they got the report and looked at it and said,
20 okay, well, here is this report.  Mr. Wood was referred to
21 the VA.  Therefore, there is no further action necessary by
22 CIT.  Would there be some record of that?
23         MS. GRIFFIN:  Objection; form and
24 foundation.
25         A.  I don't know if they would have done it.  Again,

---

Page 11

1  I don't know in this situation.
2      Q.  Sure.
3      A.  If it's going to be followed up on, they will be
4  logging onto the tracking.
5      Q.  But if there is not going to be -- if it's not
6  going to be followed up on, is there a record of that?
7      A.  There was back then.  I don't know if it's still
8  there, because again, I'm not the chain of command.
9      Q.  Sure.
10     A.  It was just the sergeant would receive it, and
11 then he would document and decide whether it should be
12 followed up or not.
13     Q.  So no matter what, whether it was followed up or
14 not followed up, if a report is forwarded to the CIT Unit,
15 there should be some documentation from within the CIT Unit
16 that they received said report and that they either
17 followed up or didn't follow up.
18     A.  But I don't know how it's done now.
19     Q.  I'm not asking about now.  Let me make that
20 clear.
21     A.  Back then, it was.
22     Q.  Great.  So back then, that would have been the
23 protocol?
24     A.  The sergeant, if he were to assign it to
25 somebody, it would be on a tracking system.

---

Page 12

1      Q.  Now, what is that tracking system called?
2      A.  It's just his own -- at the time, it was an Excel
3  type sheet.
4      Q.  So what I'm trying to do during the course of
5  this deposition -- it's a course of discovery.  So I'm
6  actually trying to find out the words that I need to use or
7  otherwise so that I can explain that to Ms. Griffin, your
8  counsel, that I'm looking for these certain things.
9          So that's why I'm asking you for specifics,
10 because I want to be clear with Stephanie, your counsel,
11 what I'm asking for and what I'm looking for after the
12 course of this deposition.  Okay.  So I need to get the
13 database, you know, showing -- so can you -- what would
14 I -- what would I ask for if I was looking for the
15 sergeant's notes and Excel spreadsheet?  How would that be?
16     A.  I don't know.  I'm not there anymore, so I don't
17 know how they do it now.  I haven't been there in quite a
18 while.
19     Q.  Do you know who the sergeant was in charge of CIT
20 in 2013?
21     A.  Sergeant John Gonzales.
22     Q.  Sergeant John Gonzales.  Now, did Mr. Gonzales --
23 did he do all of the reports follow-up, or is there
24 somebody else that also would have been handling them?  Do
25 you know?

---

Page 13

1      A.  You would have to ask him.  He -- at the time, he
2  had it, and he could have delegated that responsibility,
3  but that's something you go would have to ask him.
4      Q.  Were there any other -- in 2013, were there any
5  other sergeants with the CIT Unit?
6      A.  No, ma'am.
7      Q.  So CIT Unit only has one sergeant?
8      A.  Correct.
9      Q.  And is that still true today?
10     A.  I believe so, yes, ma'am.
11     Q.  And then there is a lieutenant, which is you now;
12 right?
13     A.  No.  I'm not there.  I haven't been there in over
14 a year now.
15     Q.  Oh, okay.  But in 2013, you were the lieutenant?
16     A.  I was the lieutenant, yes, ma'am.
17     Q.  Got it.  I understand.  Let's go back to that
18 Excel spreadsheet.  You said that if he would have made
19 notes or transferred the report, or you know, otherwise
20 documented the need or lack of need for follow-up, it would
21 be on some sort of a spreadsheet or some sort of a
22 document?
23     A.  Again --
24         MS. GRIFFIN:  Objection; form and
25 foundation.

---

4 (Pages 10 to 13)

Trattel Court Reporting & Videography
505-830-0600

Electronically signed by Penny McAlister (301-012-776-0544)                                                                                    e7102101-02d0-4d73-a06e-77ea09275beb

Hope Irvin, et al.   v. Katherine Wright, et al.
Donovan Ray Olvera

December 2, 2015
15cv00550 SCY-KBM

---

Page 42

1  that now would be the lieutenant for that unit now, which
2  is Lieutenant Glen St. Onge.  He has much more knowledge
3  than I do on this.
4      Q.  Your knowledge, I'm sure will suffice.  So it's a
5  Proto page.  It's a website.  You log onto that.
6      A.  Right.
7      Q.  And then when you log on, you have to use your
8  particular officer's user name?
9      A.  I think so.  I haven't used it in a long time.
10  I'm not out in the field.  I'm not an investigating
11  detective.  I don't input data into there.  So I don't
12  really know how to get in there, to be honest with you.
13      Q.  Well, earlier, you were saying that the officer
14  had a user name --
15      A.  I think so --
16      Q.  -- to log on; right?
17      A.  -- but I could be wrong.
18          MS. GRIFFIN:  Can you please wait for her to
19  finish her question and then answer.
20      Q.  And then when the officer logs on, they can then
21  put in the individual's name, like Vincent Wood, for
22  example?
23      A.  Yes.
24      Q.  Because you were saying that -- I mean, I think
25  it sounds great that you no longer have these hard files.

---

Page 43

1  You're looking for someone and say -- so am I correct in
2  saying this officer receives a call about a particular
3  individual, and then that officer says, okay, well, I'm
4  going to put that into the system, and then the system
5  would show if he would -- another officer, detective, for
6  example, had put his name in before, that would show up?
7      A.  I think what it does is it shows the detective is
8  following up on that individual, the CIT detective is
9  following up on that individual.
10      Q.  And that CIT Share Point, that was put in place
11  roughly, you think, maybe by May or June, or before that?
12      A.  Oh, no, way longer after that.  It had to be.
13  God, I want to say probably by November or December of
14  2013, it was actually in place.
15      Q.  It was fully operational and ready by November of
16  2013?
17      A.  I don't want to give you an exact date, but I
18  would say somewhere around there.
19      Q.  What about in July?  What system was in place in
20  July of 2013 to track individuals such as Mr. Wood, who had
21  mental health issues?
22          MS. GRIFFIN:  Object to form.
23      A.  You would contact the CIT detective.
24      Q.  So if I wanted to know if there was a
25  particular -- if Mr. Wood was being tracked, if there was a

---

Page 44

1  flag on him, I would have to contact a particular
2  detective?
3      A.  Correct.
4      Q.  And that detective would have to look at the hard
5  paper; right?
6      A.  At their files, yes, ma'am.
7      Q.  At their files.  Okay.  So let me ask you about,
8  if you know, if dispatch -- if someone called dispatch and
9  said -- if Mr. Wood had been identified by name -- in other
10  words, this man, Mr. Vincent Wood, is causing a
11  disturbance, and he is 10-40, would dispatch, if you know,
12  have the ability to go into any system like -- and I'm
13  talking about July of 2013, and find his name anywhere?  I
14  mean, did dispatch have access to the Share Point or the
15  Guardian system to see if this person --
16      A.  I don't know the answer to that, to be honest
17  with you.
18      Q.  No worries.  That's fine.  So going back to
19  Exhibit 11 that's in front of you, this SOP indicates that
20  there is a Project Guardian.  Do you see that very last
21  section there?  It says Project Guardian?
22      A.  Yes, ma'am.
23      Q.  Do you know if this SOP has changed since there
24  is no longer Project Guardian to indicate Share Point?
25      A.  I don't think it has.  This is the most recent

---

Page 45

1  one.  This is the one that's on there.
2      Q.  There is no longer -- Project Guardian is no
3  longer; correct?
4      A.  You have to contact the CIT.  I don't know what
5  it is now.
6      Q.  But there is not a Project Guardian?
7      A.  We weren't using it when I was there.  So I don't
8  know if they're going back to it.  I don't know the answer.
9  You would have to contact either the commander or the
10  lieutenant.
11      Q.  When you first got there, and you said maybe May
12  of 2013, there was a Project Guardian; correct?
13      A.  There was, but like I say, we were transitioning
14  over to the data Share Point.
15      Q.  Do you know if there was any -- if the data that
16  was in the Project Guardian got transferred?
17      A.  I don't know.
18      Q.  Now let's turn the page to the second page, and
19  up above, it says "Recognizing Abnormal Behavior."  Do you
20  see that?
21      A.  Yes, ma'am.
22      Q.  Have you reviewed this already when you were
23  preparing for your deposition, or do you want some time to
24  take a look at it now?
25      A.  I can go over it now.

---

12 (Pages 42 to 45)

Trattel Court Reporting & Videography
505-830-0600

Electronically signed by Penny McAlister (301-012-776-0544)                                    e7102101-02d0-4d73-a06e-77ea09275beb

Hope Irvin, et al.  v. Katherine Wright, et al.
Donovan Ray Olvera

December 2, 2015
15cv00550 SCY-KBM

---

Page 46

1     Q.  Okay.  Great.  So is this just for officers who
2 have special CIT training, or is this for all officers in
3 the academy, that they're responsible to know this?
4     A.  It's for all officers.
5     Q.  You don't have to have any special CIT training
6 to -- to know this?
7     A.  Correct.
8     Q.  Got it.  So officers -- just regular field
9 officers such as Officer Bludworth are responsible for
10 knowing this particular provision of this SOP?
11     A.  Correct.
12     Q.  Now let's go to Page 3.  Do you see where it says
13 "2-13-03, Handling the Mentally Ill, Suspected Mentally
14 Ill"?
15     A.  Yes, ma'am.
16     Q.  Do you see where it says "If the officer
17 determines that a subject may be mentally ill, the officer
18 will attempt to respond in the following manner:  Ensure
19 that backup officers are present before taking any action."
20 Do you see that?
21     A.  Yes, ma'am.
22     Q.  Again, same question.  Is this something that
23 field officers are responsible for knowing?
24     A.  Yes, ma'am.
25     Q.  Do you see where it says, "Subsection C, Calm the

Page 47

1 situation, cease emergency lights and sirens, assume a
2 quiet, nonthreatening manner when approaching the subject"?
3     A.  Yes, ma'am.
4     Q.  Do you agree or disagree with that?
5     MS. GRIFFIN:  Object to form.
6     A.  When it's a call for mentally ill specifically, I
7 agree with it.
8     Q.  So when you say it's a call just for mentally
9 ill, what do you mean by that?
10     A.  If it's an individual where a call is -- he's
11 outside talking to an invisible person, and that's the
12 call, the neighbors are concerned for his welfare, that
13 would be an approach to me.
14     Q.  So if it's a welfare call that you just
15 described, definitely that's the approach to take.  What
16 about the facts that I gave you earlier, the scenario such
17 as in this case, when Mr. Wood is standing outside the
18 convenience store?  And I've already told you what dispatch
19 relayed, and I'm happy to show you the call, because we
20 have it here marked as an exhibit.
21     MS. GRIFFIN:  Object to form, foundation.
22     A.  Again, the call was an individual putting knives
23 out, so I would have no issues with the lights and sirens
24 going to make sure everyone is okay.
25     Q.  Did you receive any training on the American With

Page 48

1 Disabilities Act?
2     A.  I don't remember.  Like as a lieutenant, no.
3 Maybe in the academy I did.  You're talking 17 years ago,
4 so I may have in the academy.  I'm not sure.
5     Q.  Did the American With Disabilities Act -- well,
6 let me back up and ask you a couple of questions for
7 foundation on this question.  Tell me about your career
8 with APD and how you've moved up the ranks.  You graduated
9 from the academy in '99; right?
10     A.  Yes, ma'am.
11     Q.  Tell me what you did after that.  You were a
12 field service officer; right?
13     A.  Yes, ma'am.  From '99 to 2001, I was a field
14 service officer.
15     Q.  And then where were you assigned?  What was your
16 bid?
17     A.  The Southeast and the Northeast.
18     Q.  And what did you do after that?
19     A.  I went to the DWI Unit.
20     Q.  And what were the years that you were in the DWI
21 Unit?
22     A.  2001 to 2006.
23     Q.  Were you still -- is it a P1C?
24     A.  Correct.
25     Q.  So field services officer still with the DWI Unit

Page 49

1 as a P1C, and what happens -- what did you do after that?
2     A.  I went to the narcotics unit, special
3 investigations.
4     Q.  Did you move up the ranks at that point?
5     A.  No, a detective at that point.
6     Q.  Okay.  A detective.  Is that not a move up the
7 ranks?
8     A.  It's the equivalent to a P1C.
9     Q.  It is?  Okay.  But you're no longer a field
10 service officer at that point; is that right?
11     A.  Correct.
12     Q.  How long were you doing that, Officer?
13     A.  Two years.
14     Q.  Two years.  So is it fair to say 2006 to 2008?
15     A.  Yes, ma'am.
16     Q.  And then what about after that?
17     A.  I was promoted to sergeant, back to the Field
18 Services in Valley Area Command.
19     Q.  How long did you do that?
20     A.  I want to say a year.
21     Q.  So maybe 2008 to 2009?
22     A.  Correct.
23     Q.  What did you do after that?
24     A.  Sergeant for property crimes.
25     Q.  Any particular area command or --

13 (Pages 46 to 49)

Trattel Court Reporting & Videography
505-830-0600

Plaintiff's Motion for Summary Judgment
Exhibit 11, Page 5 of 5